UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                        )
UNITED STATES OF AMERICA,               )
                                        )
        v.                              )        Criminal No. 11-0106 (PLF)
                                        )
ALI MUHAMED ALI,                        )
                                        )
        Defendant.                      )
_____)


                        OPINION AND ORDER

        This matter is before the Court on Defendant Ali Muhamed Ali's motion for bond

review filed on June 7, 2011.  The government filed an opposition to that motion, and the Court

held a hearing on the motion on June 17, 2011.  Upon consideration of the testimony presented

by counsel for the defendant and the evidence, arguments and proffers presented by counsel for

the defendant and counsel for the government, the Court will deny the motion.[1]


                        I.  BACKGROUND

        A four-count superseding indictment was returned by a grand jury against

defendant Ali Muhamed Ali on April 29, 2011.  The first count charges him with conspiracy to

commit piracy under the Law of Nations, in violation of 18 U.S.C. § 371; the second count with

piracy under the Law of Nations and aiding and abetting and causing an act to be done, in

---

[1]      The papers considered in connection with this matter include: The Superseding
Indictment ("Indictment"); the Government's memorandum and proffer in support of pretrial
detention ("Gov't. Mem."); Defendant's motion for bond review ("Def. Mot."); the
Government's memorandum in opposition to Defendant's motion for bond review ("Opp.
Mem."); and the exhibits and supplemental exhibits submitted by the parties, including a number
of letters from members of Mr. Ali's community contained in a Notice of Supplemental Exhibits
filed on June 23, 2011.

violation of 18 U.S.C. §§ 2 and 1651; the third count with attack to plunder a vessel and aiding

and abetting and causing an act to be done, in violation of 18 U.S.C. §§ 2 and 1659; and the

fourth count with hostage taking and aiding and abetting and causing an act to be done, in

violation of 18 U.S.C.

§§ 2 and 1203.

The indictment alleges that Mr. Ali took part in the hijacking of the *M/V CEC

Future*, a Bahamian-flagged vessel owned by the Danish company Clipper Group A/S. The *CEC

Future* was captured in the Gulf of Aden outside of the territorial waters of any country on

November 7, 2008, and the ship and its crew were held until January 16, 2009.  Mr. Ali boarded

the ship on November 9 or 10, 2008 and communicated with the owners of the *CEC Future* on

numerous occasions to make ransom demands on behalf of the hijackers.  Negotiations between

Mr. Ali and Clipper Group A/S continued for several weeks until the company delivered 1.7

million U.S. dollars as ransom on January 14, 2009.  The ship and crew were released two days

later.

## II.  THE BAIL REFORM ACT

Our system of criminal justice embraces a strong presumption against detention.

"'In our society, liberty is the norm, and detention prior to trial or without trial is the carefully

limited exception.'" United States v. Gloster, 969 F. Supp. 92, 96-97 (D.D.C. 1997) (quoting

United States v. Salerno, 481 U.S. 739, 755 (1987)).  The Bail Reform Act of 1984, 18 U.S.C.

§ 3142 et seq., sets forth the limited circumstances in which a defendant may be detained before

trial despite the presumption in favor of liberty.  See 18 U.S.C. § 3142(a).  The Act allows the

Court to order pretrial detention when it finds that "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(e)(1); see United States v. Simpkins, 826 F.2d 94, 96 (D.C. Cir. 1987). The Act requires the Court to consider four factors in determining whether a defendant is a risk of flight or danger to the community: the nature and circumstances of the offense charged, "including whether the offense is a crime of violence . . . [or] a Federal crime of terrorism;" the weight of the evidence against the defendant; the history and characteristics of the defendant; and the nature and seriousness of the danger to any person or the community that would be posed by the defendant's release. 18 U.S.C. § 3142(g). The government must demonstrate that the defendant is a flight risk under by a preponderance of the evidence, or that he poses a danger to the community by clear and convincing evidence. See United States v. Brown, 6 Fed. Appx. 5, 5-6 (D.C. Cir. 2001); United States v. Vortis, 785 F.2d 327, 328-29 (D.C. Cir. 1986), cert. denied, 479 U.S. 841 (1986).

Subject to rebuttal by the defendant, the Bail Reform Act contains a presumption that a defendant cannot be released where the Court finds that there is probable cause to believe that he has committed an offense listed in 18 U.S.C. § 2332b(g)(5)(B) for which a maximum term of imprisonment of 10 years or more is prescribed. See 18 U.S.C. § 3142(e)(3)(C). Hostage taking under 18 U.S.C. § 1203 is one such listed offense, see 18 U.S.C. § 2332b(g)(5)(B), and Section 1203(a) prescribes a maximum sentence of life imprisonment after conviction. See 18 U.S.C. § 1203(a). The indictment, "fair upon its face," furnishes probable cause to believe that the defendant committed the charged act. United States v. Mosuro, 648 F.Supp. 316, 318 (D.D.C. 1986) (quoting Gerstein v. Pugh, 420 U.S. 103, 117 n. 19 (1975));

3

see also United States v. Smith, 79 F.3d 1208, 1210 (D.C. Cir. 1996). Once a rebuttable presumption is created, it imposes a burden of production on the defendant to offer contrary credible evidence. See United States v. Alatishe, 768 F.2d 364, 371 (D.C. Cir. 1985). Even if such contrary evidence or credible proffers are offered, the presumption remains as a factor to be considered by the Court amongst others in determining whether the defendant should be detained. United States v. O'Brien, 895 F.2d 810, 815 (1st Cir. 1990); United States v. Narain, Civil Action No. 07-059, 2007 WL 1169335, at *1 (D.D.C. Apr. 19, 2007).[2]

## III. THE PARTIES' ARGUMENTS

### A. Nature and Circumstances of the Offense

Mr. Ali concedes that piracy and hostage taking are "stark and violent crimes," but argues that he was not part of the contingent that attacked and hijacked the ship. He asserts that he had no prior knowledge of the plan, and points out that he performed a nonviolent and neutral role as negotiator. Def. Mot. at 10-11. At the hearing, Mr. Ali introduced multiple audio recordings between himself and the Clipper Group's negotiator in which he asserts that he consistently identified himself as independent from the pirates and voiced concern that they would harm him. The Court finds no such consistency in these audio tapes. See infra at 8. The

---

[2]    At oral argument, defendant's counsel posited that the rebuttable presumption functions as a "bursting bubble" that ceases to exist once a defendant produces any credible evidence. Although the D.C. Circuit has not expressly ruled on this issue, see United States v. Alatishe, 768 F.2d at 371 n. 14, circuits that have considered the issue require using the presumption as a factor even after the defendant has produced credible evidence, see United States v. Portes, 786 F.2d 758, 764 (7th Cir. 1986), as do judges of this Court. See United States v. Bess, 678 F. Supp. 929, 934 (D.D.C. 1988) ("[The presumption] is incorporated into the § 3142(g) factors considered by the court when determining whether conditions of release can be fashioned or whether the defendant must be detained pretrial.").

government responds that negotiations for a ransom are necessary for piracy to succeed, that without them there would be no point in violently capturing a ship, and that the evidence shows that the defendant was actively involved in negotiations on behalf of the pirates, not as a neutral party.  Opp. Mem. at 7-8.

Mr. Ali also contends that the seriousness of the charges actually weighs against his risk of flight.  Because the United States has taken a strong public stance against piracy, he argues, even if Mr. Ali flees to Somalia he will be tracked down and returned to the United States. Def. Mot. at 12.

## B.  Weight of the Evidence

The government maintains that the evidence against Mr. Ali is quite substantial; it includes eyewitness testimony and documentary proof of Ali's role as negotiator for the pirates and Ali's own statements to the media and law enforcement admitting his role in the piracy.  The government also points out that Mr. Ali was separately paid $75,000 by the Clipper Group.  Opp. Mem. at 8.  Mr. Ali contends that this $75,000 was voluntarily given to him by the company for diffusing the negotiations; he was paid nearly two weeks after hostages were released.  Mr. Ali also provides a letter from the CEO of the Clipper Group, Per Gullestrup, thanking Mr. Ali for improving the conditions of the crew and stating that Mr. Ali "has at no point asked for any kind of compensation." Def. Mot. at 13-14.  In response to the letter, the government represents that it subsequently contacted Mr. Gullestrup, and he expressed approval of Mr. Ali's arrest.  Mr. Ali's counsel states that he also spoke with Mr. Gullestrup, who qualified his statement to the

government, saying that he was speaking generally about the prosecution of piracy by the United States.

*C. History and Characteristics of the Defendant*

Mr. Ali maintains that he has significant ties to the United States and is well regarded both in the United States and in Somaliland. He lived in the United States for 26 years and has numerous friends and family members in the Washington metropolitan area, two of whom testified as to his good reputation amongst the Somali-American community and one of whom offered to have Mr. Ali live with him if released on bond. Mr. Ali returned to Somalia in 2007 to care for his young son, for whom Mr. Ali is pursing asylum. Until shortly before his arrest, Mr. Ali was Somaliland's Director General of the Ministry of Education and participated in programs to expand Somaliland's primary school education programs. Def. Mot. at 3-4. Mr. Ali also points out that he has no prior criminal record and has a history of attending court proceedings. Id. at 6-7. Finally, he has submitted a number of letters of support from individuals in the Somali-American community attesting to Mr. Ali's good character and integrity.

The government argues that Mr. Ali has no property or funds in the United States; that he was fired from his position in Somaliland; and that he has engaged in fraudulent behavior as determined by the Immigration and Naturalization Service ("INS"). Mr. Ali submitted to INS that he was an agricultural worker in order to change his immigration status, but the affidavits in support of Mr. Ali's claim were found to be fraudulent. Similarly, Mr. Ali provided a document, stating that he was awarded a no-fault divorce overseas, which INS determined was fraudulent. Opp. Mem. at 10-11. Many of Mr. Ali's immigration documents list different birth dates and

places of birth, although Mr. Ali contends that these are clerical errors.  See id. at 11-12; Def.

Mot. at 7-8.  The government also determined that Mr. Ali was in the process of purchasing fake

degrees online when he was arrested.  Opp. Mem. at 11.  Finally, Mr. Ali used an alias when

negotiating with the company for release of the hostages, although he contends he did so because

of his fear of the pirates, not to mask his identity to the Clipper Group or to law enforcement, as

evidenced by his willingness to discuss the event with the media and with law enforcement.

Def. Mot. at 9-10.

### D.  Danger to the Community

In contending that he is not dangerous, Mr. Ali points to his lack of a criminal

record or history of violence.  Def. Mot. at 14.  The government argues that Mr. Ali would have a

significant incentive to flee and rejoin the pirates, as they would provide a means of protection

and income, and would thus pose a danger to the seafaring community along the coast of Africa.

Opp. Mem. at 13.

### IV.  DISCUSSION

The gravity of the charges Mr. Ali faces and the presumption in favor of detention

they create weigh heavily against release.  Although Mr. Ali has no criminal history in this

country and apparently is well regarded both here and in Somaliland, his past misrepresentations

to the INS are a concern for this Court.  Furthermore, he currently resides in Somalia, and, if he

fled, recapture would pose a particular difficulty, despite Mr. Ali's contentions to the contrary.

As the government points out, there exists no extradition treaty between the United States and

Somalia, and "there is limited lawful authority in Somalia, making it unreasonable to expect the

government to be willing to assume the tremendous logistical burden of undertaking an operation to procure the defendant's presence from abroad through other means." Gov't. Mem. at 8.

As for the weight of the evidence, the evidence and proffers presented by the parties demonstrate clearly that Mr. Ali acted as negotiator between the pirates and the company for the payment of ransom in exchange for the hostages on board the ship. The parties differ drastically, however, on what the evidence signifies. Counsel for Mr. Ali says he was a neutral go-between who acted courageously at great personal risk. See Def. Mot. at 12-13. The government and the grand jury that found probable cause to indict Mr. Ali for piracy and hostage taking, by contrast, believe the evidence shows Mr. Ali to have been "a willing participant in a ransom scheme." Opp. Mem. at 7. While both parties rely on audio tapes, the government also relies on eyewitness testimony and Mr. Ali's admission to the media and law enforcement of his active involvement in these criminal acts. Id. at 8. The Court has viewed the excerpts from the audio tapes counsel for the defendant has chosen to show and has read the transcripts of those tapes. They hardly provide the dramatic support for Mr. Ali's position that he suggests. In the Court's view, whether he was a neutral middleman or an active conspirator remains an open question, one which a jury ultimately will be called upon to decide.[3]

In United States v. Anderson, 384 F. Supp. 2d 32, 35 (D.D.C. 2005), this Court found the defendant a flight risk despite his being charged with nonviolent crimes and having no prior criminal history. The factors which led the Court to deny release in that case included Mr. Anderson's ability to flee by use of assets abroad, connections overseas, and aliases;

---

[3]     As for Mr. Gullestrup's views, see supra at 5-6, the Court can make no finding as to what his position is at this point in light of the conflict in the proffers presented by the parties. His views would not be determinative in any event.

evidence of his interest in fleeing; the length of the sentence he faced if convicted; his lack of ties

to the District of Columbia; and his persistent lack of candor and good faith in his dealings with

the government.  Id. at 36.  Here, Mr. Ali similarly lacks current ties to the Washington

metropolitan region and to the United States.  Mr. Ali has significant contacts overseas, as he

resides in Somalia, where his young son remains.  And, according to the government, his

overseas contacts include pirate organizations, which would be of immense assistance in

enabling Mr. Ali to escape the reach of the United States.  Opp. Mem. at 13.  Although Mr. Ali

has not demonstrated an interest in fleeing, he has strong incentives to do so — to be reunited

with his six-year old son in Somalia and to avoid a mandatory life sentence.  Furthermore,

Mr. Ali has previously used aliases and has misrepresented himself in past dealings with the INS.

Such past acts of deception provide evidence supporting the presumption that Mr. Ali poses a

risk of flight.  See United States v. Khanu, 370 Fed. Appx. 121, 122 (D.C. Cir. 2010).

Mr. Ali argues that this case is similar to United States v. Karni, 298 F. Supp. 2d

129 (D.D.C. 2004), and United States v. Hanson, 613 F. Supp. 2d 85 (D.D.C. 2009). In Karni,

the defendant was charged with acquiring products that are capable of triggering nuclear weapons

and exporting them to Pakistan.  United States v. Karni, 298 F.Supp.2d at 130.  Because the

charge was nonviolent in nature — and the Court had been provided with letters of support

attesting to Mr. Karni's nonviolent nature — and Mr. Karni had no criminal history, there was no

rebuttable presumption at play in Karni, as there is here.  Id. at 131-32.  Although Judge Hogan

acknowledged a risk of flight in view of Karni's lack of ties to the United states, he released him

under stringent conditions, including home detention and electronic monitoring.  Id. at 133.  In

Hanson, the defendant was charged with illegally exporting unmanned aerial vehicle autopilot

components.  United States v. Hanson, 613 F. Supp. 2d at 87.  Ms. Hanson also had no criminal

history and was charged with a nonviolent crime, so, as in Karni, the Court had no need to

consider the statutory rebuttable presumption.  Ms. Hanson, unlike Mr. Karni, did have

significant ties to the United States, as she lived with her husband in the District of Columbia,

owned a home in California, and was a naturalized U.S. citizen.  Id. at 88-89.  Despite the fact

that she also had very significant ties to China, including property and close relatives there, the

Court released Ms. Hanson on conditions including home detention with electronic monitoring

and a substantial bond.  Id. at 91.

       Both Karni and Hanson are distinguishable from this case.  First, neither involved

a charge that triggers the statutory presumption under which the Court presumes at the outset that

there is no condition or combination of conditions under which the defendant can be released.

See 18 U.S.C. § 3142(e)(3)(C).  Even with the defendant's evidence and proffers, that

presumption is incorporated into the other factors considered by this Court in determining

whether to grant a conditional release and is given substantial weight.  United States v. Bess, 678

F. Supp. at 934.  Second, neither Mr. Karni nor Ms. Hanson was involved in a violent criminal

enterprise, nor was the Court presented with evidence of past acts of fraud and misrepresentation.

Third, Mr. Ali has no significant ties to the United States.  He left the District of Columbia four

years ago; he has no property here and no apparent funds.  All of his immediate family members

are outside the United States.  Finally, Mr. Ali faces a very significant sentence in this case: a

piracy conviction carries with it a mandatory life sentence, and hostage taking carries a sentence

of any number of years up to life.  By contrast, Ms. Hanson faced a maximum sentence of twenty

years, United States v. Hanson, 613 F. Supp.2d at 87; see 50 U.S.C. § 1705, and Mr. Karni was

charged under the same Act. As this Court stated in <u>Anderson</u>, "[t]he gravity of the offenses and the potential prison term . . . also create a considerable incentive . . . to avoid prosecution and the likelihood of imprisonment in the event of a conviction." <u>United States v. Anderson</u>, 384 F. Supp.2d at 36. Here, the potential term is significantly greater than in <u>Anderson</u>, where the defendant faced up to 23 years in prison. <u>Id</u>. at 35. Mr. Ali faces mandatory life in prison.

Mr. Ali suggests that conditions including home detention with electronic monitoring, waiver of extradition rights, and release into the custody of a third party are sufficient to assure his appearance. A general waiver of extradition would be effective only if Mr. Ali were to seek refuge in a country whose laws recognize such a waiver, and only if Mr. Ali were actually apprehended in that country. <u>See</u> <u>United States v. Anderson</u>, 384 F. Supp. 2d at 41. The country Mr. Ali would most likely flee to, given his significant ties, is Somalia, where it is unlikely that Mr. Ali would be apprehended, let alone extradited. <u>See</u> <u>supra</u> at 7-8. Furthermore, electronic monitoring would give Mr Ali ample lead time if he wished to flee the country. <u>See</u> <u>United States v. Townsend</u>, 897 F.2d 989, 994-95 (9th Cir. 1990) ("Nor does the wearing of an electronic device offer assurance against flight occurring before measures can be taken to prevent a detected departure from the jurisdiction."); <u>United States v. Anderson</u>, 384 F. Supp. 2d at 41 (conventional electronic monitoring would still "give him ample lead time if he wanted to flee").

The Court finds that the factors which justified conditionally releasing the defendants in <u>Karni</u> and <u>Hanson</u> are not present here. Although Mr. Ali has no prior criminal record, the charges he faces carry a maximum sentence of life imprisonment and a presumption that no conditions will assure his appearance. This presumption functions as evidence that Mr. Ali poses a flight risk. <u>See</u> <u>United States v. Bess</u>, 678 F. Supp. at 934. Mr. Ali has not lived

in the United States for several years since he returned to Somalia in order to care for his young son, and this continues to be an impetus for him to leave this country. Furthermore, Mr. Ali has repeatedly shown a willingness to misrepresent himself in his dealings with this government in presenting fraudulent documents to the INS. The gravity of the charges, the potential length of Mr. Ali's sentence, his ties abroad, his past acts of misrepresentation, and the presumption created by the charges against him all lead the Court to find by a preponderance of the evidence that Mr. Ali poses a serious flight risk.[4]

## V.  CONCLUSION

For the above reasons, this Court finds that no condition or combination of conditions will reasonably assure the appearance of the defendant as required in this case and therefore will deny Defendant's motion for an order setting forth conditions of release. Accordingly, it is hereby

ORDERED that Defendant Ali Muhamed Ali's Motion for Bond Review and to Impose Conditions of Release [19] is DENIED; and it is

FURTHER ORDERED that the defendant shall be detained pending trial in this matter.

SO ORDERED.

/s/
‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾
PAUL L. FRIEDMAN
DATE:  June 24, 2011                    United States District Judge

‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾

[4]        The government has also suggested both in its brief and at oral argument that Mr. Ali may be a danger to the seafaring community along the coast of Africa.  See Opp. Mem. at 13. The Court need not reach this issue and decides this motion on the basis of risk of flight alone.