**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| |
|---|
| **UNITED STATES OF AMERICA** |
| **v.** |
| **ALI MOHAMED ALI,** |
| ***Defendant*.** |

**Criminal No. 11-0106**

<u>**REDACTED MEMORANDUM OPINION**</u>[*]

  Defendant Ali Mohamed Ali is charged with conspiracy, aiding and abetting, piracy, and

hostage taking as a result of the hijacking of the M/V *CEC Future*, a Bahamian-flagged cargo

ship owned by Clipper Group A/S, a Danish company.[1]  On November 7, 2008, the *CEC Future*

was sailing in the Gulf of Aden, off the coast of Yemen, when it was seized by Somali pirates.

The pirates forced the crew to navigate the ship to Point Raas Binna, near the Somali coast.

There, sometime on November 9 or 10, Ali boarded the ship before it sailed to waters near Eyl,

Somalia.  The government alleges that while the ship was under the pirates' control, Ali

communicated ransom demands from the pirates to Clipper.  Initially, Ali communicated with

"Steven," a negotiator hired by Clipper, but as the incident wore on, Ali began communicating

directly with Per Gullestrup, Clipper's CEO.  The government further alleges that, as Ali

negotiated a ransom of $1.7 million for the release of the ship, he also negotiated a separate

---

[*] The Court filed this Memorandum Opinion under seal on May 25, 2012 [Dkt. No. 183] because
many of the pleadings it addressed were sealed.  Based on input from the parties, the Opinion is
now being made public in redacted form.  It will be released in full once trial in this matter is
underway.

[1] *See* Second Superseding Indictment, May 8, 2012 [Dkt. No. 172] ("Ind.").

payment of $75,000 for himself.  On January 16, 2009, after Clipper paid the $1.7 million, Ali

and the pirates disembarked the ship.  Ali allegedly received the $75,000 from Clipper on or

about January 27, 2009.

Before the Court are two motions in limine brought by the government seeking to

preclude the admission of certain evidence relating to Ali's mental state;[2] defendant's motion for

the admission of other acts evidence;[3] and defendant's motion to suppress evidence which he

alleges was illegally obtained.[4]  For the reasons stated below, the Court will deny the

government's motions in limine, grant the defendant's motion for the admission of other acts

evidence, and deny the defendant's motion to suppress.

---

[2] *See* Government's Motion in Limine to Preclude Reliance on a ▮▮▮▮▮▮▮▮▮▮▮ or to
Introduce Evidence of Previous Association with ▮▮▮▮▮▮▮▮▮▮▮, March 1, 2012
[Dkt. No. 161] (under seal); Government's Motion in Limine to Preclude Certain Defense
Arguments and Evidence, March 2, 2012 [Dkt. No. 116] ("Gov't Omnibus Mot."); Defendant's
Omnibus Opposition to the Government's Motions In Limine Concerning Exculpatory Evidence,
March 13, 2012 [Dkt. No. 132] ("Def. Omnibus Opp'n") (under seal); Government's Reply to
Defendant's Opposition to Government's Omnibus Motion in Limine, March 26, 2012 [Dkt. No.
152] ("Gov't Omnibus Reply") (under seal).

[3] *See* Defendant's Motion and Proffer Regarding Rule 404(b) Evidence and Witnesses, April 26,
2012 [Dkt. No. 167] ("Def. 404(b) Mot.") (under seal).

[4] *See* Defendant's Omnibus Motion to Suppress Evidence, March 6, 2012 [Dkt. No. 129] ("Def.
Mot. to Suppress") (under seal); Government's Opposition to Defendant's Motion to Suppress
Physical Evidence, March 12, 2012 [Dkt. No. 133] ("Gov't Suppression Opp'n") (under seal);
Defendant's Reply Memorandum in Support of Defendant's Omnibus Motion to Suppress
Evidence, March 26, 2012 [Dkt. No. 152] ("Def. Suppression Reply") (under seal); Defendant's
Supplemental Memorandum in Support of Defendant's Omnibus Motion to Suppress Evidence,
April 26, 2012 [Dkt. No. 168] (under seal); Government's Reply to Defendant's Supplemental
Memorandum In Support of Defendant's Omnibus Motion to Suppress Evidence, May 9, 2012
[Dkt. No. 173] ("Gov't Supp. Suppression Mem.").

## FACTUAL BACKGROUND

Ali was born in Yemen on June 26, 1962.  (Def. Mot. to Suppress, Ex. 2 at 1.)  He spent most of his childhood in Mogadishu, Somalia, before coming to the United States in December 1981 on a student visa and subsequently attaining asylee status. ███████████████

████████████████████████████████████

████████████████████████████████

████████████████████████████████

██████████████████████████

In 2001, Ali moved to Memphis, Tennessee, where he worked for a wireless telephone company. ██████████████████████████████

██████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

██████████████████████████████

████████████████████████████

█████████

In 2005, Ali moved to Washington, D.C., where he worked as a taxi cab driver. ████

████████████████████████████████

████████████████████████████████

████████████████████████████████

█████████████████████



Among his purported anti-piracy efforts, Ali includes his role in the *CEC Future* incident, as well as in a number of other piracy incidents.  In June 2008, before the *CEC Future* was hijacked, Somali pirates attacked the *Rockall*, and took its owners, a German couple, to shore in Somalia and held them there.  (Defendant's Motion for a Deposition Under Federal Rule of Criminal Procedure 15, March 6, 2012 [Dkt. No. 128] (under seal), Ex. 2 at 1.)  Ali was asked by

4

a friend to assist in negotiating the couple's release.  (*Id.* at 1–2; *see* Def. Mot. to Suppress at 6–7.)  In July 2008, Ali traveled to the area where they were being held, camped with them, brought them medicine and supplies, and acted as a go-between for the German government and the kidnappers.  (*Id.*; *see* Def. Mot. for Pretrial Rel., Exs. 1, 2, 10, 11.)  The couple was released in August 2008 after a $1 million ransom was paid.  (Def. Mot. to Suppress, Ex. 2 at 3.) ███

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

██████████████████████████

A day or two after Ali boarded the *CEC Future*, on November 11 or 12, 2008, Somali pirates captured the *M/V Karagöl*, a chemical tanker owned by a Turkish company, and forced its captain to navigate the ship to an area near Eyl where it dropped anchor next to the *CEC Future*.  (*Id.*, Ex. 2 at 4; Government's Motion in Limine to Introduce Direct Evidence of the Conspiracy, March 2, 2012 [Dkt. No. 117] ("Gov't *Karagöl* Mot.") at 2.)  Ali alleges that one of the *CEC Future* pirates ordered Ali to board the *Karagöl* and translate demands from those pirates to the Turkish company.  (Def. Mot. to Suppress, Ex. 2 at 4, 6; *see id.*, Ex. 9 at 1268; Gov't *Karagöl* Mot. at 2–3.)  Ali allegedly made many trips back-and-forth between the *CEC Future* and the *Karagöl*, but his role with regard to the latter ship ended in late November 2008.[5]  (*Id.* at 3.)

───────────────

[5] ████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

In February 2009, after the release of the *CEC Future*, Per Gullestrup asked Ali for help in reaching the pirates who had taken another ship, the *Stolt Strength*, and the two corresponded about that piracy for a number of months. (*See* Def. Mot. for Pretrial Rel., Exs. 4, 16, 17, 18, 33.) ███████████████████████████████████████████████ ████████████████████████████████████████████████████ Finally, in October 2009, the *De Xin Hai*, a Chinese merchant ship, was hijacked, as was the *Lynn Rival*, a yacht owned by a British couple. Ali corresponded with ███████████, a global crisis management consultant, about both piracies, and with Gullestrup and others about the *Lynn Rival*. (*See id.*, Exs. 4–5, 7–8; Def. Mot. for Pretrial Rel., Exs. 6–7; Def. Mot. to Suppress, Ex. 18.)

In November 2010, while Ali was still in Somalia, he was charged by a criminal complaint filed in this Court for his role aboard the *CEC Future*, and a warrant for his arrest was issued. (Gov't Suppression Opp'n at 1; *see* Complaint, Nov. 10, 2010 [Dkt. No. 1]; Arrest Warrant, Nov. 10, 2010 [Dkt. No. 52].) Ali was formally indicted on April 15, 2011. (*See* Indictment, April 15, 2011 [Dkt. No. 6].[7]) About a year prior, in June 2010, Ali had been appointed the Director General of the Ministry of Education in Somaliland, a self-declared

---

[6] ████████████████████████████████████████████████████████
████████████████████████████ He also corresponded with officials at the Merchant Maritime Warfare Center, a private maritime security and intelligence firm with a specialty in counter-piracy measures (*id.*, Ex. 21); British naval officers whom Ali met at a counter-piracy seminar for regional governments and international actors (*id.*, Exs. 22–23); the Council of the European Union (*id.*, Ex. 24); the International Chamber of Commerce Commercial Crime Services (*id.*, Ex. 25); and the United Nations Monitoring Group for Somalia. (*Id.*, Exs. 26–28.)

[7] Federal grand juries subsequently returned two superseding indictments. (*See* Superseding Indictment, April 29, 2011 [Dkt. No. 11]; Second Superseding Indictment, May 8, 2012 [Dkt. No. 172] (the operative indictment, referenced as "Ind.").)

republic within Somalia.  (Def. Mot. for Pretrial Rel., Ex. 41 at 2.)  In March 2011, Ali received

an email which purported to be from a United States foundation inviting him to attend a

conference on education in Raleigh, North Carolina.  (Def. Mot. to Suppress at 14.)  When Ali

traveled to the United States for the conference, he was arrested upon his arrival at Dulles

International Airport on April 20, 2011.  (*Id.* at 1.)

<div align="center">ANALYSIS</div>

## I.    THE ADMISSIBILITY OF CERTAIN EVIDENCE PERTAINING TO ALI'S INTENT

The parties agree that Ali's "'intent in conducting the negotiations for the pirates [aboard

the *CEC Future*] is expected to be *the primary issue* at trial.'"  (Def. Omnibus Opp'n at 3

(emphasis in the original) (quoting Gov't *Karagöl* Mot." at 9).)  Ali seeks to introduce evidence

to show that he opposed the goals of the pirates and acted "to shorten the crew's ordeal, protect

their lives, and collect intelligence on pirates for the benefit of the United States and the

seafaring community."  (*Id.* at 3.[8])  The government has moved to exclude such evidence,

---

[8] Specifically,



(Def. Omnibus Opp'n at 9–10 n.9.)

arguing that it is has no bearing on whether Ali intended to commit the acts alleged in the indictment.

Under the Federal Rules of Evidence, relevant evidence is generally admissible and irrelevant evidence is not admissible. Fed. R. Evid. 402. "Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." *Id.* Rule 401. For purposes of deciding the government's motions, the fact of consequence in determining the action is Ali's mental state, or *mens rea*, and evidence relating to it is relevant if such evidence would tend to make it more or less probable that Ali committed the acts described in the indictment with the intent required for any of the crimes charged therein. *Id.* Furthermore, the Rules provide that evidence of Ali's "other acts is not admissible to prove [his] character in order to show that on a particular occasion [he] acted in accordance with the character," *id.* Rule 404(b)(1), but such evidence "may be admissible" to prove, *inter alia*, Ali's "intent." *Id.* Rule 404(b)(2).

Ali is charged with conspiracy to commit piracy under the law of nations (Count One) in violation of 18 U.S.C. § 371 and 18 U.S.C. § 1651, piracy under the law of nations (Count Two) in violation of 18 U.S.C. § 1651, conspiracy to commit hostage taking (Count Three) in violation of 18 U.S.C. § 371 and 18 U.S.C. § 1203, and hostage taking (Count Four) in violation of 18 U.S.C. § 1203. Counts Two and Four charge Ali with both the substantive offenses and with aiding and abetting in violation of 18 U.S.C. § 2. (Ind. at 1–6.)



Conspiracy and aiding and abetting are inchoate crimes.  *United States v. Bailey*, 444

U.S. 394, 405 (1980) (conspiracy is an "inchoate offense[]"); *United States v. Seals*, 130 F.3d

451, 463 (D.C. Cir. 1997) (aiding and abetting is an "inchoate offense[]").

> This is to say, that, although the law generally makes criminal only antisocial
> conduct, at some point in the continuum between preparation and consummation,
> the likelihood of a commission of an act is sufficiently great and the criminal
> intent sufficiently well formed to justify the intervention of the criminal law.

*United States v. Feola*, 420 U.S. 671, 694 (1975) (citation omitted).  Because of their focus on an

"agreement to engage in a criminal venture," *id.*,[9] "laws against conspiracy . . . criminalize

*speech* . . . that is intended to . . . commence illegal activities."  *United States v. Williams*, 553

U.S. 285, 298 (2008) (emphasis added).  Where a particular kind of criminal intent is absent, so,

too, is criminal liability.  The same can be said of aiding and abetting.[10]  Thus, under "the law of

inchoate offenses . . . a heightened mental state separates criminality itself from otherwise

innocuous behavior."  *Bailey*, 444 U.S. at 405.[11]

---

[9] *See United States v. Jimenez Recio*, 537 U.S. 270, 274 (2003) ("The Court has repeatedly said that the essence of a conspiracy is 'an *agreement* to commit an unlawful act.'" (emphasis added) (collecting cases) (quoting *Iannelli v. United States*, 420 U.S. 770, 777 (1975))).

[10] *See* Ethan Preston & John Lofton, *Computer Security Publications: Information Economics, Shifting Liability and the First Amendment*, 24 Whittier L. Rev. 71, 101 (2002) ("Many cases of inchoate crimes are often or always effected through speech acts.  Such crimes include conspiracy . . . and aiding and abetting." (internal quotation marks, alterations, citation, and footnote omitted)); Jeremy J. Ofseyer, *Taking Liberties with John Stuart Mill*, 1999 Ann. Surv. Am. L. 395, 411 (1999) ("Speech crimes include perjury and several inchoate crimes, such as incitement, solicitation, conspiracy, and aiding and abetting.").

[11] *See* Ira P. Robbins, *Double Inchoate Crimes*, 26 Harv. J. on Legis. 1, 6–7 (1989) (Inchoate crimes "allow the judicial system to impose criminal liability on conduct designed to culminate in the commission of a substantive offense" and "permit[] intervention once an individual's actions, *though not criminal in themselves*, have sufficiently manifested an intent to commit a criminal act." (emphasis added, footnotes omitted)); David B. Filvaroff, *Conspiracy and the First Amendment*, 121 U. Pa. L. Rev. 189, 194–95 (1972) (Inchoate crimes "reach[] back in time, prior to the completion of the substantive offense, and seek[] to punish for something less than

Courts sometimes refer to this "heightened mental state" as one of "specific intent." *See United States v. Moore*, 651 F.3d 30, 92 (D.C. Cir. 2011) ("An aiding and abetting conviction require[s] proof that [the defendant] had . . . the specific intent to facilitate the commission of a crime by another." (internal quotation marks and citation omitted)); *United States v. Childress*, 58 F.3d 693, 707 (D.C. Cir. 1995) ("[C]onspiracy is a 'specific intent' crime.").[12]  Specific intent, in turn, is described as encompassing notions of purpose.  *See Bailey*, 444 U.S. at 405 ("In a general sense, 'purpose' corresponds loosely with the common-law concept of specific intent.").

"'[T]he specific intent required for the crime of conspiracy is . . . the intent to advance or further the unlawful object of the conspiracy.'"  *Childress*, 58 F.3d at 708 (alterations in the original) (quoting *United States v. Haldeman*, 559 F.2d 31, 112 (D.C. Cir. 1976)).  Accordingly, in order to convict Ali of conspiracy, the government must prove beyond a reasonable doubt that Ali acted with the "specific intent to further the conspiracy's objective."  *Id.*

The second superseding indictment alleges that the "purpose and object" of the conspiracy to commit piracy (Count One) was "to profit and make money by detaining the ship, crew and cargo of the M/V *CEC Future* and depriving the lawful owners of control over and the value of the ship and the cargo until ransom was paid."  (Ind. at 2.)  The indictment does not

---

effectuation of the ultimate harm. . . . Among [these], conspiracy is most distant from the completed harm. . . . [C]onspiracy prescribes punishment for little more than state of mind.").

[12] The term "specific intent" is not without its detractors.  The Supreme Court has acknowledged that the distinction between specific intent and general intent, while "venerable," "has been the source of a good deal of confusion."  *Bailey*, 444 U.S. at 403.  Other courts and treatises have noted that the term "'specific intent' [is] particularly susceptible to a wide variety of meanings."  *United States v. Starnes*, 583 F.3d 196, 210 (3d Cir. 2009); *see generally* Wayne R. LaFave, 1 *Substantive Criminal Law* § 5.2(e) (2d ed. 2003).  In *Starnes*, after examining the "'traditional dichotomy of general versus specific intent,'" the Third Circuit rejected it as "more perplexing than helpful."  583 F.3d at 209 (quoting *Dixon v. United States*, 548 U.S. 1, 7 (2006)).

specifically define the objective of the conspiracy to commit hostage taking (Count Three), but

alleges that Ali and others

> did conspire and agree with one another, to seize, detain and threaten to kill, to
> injure, and to continue to detain the crew of the M/V *CEC Future*, in order to
> compel . . . Clipper Group . . . to pay a ransom, consisting of 1.7 million U.S.
> dollars delivered to the ship, and a separate payment of 75,000 U.S. dollars
> delivered via a wire transfer to a bank account, as an explicit condition for the
> release of the M/V *CEC Future*, its crew and cargo.

(Ind. at 6.)

Therefore, in order to convict Ali of conspiracy, the government must establish that Ali

acted with the specific intent, or the "*purposeful* intent," *Childress*, 58 F.3d at 707 (emphasis in

the original), to a) profit and make money by detaining the *CEC* Future, its crew, and its cargo,

and by depriving Clipper of control over the ship, and of the ship's value, until ransom was paid

(Count One); and to b) compel Clipper to pay a ransom by seizing, detaining, and threatening to

kill, injure, and continue to detain the *CEC Future*'s crew (Count Three).  (Ind. at 2, 6.)  The

government bears the burden of proving beyond a reasonable doubt that Ali "consciously

desire[d] [these] result[s]."  *Bailey*, 444 U.S. at 404 (internal quotation marks and citation

omitted); *see Childress*, 58 F.3d at 707–08.

Similarly, "[i]n order to aid and abet another to commit a crime it is necessary that a

defendant 'in some sort associate himself with the venture, that he participate in it as in

something that he wishes to bring about, that he seek by his action to make it succeed.'"  *Nye &*

*Nissen v. United States*, 336 U.S. 613, 619 (1949) (quoting *United States v. Peoni*, 100 F.2d 401,

402 (2d Cir. 1938) (Hand, J.)) (cited in *Moore*, 651 F.3d at 92).  "All the words used" in this

definition—"even the most colorless, 'abet'—carry an implication of *purposive attitude*."  *Peoni*,

100 F.2d at 402 (emphasis added).  Therefore, in order to convict Ali of aiding and abetting

piracy under the law of nations (Count Two) and hostage taking (Count Four), the government

must prove that Ali acted with "the specific intent to facilitate the commission of [these] crime[s]

by []other[s]."  *Moore*, 651 F.3d at 92  (internal quotation marks and citation omitted).

Ali argues that the evidence which the government seeks to prevent him from introducing

is directly relevant to whether he acted with these intentions onboard the *CEC Future*.

Specifically, he claims that evidence ██████████████████████████ and of his role

in other piracy incidents both before and after the *CEC Future* hijacking would undercut the

government's case as to his *mens rea* and further would, as to post-*CEC Future* events, show a

lack of consciousness of guilt.[13]  The government, on the other hand, characterizes such evidence

as purporting to show Ali's "good motive," and argues that it is irrelevant to his defense.  (Gov't

Omnibus Mot. at 4.)

Court decisions, treatises, and law reviews are rife with debates about the relationship

between specific intent and motive, and the relevance (if any) of the latter in a criminal case.[14]

---

[13] The government arguably opened the door to this argument by seeking to introduce evidence
that Ali "conducted negotiations" during the piracy of the *Karagöl*.  (Gov't *Karagöl* Mot. at 3.)
Ali not only urged the Court to admit the *Karagöl* evidence under Rule 404(b) (Def. Omnibus
Opp'n at 2 & n.2), but also moved to introduce evidence of his role in additional incidents of
piracy, all to negate the government's *mens rea* showing.  (*See* Def. 404(b) Mot.)  This Court has
granted the government's motion regarding the *Karagöl* as unopposed.  (*See* Order, April 12,
2012 [Dkt. No. 164] (under seal).)  The Court addresses Ali's Rule 404(b) motion below.

[14] Compare *United States v. Poindexter*, 727 F. Supp. 1470, 1475 (D.D.C. 1989) (agreeing with
defendant that "absence of . . . motive would . . . refute the claim that [defendant] intentionally
entered into" the conspiracy charged in the indictment, and holding that "[e]vidence regarding
the absence of motive is usually admitted to negate specific intent") (collecting cases), *and
United States v. Richmond*, 700 F.2d 1183, 1196 (8th Cir. 1983) ("good motive, by itself, is not a
defense to a crime" but "evidence relating to motive can be considered in relationship to [a
defendant's] intent or state of mind"), *abrogated on other grounds*, *United States v. Raether*, 82
F.3d 192 (8th Cir. 1996), *and United States v. Wilson*, 2 F. Supp. 2d 1170, 1171 (E.D. Wis.
1998) ("'[t]he motive of the defendant is . . . immaterial except insofar as evidence of motive
may aid in the determination of state of mind or the intent of the defendant'" (alterations in the

The Court need not wade into this debate, however, because on these facts, Ali has the better

argument.  This is not the typical case where the criminal law finds it irrelevant that a robber

---

original) (quoting 1 Devitt, Blackmar, Wolff, & O'Malley, *Federal Jury Practice and Instructions* § 17.06 (14th ed.)), *and* Elaine M. Chiu, *The Challenge of Motive in the Criminal Law*, 8 Buff. Crim. L. Rev. 658, 663 (2005) ("As Jerome Hall so pithily stated in 1960, '[h]ardly any part of penal law is more definitely settled than that motive is irrelevant.' . . . Earnest defenders of the maxim," however, "qualify the pithy phrase: 'The orthodox doctrine holds that motive is irrelevant to criminal liability unless it is specifically made relevant as part of the definition of a crime . . . .' Although stated for the purpose of defending the irrelevance maxim, such qualifications are basically a concession that specific intent crimes, inchoate crimes, and [certain defenses] have long regarded the motives of a defendant in determining criminal liability." (footnotes omitted) (quoting Jerome Hall, *General Principles of Criminal Law* 88 (2d ed. 1960)), *and* Guyora Binder, *The Rhetoric of Motive and Intent*, 6 Buff. Crim. L. Rev. 1, 48–49 (2002) ("inchoate offenses such as attempt and conspiracy . . . criminal[ize an act] only if [it is] committed with the . . . purpose of causing some harm" (citing Walter H. Hitchler, *Motive as an Essential Element of Crime*, 35 Dick. L. Rev. 105, 111, 113–14 (1931)), *with United States v. Romano*, 849 F.2d 812, 816 n.7 (3d Cir. 1988) (affirming the irrelevance of any defense based on an intent to save lives in a case charging a defendant with conspiring to damage government property), *and United States v. Kabat*, 797 F.2d 580, 588–89 (8th Cir. 1986) (evidence of motive is irrelevant even with regard to a specific intent crime), *and United States v. Martin*, 740 F.2d 1352, 1360 (6th Cir. 1984) (same), *and United States v. Rosado*, 728 F.2d 89, 93 (2d Cir. 1984) (describing as "erroneous" the "assumption that good motive for committing a crime is inconsistent with criminal intent"), *and United States v. Badolato*, 701 F.2d 915, 921–22 (11th Cir. 1983) ("The Government does not deny that [the defendant] is an investigative journalist and film-maker by profession, and we are not unsympathetic to this position; however, his argument on appeal confuses the intent to enter into an agreement to violate federal drug laws with the purpose or goal which motivates one to enter into such an agreement. . . . What [the defendant] hoped to achieve by entering into this agreement is of little consequence. . . . Regardless of what the conspirator hopes to get out of it, conspiracy is a criminal act, and the issue properly phrased is whether [defendant] knowingly and intentionally entered into it."), *and United States v. Huet-Vaughn*, 43 M.J. 105, 113–14 (C.A.A.F. 1995) ("'A person often acts with two or more intentions.  These intentions may consist of an immediate intention (intent) and an ulterior one (motive), as where the actor takes another's money intending to steal it and intending then to use it to buy food for his needy family. . . . It may be said that, so long as the defendant has the intention required by the definition of the crime, it is immaterial that he may also have had some other intention.'" (quoting W. LaFave & A. Scott, 1 *Substantive Criminal Law* § 3.5(d) at 313 (1986))), *and* Michael T. Rosenberg, Note, *The Continued Relevance of the Irrelevance-of-Motive Maxim*, 57 Duke L. J. 1143, 1169–70 (2008) ("Once motive is understood as something altogether distinct from intentions, it is clear that motive is irrelevant to specific intent crimes and inchoate crimes." (citing Hall, *General Principles*, *supra*, at 86)).

stole to stave off starvation.  Rather, to "prove" the "particular offense[s]" with which Ali is

"charged[,] . . . an analysis of [his] purpose . . . . is necessary."  *United States v. Cullen*, 454 F.2d

386, 391–92 (7th Cir. 1971) (Stevens, J.) (footnote omitted).[15]  Specific intent is unquestionably

"an element of" the crimes of conspiracy and aiding and abetting.  *Id.* at 391; *see Childress*, 58

F.3d at 707–08 ("*purposeful* intent—or 'conscious desire' to achieve a 'result[]' . . . is the

essence of conspiracy" (emphasis in the original, citation omitted) (quoting *Bailey*, 444 U.S. at

404)); *Moore*, 651 F.3d at 92 (aiding and abetting is a specific intent crime); *see also Peoni*, 100

F.2d at 403 (aiding and abetting and "conspiracy [both] import[] a concert of purpose").  With

regard to the conspiracy charges, evidence that Ali acted "to shorten the crew's ordeal, protect

their lives, and collect intelligence on pirates for the benefit of the United States and the

seafaring community" (Def. Omnibus Opp'n at 3) may make it more or less likely that he acted

---

[15] In *Cullen*, the defendant had been convicted of burning draft records.  454 F.2d at 387.  On appeal, his principal contention was that the trial judge should have instructed the jury "that religious compulsion might negate the requisite criminal intent and thereby warrant acquittal." *Id.*  Cullen claimed that he was "compelled by his religious beliefs to act as he did and, therefore, did not have the requisite intent to commit the offenses charged."  *Id.* at 390.

The Seventh Circuit affirmed Cullen's conviction.  *Id.* at 392.  Writing for the court, then-Judge Stevens responded to Cullen's contention "that his evidence of 'compulsion' [was] relevant to the issue of intent" by first "recogniz[ing] that the term 'intent' may be used in at least three different senses: First, that the prohibited act was performed deliberately; second, that defendant knew it was wrong; and third, that it was designed to further some ultimate goal."  *Id.* at 390.  Judge Stevens concluded that the crimes with which Cullen was charged only required a showing of intent as contemplated by the first and second meanings of the term, such that any religious compulsion he may have felt was irrelevant.  *Id.* at 392.  As to the third type of intent, however, Judge Stevens recognized that, "[i]n some situations the defendant's ultimate objective may be an element of the particular offense charged."  *Id.* at 391.  As an example, Judge Stevens stated that "to prove a criminal attempt an analysis of the defendant's purpose beyond the overt act actually completed is necessary."  *Id.* at 391–92 (footnote omitted).  Conspiracy and aiding and abetting, as other inchoate offenses, require the same.  As noted above, under "'the law of inchoate offenses,'" with regard to crimes "'such as attempt[,] . . . conspiracy,'" and aiding and abetting, "'a heightened mental state separates criminality itself from otherwise innocuous behavior.'"  *Childress*, 58 F.3d at 707 (quoting *Bailey*, 444 U.S. at 405); *see Seals*, 130 F.3d at 463 (aiding and abetting is an inchoate offense).

purposefully, *Childress*, 58 F.3d at 707–08, to profit and make money by taking and holding the

*CEC Future* for ransom, and to compel Clipper to pay a ransom by seizing, detaining, and

threatening to kill, injure, and continue to detain the *CEC Future*'s crew.  And with regard to

aiding and abetting piracy and hostage taking, such evidence may make it more or less likely that

Ali acted with the specific intent to facilitate the commission of those crimes by the pirates.

*Moore*, 651 F.3d at 92.  The Court therefore concludes that the evidence at issue is relevant, and

it will deny the government's motions in limine.[16]

The Court further concludes that although this evidence pertains to Ali's "other act[s]," it

is nonetheless "admissible" for the "purpose" of negating the government's showing of Ali's

"intent."  Fed. R. Evid. 404(b)(2).  Evidence of a defendant's other acts is admissible under Rule

404(b) if it

> 1) . . . is relevant in that it has "any tendency to make the existence of any fact
> that is of consequence to the determination of the action more probable or less
> probable than it would be without the evidence," Fed. R. Evid. 401; 2) the fact of
> consequence to which the evidence is directed relates to a matter in issue other
> than the defendant's character or propensity to commit crime; and 3) the evidence
> is sufficient to support a jury finding that the defendant committed the other . . .
> act.

---

[16] The Supreme Court's decision in *United States v. Pomponio*, 429 U.S. 10 (1976) (per curiam),
is not to the contrary.  In *Pomponio*, the court approved a district court's jury instruction that
"'[g]ood motive alone is never a defense *where the act done or omitted is a crime*,' and that
consequently motive [is] irrelevant *except as it* [*bears*] *on intent*."  429 U.S. at 11 (emphasis
added, first alteration in the original, internal quotation marks omitted); *see id.* at 13.  This
instruction, the court held, accurately reflected the government's burden of proving that
defendants acted with "the specific intent to violate the law."  *Id.* at 11.  Here, "the act done or
omitted"—Ali's agreement with the pirates in the conspiracy charges, for example—is only "a
crime," *id.*, if Ali acted with "*purposeful* intent—or 'conscious desire' to achieve . . . the
conspiracy's objective."  *Childress*, 58 F.3d at 707–08 (emphasis in the original, citation
omitted) (quoting *Bailey*, 444 U.S. at 404).  Therefore, this Court's decision is entirely consistent
with *Pomponio*, as the evidence that the Court is admitting, however it is characterized, bears on
Ali's intent.  429 U.S. at 11.

*United States v. Bowie*, 232 F.3d 923, 930 (D.C. Cir. 2000) (some citations omitted).  The

evidence at issue qualifies in all regards, in that it 1) is relevant to 2) Ali's intent, and 3) is

sufficient to show that Ali committed the other acts in question.  *Id.*  Notwithstanding the

government's arguments to the contrary (*see* Gov't Omnibus Mot. at 6–7), the fact that the

evidence may *negate* the government's showing as to Ali's *mens rea* is precisely what makes it

admissible under Rule 404(b).  "Whether the [other act] is laudable or unlawful should not make

much difference; the question in each case is whether [the act] makes more or less likely the

existence of some fact that matters."  *United States v. Burke*, 781 F.2d 1234, 1243 (7th Cir.

1985); *see United States v. Hayes*, 219 F. App'x 114, 116 (3d Cir. 2007) (unpublished) ("As is

true with bad act evidence, evidence of good acts is also admissible for a proper purpose such as

motive, intent, absence of mistake, etc.").

　　　　However, the Federal Rules of Evidence require the Court, in its discretion, to "exclude

relevant evidence if its probative value is substantially outweighed by a danger of," *inter alia*,

"confusing the issues, misleading the jury, undue delay, wasting time, or needless presenting

cumulative evidence."  Fed. R. Evid. 403; *see United States v. Brown*, 597 F.3d 399, 406 (D.C.

Cir. 2010) ("'[T]he Rule 403 inquiry in each case involving Rule 404(b) evidence will be case-

specific. There can be no 'mechanical solution,' no *per se* rule.'  *United States v. Crowder*, 141

F.3d 1202, 1210 (D.C. Cir. 1998) (en banc). . . . [T]he decision on exclusion rests in the sound

discretion of the district court." (some alterations in the original)).

　　　　For the reasons stated above and discussed at hearings on April 11, 2012, and May 17,

2012, the Court will grant Ali's 404(b) motion.  Specifically, the Court will admit evidence

pertaining to Ali's role in incidents of piracy involving the ships *Rockall*, *Karagöl*, *Stolt*

*Strength*, *Maersk Alabama*, *Lynn Rival*, and *De Xin Hai* under Rule 404(b).  (*See also* Order,

16

April 12, 2012 [Dkt. No. 164] (under seal) at 2.)  In addition, having already determined that it is relevant, the Court concludes that evidence of the following passes the Rule 403 balancing test and will be admitted:



(Def. Omnibus Opp'n at 9–10 n.9.)

[18]

---

[17]

[18] The Court will defer ruling on the admissibility of the classified document dated April 13, 2010 (*see supra* n.8) pending any forthcoming filing made by Ali pursuant to the Classified Information Procedures Act.  The Court also notes that the January 5, 2010 cut-off date does not pertain to evidence specific to the *CEC Future* or the other boats listed above.  For example, throughout 2010, Ali corresponded with Gullestrup to help track down the pirates who hijacked the *CEC Future*.  (*See* Def. Mot. for Pretrial Rel., Exs. 17, 18, 19, 20, 38, 39, 40.)  And in July 2010 Ali recorded a "proof of life" call with the owners of the *Lynn Rival* and corresponded with about their kidnapping.  (*See* Def. Mot. to Suppress, Ex. 5 at 1419; Def. 404(b) Mot., Exs. 7–8.)  In granting Ali's 404(b) motion, the Court has deemed such evidence admissible.  Finally, the Court notes that its conclusion as to the general admissibility of this evidence does not foreclose evidentiary challenges to specific exhibits or testimony.

II.     **DEFENDANT'S MOTION TO SUPPRESS**

Ali challenges six search warrants and the searches and seizures conducted pursuant to them.[19]  He argues that the Fourth Amendment demands the exclusion of the evidence obtained.

A.     **Legal principles**

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures," and provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."  U.S. Const. amend. IV.  By its text, the Amendment "'contains no provision expressly precluding the use of evidence obtained in violation of its commands.'"  *Herring v. United States*, 555 U.S. 135, 139 (2009) (quoting *Arizona v. Evans*, 514 U.S. 1, 10 (1995)).  However, Supreme Court "decisions establish an exclusionary rule that, when applicable, forbids the use of improperly obtained evidence at trial," *id.*, in order "to 'compel respect for the constitutional guaranty.'"  *Davis v. United States*, 131 S. Ct. 2419, 2426 (2011) (quoting *Elkins v. United States*, 364 U.S. 206, 217 (1960)).

Although the Supreme Court "has applied the exclusionary rule to certain Fourth Amendment violations," it "'has never . . . interpreted'" that provision as "'proscrib[ing] the introduction of illegally seized evidence in all proceedings or against all persons.'"  *United States v. Spencer*, 530 F.3d 1003, 1006 (D.C. Cir. 2008) (quoting *United States v. Leon*, 468 U.S. 897, 906 (1984)).  To the contrary, the Court has "repeatedly rejected the argument that

---

[19] *See* Def. Mot. to Suppress, Ex. 1 (May 25, 2010 warrant for Ali's email), Ex. 3 (April 21, 2011 warrant for Ali's suitcase and computer bag), Ex. 4 (April 21, 2011 warrant for Ali's cell phone), Ex. 5 (April 21, 2011 warrant for Ali's laptop computer), Ex. 6 (May 4, 2011 warrant for Ali's external hard drive).

exclusion is a necessary consequence of a Fourth Amendment violation." *Herring*, 555 U.S. at 141 (collecting cases). Rather, the judicially created exclusionary rule is designed to safeguard Fourth Amendment rights generally through its deterrent effect, and therefore applies only where it results in appreciable deterrence. *Id.* at 139, 141.

Furthermore, "[r]eal deterrent value is a necessary condition for exclusion, but it is not a sufficient one," because "[t]he analysis must also account for the substantial social costs generated" by the rule. *Davis*, 131 S. Ct. at 2427 (internal quotation marks and citations omitted). The rule "almost always requires courts to ignore reliable, trustworthy evidence bearing on guilt or innocence." *Id.* Therefore, the Supreme Court has emphasized that "[f]or exclusion to be appropriate, the deterrence benefits of suppression must outweigh its heavy costs." *Id.*

"In a line of cases beginning with" *Leon*, the Supreme Court has calibrated its "cost-benefit analysis" according to "the flagrancy of the police misconduct at issue" and has instructed that "the deterrence benefits of exclusion vary with the culpability of the law enforcement conduct." *Id.* (internal quotation marks and alterations omitted); *see Leon*, 468 U.S. at 909. When the police exhibit deliberate, reckless, or grossly negligent disregard for Fourth Amendment rights, the deterrent value of exclusion is strong and tends to outweigh the resulting costs. *Davis*, 131 S. Ct. at 2427 (citing *Herring*, 555 U.S. at 144). But when the police act with an objectively reasonable good-faith belief that their conduct is lawful, or when their conduct involves only simple, isolated negligence, the deterrence rationale loses much of its force, and "exclusion cannot 'pay its way.'" *Id.* at 2427–28 (quoting *Leon*, 468 U.S. at 908 n.6).

In *Davis*, the Supreme Court listed cases where it had "applied [*Leon*'s] 'good-faith' exception" to the exclusionary rule. *Id.* at 2428 (collecting cases). The Court stated the well-

established "theme" linking these cases, and the rationale behind it: "The error in [such cases]

rests with the issuing magistrate, not the police officer, and 'punish[ing] the errors of judges' is

not the office of the exclusionary rule." *Id.* (second alteration in the original) (quoting *Leon*, 468

U.S. at 916). Thus, in "*Leon* itself," the Supreme Court held that "the exclusionary rule does not

apply when the police conduct a search in 'objectively reasonable reliance' on a warrant later

held invalid." *Id.* (quoting *Leon*, 468 U.S. at 922).

Pursuant to *Leon*, courts determine the objective reasonableness of the police's reliance

on a warrant by considering "'whether a reasonably well trained officer would have known that

the search was illegal' in light of 'all of the circumstances.'" *Herring*, 555 U.S. at 145 (quoting

*Leon*, 468 U.S. at 922 n.23).[20] If such an officer would have discerned the search's illegality

because "the affidavit supporting the warrant was 'so lacking in indicia of probable cause as to

render official belief in its existence entirely unreasonable,'" then suppression remains

appropriate. *Spencer*, 530 F.3d at 1007 (quoting *Leon*, 468 U.S. at 923). Supreme Court

"precedents make clear, however, that [this] threshold . . . is a high one." *Messerschmidt v.

Millender*, 132 S. Ct. 1235, 1245 (2012).

Probable cause is "a fluid concept—turning on the assessment of probabilities in

particular factual contexts—not readily, or even usefully, reduced to a net set of legal rules."

*Illinois v. Gates*, 462 U.S. 213, 232 (1983). In determining whether probable cause exists,

> [t]he task of the issuing magistrate is simply to make a practical, common-sense
> decision whether, given all the circumstances set forth in the affidavit before him
> . . . there is a fair probability that contraband or evidence of a crime will be found
> in a particular place. And the duty of a reviewing court is simply to ensure that

---

[20] Courts consider the executing "officer's knowledge and experience" but the test remains an
objective one, *Herring*, 555 U.S. at 145, and asks, given what he knew, whether it was
reasonable for the officer to rely on the magistrate's finding of probable cause.

the magistrate had a "substantial basis for . . . conclud[ing]" that probable cause existed.

*Id.* at 238–39 (some alterations in the original) (quoting *Jones v. United States*, 362 U.S. 257, 271 (1960), *overruled on other grounds by United States v. Salvucci*, 448 U.S. 83, 85 (1980)). Thus, the Supreme Court has "described . . . probable cause to search as existing where the known facts and circumstances are sufficient to warrant a man of reasonable prudence in the belief that contraband or evidence of a crime will be found." *Ornelas v. United States*, 517 U.S. 690, 696 (1996).

In this "totality-of-the-circumstances analysis," *Gates*, 462 U.S. at 238, courts consider, *inter alia*, whether the facts in the underlying affidavit are "so closely related to the time of the issue of the warrant as to justify a finding of probable cause at that time." *Sgro v. United States*, 287 U.S. 206, 210 (1932). Yet, pursuant to *Leon*, an affidavit's facts are only "too stale," and the exclusionary rule only applies, if the officers executing the warrant "'could not have harbored an objectively reasonable belief in the existence of probable cause.'" *United States v. Webb*, 255 F.3d 890, 905 (D.C. Cir. 2001) (quoting *Leon*, 468 U.S. at 926). Courts "give 'great deference' to the issuing judge's probable-cause determination . . . [a]nd a police officer is ordinarily entitled to rely on the magistrate's conclusion." *Spencer*, 530 F.3d at 1006 (quoting *Gates*, 462 U.S. at 236).

Objectively reasonable reliance by the executing officers does not, however, bar application of the exclusionary rule in all instances. Suppression remains appropriate under *Leon* "'if the magistrate or judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth.'" *Id.* at 1007 (quoting *Leon*, 468 U.S. at 923); *see Franks v. Delaware*, 438 U.S. 154

(1978).[21]  Yet, "[a]n affidavit offered in support of a search warrant enjoys a 'presumption of

validity.'"  *United States v. Maynard*, 615 F.3d 544, 550 (D.C. Cir. 2010) (quoting *Franks*, 438

U.S. at 171).  In order to invoke *Franks*, a defendant must

> make[] a substantial preliminary showing that a false statement knowingly and
> intentionally, or with reckless disregard for the truth, was included by the affiant
> in the warrant affidavit, and [that] the allegedly false statement [was] necessary to
> the finding of probable cause.

438 U.S. at 155–56.  Upon making this substantial showing, which must be "more than

conclusory" and "accompanied by an offer of proof," *id.* at 171, "the Fourth Amendment

requires that a hearing be held."  *Id.* at 156.  If the defendant proves his allegations "by a

preponderance of the evidence, and, with the affidavit's false material set to one side, the

affidavit's remaining content is insufficient to establish probable cause, the search warrant must

be voided and the fruits of the search excluded."  *Id.*

  "[U]nder certain circumstances," a defendant may establish that he is entitled to a *Franks*

hearing on the basis of "material omissions."  *Spencer*, 530 F.3d at 1007 (citing *United States v.*

*Johnson*, 696 F.2d 115, 118 n.21 (D.C. Cir. 1982)); *see Burke*, 405 F.3d at 81 ("the intentional or

reckless omission of material exculpatory facts from information presented to a magistrate may

---

[21] Whereas *Leon* emphasizes the deference courts owe magistrates' probable cause
determinations, in the situations contemplated in *Franks*,

> [a]llegations of intentional or reckless misstatements or omissions implicate the
> very truthfulness, not just the sufficiency, of a warrant application.  If such
> allegations prove to be true, a court owes no deference to a magistrate's decision
> to issue an arrest warrant because, "where officers procuring a warrant have
> deliberately misled the magistrate about relevant information, no magistrate will
> have made a prior probable cause determination" based on the correct version of
> the material facts.

*Burke v. Town of Walpole*, 405 F.3d 66, 82 (1st Cir. 2005) (quoting *Velardi v. Walsh*, 40 F.3d
569, 574 n.1 (2d Cir. 1994)).

. . . amount to a Fourth Amendment violation" (citing *DeLoach v. Bevers*, 922 F.2d 618, 622

(10th Cir. 1990))).  Indeed, "[b]y reporting less than the total story, an affiant can manipulate the

inference a magistrate will draw.  To allow a magistrate to be misled in such a manner could

denude the probable cause requirement of all real meaning."  *United States v. Stanert*, 762 F.2d

775, 781 (9th Cir. 1985) (citing *Franks*, 438 U.S. at 168).[22]

Therefore, a defendant seeking to obtain a *Franks* hearing must show that (1) the

affidavit contained false statements or omitted certain facts; (2) the false statements or omitted

facts were material to the finding of probable cause; and (3) the false statements or omissions

were made knowingly and intentionally, or with reckless disregard for the truth.  *United States v.*

*Becton*, 601 F.3d 588, 594 (D.C. Cir. 2010); *Spencer*, 530 F.3d at 1007.

---

[22] The Sixth Circuit has observed that "an affidavit which omits potentially exculpatory
information is less likely to present a question of impermissible official conduct than one which
affirmatively includes false information."  *United States v. Atkin*, 107 F.3d 1213, 1217 (6th Cir.
1997) (citing *United States v. Martin*, 920 F.3d 393, 398 (6th Cir. 1990)); *see also Mays v. City
of Dayton*, 134 F.3d 809, 816 (6th Cir. 1998).  The Sixth Circuit's reasoning, however, has
nothing to do with the likelihood that an officer's conduct was impermissible, but rather with the
unrelated concern that an allegation of an omission "'potentially opens officers to endless
conjecture about investigative leads, fragments of information, or other matter that might, if
included, have redounded to defendant's benefit.'"  *Martin*, 920 F.2d at 398 (quoting *United
States v. Colkley*, 899 F.2d 297, 301 (4th Cir. 1990)).  The Court recognizes that this concern
may be compelling, but because it has no bearing on the question that motivates *Franks*—
namely, "whether there ha[s] been official misconduct in the drafting of the affidavit," 438 U.S.
at 167—the Court will not treat the Sixth Circuit's empirical observation as though it were a
substantive factor to be applied in assessing whether a defendant has made out the preliminary
showing that *Franks* requires.  In so doing, the Court follows the example of the Fourth Circuit,
on which the Sixth Circuit has relied.  The Fourth Circuit has observed that "the *Franks*
threshold is even higher for defendants making claims of omissions rather [than] affirmative
false statements," but in defining that threshold, it has stated the same, standard formulation on
which this Court relies: "the defendant must show that the omissions were '*designed to mislead*,
or . . . made in *reckless disregard of whether they would mislead*' and that the omissions were
material, meaning that their 'inclusion in the affidavit would defeat probable cause.'"  *United
States v. Clenney*, 631 F.3d 658, 664 (4th Cir. 2011) (emphasis and alterations in the original)
(quoting *Colkley*, 899 F.2d at 301).

With regard to the second factor, allegedly false information in an affidavit is material only if, when it is "set to one side, the affidavit's remaining content is insufficient to establish probable cause." *Franks*, 438 U.S. at 156.  By corollary, omitted facts are only material if "their 'inclusion in the affidavit would defeat probable cause.'" *Spencer*, 530 F.3d at 1007 (quoting *Colkley*, 899 F.2d at 301); *see United States v. Davis*, 617 F.2d 677, 694 (D.C. Cir. 1979) (omitted facts are only material if their "recitation would have tipped the balance against a finding of probable cause").  Accordingly, for a defendant to be entitled to a *Franks* hearing, "[a] substantial preliminary showing that the affidavit contained reckless or deliberate falsities and omissions must be followed by a substantial showing that the affidavit purged of those falsities and supplemented by the omissions would not be sufficient to support a finding of probable cause." *United States v. McNeese*, 901 F.2d 585, 596 (7th Cir. 1990), *overruled on other grounds by United States v. Nance*, 236 F.3d 820 (7th Cir. 2000).

With regard to the third factor, "*Franks* protects against" false statements and "omissions that are designed to mislead, or that are made in reckless disregard of whether they would mislead, the magistrate." *Colkley*, 899 F.2d at 301 (emphasis omitted).  "Under *Franks*, negligent police miscommunications in the course of acquiring a warrant do not provide a basis to rescind a warrant and render a search . . . invalid." *Herring*, 555 U.S. at 145.  Courts are well-equipped to judge allegations that false statements and omissions are intentionally misleading. However, "as the Court of Appeals for the District of Columbia Circuit has lamented, 'unfortunately, the Supreme Court in *Franks* gave no guidance concerning what constitutes a reckless disregard for the truth in fourth amendment cases, except to state that negligence or innocent mistake is insufficient.'" *Wilson v. Russo*, 212 F.3d 781, 787 (3d Cir. 2000) (alterations and some internal quotation marks omitted) (quoting *Davis*, 617 F.2d at 694).

24

In *Davis*, the D.C. Circuit defined recklessness as it pertains to alleged false statements with recourse to "precedents in the area of libel and the [F]irst [A]mendment," where "reckless disregard for the truth requires a showing that" the speaker "'in fact entertained serious doubts as to the truth of his publication.'"  617 F.2d at 694 (quoting *St. Amant v. Thompson*, 390 U.S. 727, 7231 (1968)).  At issue in *Davis* was whether the defendant was entitled to a *Franks* hearing where the affidavit included statements made by an informant whom the affiant knew to have been "under coercion" when he made them.  *Id.*  Importing the "subjective test" for reckless disregard from the libel area, the court held that a defendant could succeed "by showing actual deliberation" on behalf of the affiant or "by demonstrating that there existed 'obvious reasons to doubt the veracity of the informant or the accuracy of his reports.'"  *Id.* (quoting *St. Amant*, 390 U.S. at 732)).  Since the D.C. Circuit decided *Davis*, "most Circuits that have had occasion to address the issue have adopted a" similar test, which asks whether the affiant "in fact entertained serious doubts as to the truth of the . . .  statements" which the defendant alleges to be false. *United States v. Kunen*, 323 F. Supp. 2d 390, 395 (E.D.N.Y. 2004) (internal quotation marks, alterations, and citation omitted).

Determining whether an omission was made recklessly presents particular difficulties. On the one hand, "[a]ll storytelling involves an element of selectivity," and courts "cannot demand that police officers relate the entire history of events leading up to a warrant application with every potentially evocative detail that would interest a novelist or gossip." *Wilson*, 212 F.3d at 787.  To do so "would make the process of applying for a search warrant a cumbersome procedure inimical to effective law enforcement" and therefore "might encourage rather than discourage improper police behavior: facing ever more stringent requirements for obtaining warrants, police might forego applying for one whenever they think they might have a tenable

case for proceeding without one." *Davis*, 617 F.2d at 694 (citing *United States v. Ventresca*, 380 U.S. 102, 108 (1965)).

"On the other hand, one of the reasons for requiring a neutral magistrate to evaluate probable cause is that an uninterested party is presumably better suited to review and evaluate the facts than an officer pursuing a lead." *Wilson*, 212 F.3d at 787. As the Supreme Court has emphasized,

> "The point of the Fourth Amendment, which often is not grasped by zealous officers, is not that it denies law enforcement the support of the usual inferences which reasonable men draw from evidence. Its protection consists in requiring that those inferences be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime. . . . When the right of privacy must reasonably yield to the right of search is, as a rule, to be decided by a judicial officer, not by a policeman or Government enforcement agent."

*Payton v. New York*, 445 U.S. 573, 586 n.24 (1980) (quoting *Johnson v. United States*, 333 U.S. 10, 13–14 (1948)). Thus, consistent with the Fourth Amendment, "a police officer cannot make unilateral decisions about the materiality of information, or, after satisfying him or herself that probable cause exists, merely inform the magistrate or judge of inculpatory evidence." *Wilson*, 212 F.3d at 787.

Balancing these competing concerns, the Third Circuit chose to "follow the common sense approach" of the Eighth Circuit, *id.*, and held that "omissions are made with reckless disregard for the truth when an officer recklessly omits facts that any reasonable person would know that a judge would want to know." *Id.* at 783; *see United States v. Jacobs*, 986 F.2d 1231, 1235 (8th Cir. 1993) (inferring reckless disregard based on the "highly relevant" nature of the omitted information); *United States v. Reivich*, 793 F.2d 957, 961 (8th Cir. 1986) (noting inference permissible when omission would have been "'clearly critical'" to the issuing judge's

probable cause determination (quoting *United States v. Martin*, 615 F.2d 318, 329 (5th Cir.

1980)).  It is clear that courts cannot "infer recklessness solely from [an affiant's] alleged

awareness" of exculpatory material.  *Davis*, 617 F.2d at 694.  Yet, the weight of legal authority

permits the inference "'where the omitted information was critical to the probable cause

determination.'"  *Burke*, 405 F.3d at 81 (quoting *Golino v. City of New Haven*, 950 F.2d 864, 871

(2d Cir. 1991); citing *Wilson*, 212 F.3d at 783); *accord Madiwale v. Savaiko*, 117 F.3d 1321,

1327 (11th Cir. 1997); *DeLoach v. Bevers*, 922 F.2d 618, 622 (10th Cir. 1990).[23]

      With these principles in mind, the Court proceeds to address Ali's specific arguments for

suppression.  To begin, the Court will consider two issues that concern many of the underlying

---

[23] As noted, the First, Second, Third, Fifth, Eighth, Tenth, and Eleventh circuits instruct courts
assessing a defendant's request for a *Franks* hearing to infer that an affiant's omission was
reckless if the omitted material was "clearly critical" to the finding of probable cause.  The Ninth
Circuit has also adopted this approach, albeit in an unpublished opinion.  *See United States v.
Hayes*, Nos. 87-5164, 87-5166, and 87-5168, 1993 WL 515508, at *2 (9th Cir. Dec. 10, 1993)
("recklessness may be inferred 'where the omitted information was clearly critical to the
probable cause determination'" (some internal quotation marks omitted) (quoting *Rivera v.
United States*, 928 F.2d 592, 604 (2d Cir. 1991)).  The Fourth Circuit, however, has criticized
the "clearly critical" approach on the grounds that it "collapses into a single inquiry the two
elements—'intentionality' and 'materiality'—which *Franks* states are independently necessary."
*Colkley*, 899 F.2d at 301.
      "The D.C. Circuit has not yet weighed in on whether a court can make an inference of
recklessness if an affiant omits material that is 'clearly critical' to the finding of probable cause."
*United States v. Lindsey*, 596 F. Supp. 2d 55, 60 n.4 (D.D.C. 2009).  However, in the context of
false statements, the Circuit in *Davis* held that an affiant acts with reckless disregard for the truth
where "there exist[] 'obvious reasons to doubt [the statement's] veracity.'"  617 F.2d at 694
(quoting *St. Amant*, 390 U.S. at 732).  By extension, it seems that reckless disregard can be
inferred in the context of omissions where "any reasonable person would know that a judge
would want to know" the omitted facts in making a determination of probable cause.  *Wilson*,
212 F.3d at 783; *see, e.g.*, *United States v. Robinson*, 546 F.3d 884, 889 (7th Cir. 2008) (To be
entitled to a *Franks* hearing, "a defendant has the burden to 'offer direct evidence of the affiant's
state of mind *or inferential evidence that the affiant had obvious reasons for omitting facts* in
order to prove deliberate falsehood *or reckless disregard*.'" (emphasis added) (quoting *McNeese*,
901 F.2d at 594)).

affidavits: first, the relevance of certain exculpatory facts to the probable cause analysis, and second, staleness.

### B.    Exculpatory facts

Ali's primary challenge to the sufficiency of the affidavits is born of the fact that he maintains a view of his role on the *CEC Future* that is completely at odds with the government's characterization of the evidence.  Ali's chief defense at trial will be that he intended neither to conspire with, nor to aid and abet, the pirates.  The government, on the other hand, argues that Ali had the requisite intent.  The jury will make the ultimate determination of Ali's *mens rea*.  But, in his motion to suppress, Ali presses a related argument.  He claims that the affidavits underlying certain warrants omitted facts which he alleges show his innocent intent,[24] and that these omissions entitle him to a *Franks* hearing.

---

[24] Ali alleges that affiants knew the following facts but intentionally or recklessly failed to include them in their affidavits: Ali told news media that he boarded the *CEC Future* with the intention of serving as a neutral observer so that he could develop marketable expertise as an anti-piracy consultant; ███████████████████████████; Gullestrup praised Ali repeatedly and wrote a letter in defense of Ali, wherein Gullestrup stated that he did not believe that Ali had done anything criminal with regard to the *CEC Future*; and after the *CEC Future* incident, Ali worked to provide anti-piracy consulting services to Clipper (from which he did not seek additional compensation), ██ ████████, and other legitimate actors.  Ali also protests the fact that later affidavits omitted mention of the fact that prior searches revealed no communications between Ali and any alleged co-conspirators, but did show that Ali marketed himself as an expert to anti-piracy actors.

In addition, Ali notes that an affiant related the fact that Ali told Gullestrup ███████ ████████, but characterized this as "show[ing] that Ali currently utilizes [his] email account to relay information about past and present pirate activities."  (Def. Mot. to Suppress, Ex. 1 at 1392.)  Ali argues that this communication shows Ali's efforts █████████████████, and counters evidence of criminal intent.  Similarly, Ali argues that an affiant's characterization of emails he sent pertaining to the piracy of the *Lynn Rival* was "intended to create the impression that" Ali was a "'pirate consultant' . . . who provide[d] consulting services to *pirates*," when the affiant knew that "Ali was attempting to provide *anti-piracy* consulting services to █████████ and other legitimate actors."  (*Id.* at 30 (emphasis in original).)

Finally, Ali also notes that an affiant stated that, in light of the affiant's "training and

In so arguing, however, Ali has confused the showing required of an affidavit—for probable cause—with that required of the government to prove his guilt. "[P]robable cause requires only a probability or substantial chance of criminal activity, not an actual showing of such activity." *Gates*, 462 U.S. at 245 n.13; *see Jones*, 362 U.S. at 270 (the "'difference between what is required to prove guilt in a criminal case and what is required to show probable cause for arrest or search'" is "'large'" (quoting *Brinegar v. United States*, 338 U.S. 160, 172 (1949))). And "'[o]nce it is established that probable cause exists to believe a federal crime has been committed a warrant may issue for the search of any property which the magistrate has probable cause to believe may be the place of concealment of evidence of the crime.'" *Zurcher v. Stanford Daily*, 436 U.S. 547, 558 (1978) (alteration in the original) (quoting *United States v. Mfrs. Nat'l Bank of Detroit*, 536 F.2d 699, 703 (6th Cir. 1976)).

While Ali maintains that his own involvement in the piracy of the *CEC Future* was not criminal, he does not contest that what occurred was a crime. Therefore, the only question is whether there was a "fair probability that contraband or evidence of [that] crime [would] be found in" the warrants' targets. *Gates*, 462 U.S. at 238; *see Zurcher*, 436 U.S. at 558; *Mays*, 134 F.3d at 814 ("[S]earch warrants are directed, not at persons, but at property where there is

---

experience, and information provided to [him] by other law enforcement agents," he" knew that "individuals who use email in connection with criminal activity, or activity of questionable legality, often set up separate email accounts to be used solely for limited criminal purposes" in "an effort to avoid detection and to separate personal communication from communication and information that is related to the criminal activity." (*Id.*, Ex. 1 at 1395–96.)

As with the above, this argument hinges on Ali's characterization of his communications as showing his innocent state of mind.

probable cause to believe that . . . evidence of a crime will be found.").[25]  On these facts, Ali's

intent was not relevant to the magistrates' determinations of probable cause.

The Fourth Circuit's recent decision in *Sennett v. United States*, 667 F.3d 531 (4th Cir.

2012), is illustrative.  Laura Sennett was "a photojournalist who claim[ed] a special interest in

covering protests, political demonstrations, and grassroots activism."  *Id.* at 532 (internal

quotation marks omitted).  In April 2008, she "received a phone tip that there would be a

demonstration during the International Monetary Fund's ('IMF') annual spring meeting at the

Four Seasons Hotel in Washington, D.C."  *Id.* at 533.  She "arrived at the Four Seasons at

approximately 2:30 a.m. on April 12, 2008, in order to photograph the protest," allegedly

"unaware that the purported protesters planned to destroy property or commit other criminal

acts."  *Id.*  Nonetheless, the protest turned violent.  "[I]ndividuals entered the hotel lobby and

threw firecrackers and smoke-generating pyrotechnic devices, along with paint-filled balloons, at

various targets," and "shattered a large glass window by the entrance" before fleeing the scene.

*Id.*

The hotel's security camera footage revealed a woman "using a small handheld camera to

videotape or photograph the protest."  *Id.*  The photographer was dressed similarly to the

---

[25] Therefore, Ali is incorrect when he argues that "the government could not rummage through
Mr. Gullestrup's email account, mobile phone records, and laptop files—without any indication
of impropriety by Mr. Gullestrup—simply because he *discussed* the *CEC Future* incident with
journalists, law enforcement officers, and maritime security experts."  (Def. Suppression Reply
at 10 (emphasis in the original).)  To the contrary, if there was probable cause to believe that
Gullestrup possessed evidence pertaining to crimes committed aboard the *CEC Future*, and if
Gullestrup refused to disclose that evidence to the government, there would be nothing improper
about a search warrant executed against him notwithstanding that he is not suspected of criminal
activity.  *See Mays*, 134 F.3d at 814 ("Property owned by a person absolutely innocent of any
wrongdoing may nevertheless be searched under a valid warrant."); *accord United States v.
Adjani*, 452 F.3d 1140, 1147 (9th Cir. 2006) (same); *United States v. Tehfe*, 722 F.2d 1114, 1118
(3d Cir. 1983) (same).

protestors.  *Id.*  "Like several others present, the photographer . . . remained outside during the

incident in the lobby.  And, after the people who damaged the lobby exited the hotel, the

unidentified female fled from the hotel with or in the same general direction as the protesters."

*Id.*

Eventually, Sennett was identified as the female photographer, *id.*, and a warrant was

issued for a search of her residence for evidence of suspected criminal activity that occurred

during the protest.  *Id.* at 534.  When the warrant was executed, the agents "seized dozens of

items, including an external hard drive allegedly containing more than 7,000 photographs, two

computers, several cameras, and several camera memory cards."  *Id.*  "Sennett was never

arrested or charged with any crimes relating to" the protest.  *Id.*

Sennett sued under the Privacy Protection Act, 42 U.S.C. §§ 2000aa *et seq.*, arguing that

the search of her residence was unlawful for lack of probable cause.  *Id.*[26]  The district court

granted summary judgment in favor of the government.  *Id.* at 534–35.  On appeal, Sennett

argued that there was no probable cause because there were "innocent explanation[s] for her

actions":

> For instance, Sennett argue[d] that she believed there was a noncriminal purpose
> for protesting at night—such as waking up the IMF delegates—rather than
> concealing criminal acts under cover of darkness.  Moreover, Sennett argue[d]
> that she fled not out of a consciousness of guilt, but because she was frightened
> for her safety.

---

[26] The Privacy Protection Act "prohibits government searches for documents and materials that
are intended for publication," but does not apply "when the person possessing the materials is a
criminal suspect, rather than an innocent third party."  *Sennett*, 667 F.3d at 535 (emphasis,
internal quotation marks, and citations omitted).  To take advantage of this exception, the
government must have "'probable cause to believe that the person possessing such materials has
committed or is committing the criminal offense to which the materials relate.'"  *Id.* (quoting 42
U.S.C. §§ 2000aa(a)(1) & (b)(1)).  The question in *Sennett* was whether this so-called "suspect
exception," under which the police claimed authority to search Sennett's residence, applied.  *Id.*

*Id* at 536. The Fourth Circuit, however, upheld the grant of summary judgment in favor of the

government:

> Such plausible explanations, *based on Sennett's subjective mindset*, . . . do not
> factor into the probable cause calculus. "[I]n considering the totality of the
> circumstances, [a defendant's] innocent explanations for his odd behavior cannot
> eliminate the suspicious facts from the probable cause calculus. The test is not
> whether the conduct under question is consistent with innocent behavior; law
> enforcement officers do not have to rule out the possibility of innocent behavior."
> *Ramirez v. City of Buena Park*, 560 F.3d 1012, 1024 (9th Cir. 2009) (internal
> quotation marks omitted). . . . [Furthermore,] [a]lthough Sennett's occupation
> provides an innocent explanation for her appearance in the security camera
> footage, the other facts nevertheless permitted [the affiant] to reasonably conclude
> that Sennett was involved in the acts of vandalism. *See United States v. Booker*,
> 612 F.3d 596, 601 (7th Cir. 2010) ("The possibility of an innocent explanation
> does not vitiate properly established probable cause.").

*Sennett*, 667 F.3d at 536 (emphasis added, some alterations in the original);[27] *cf. Pennsylvania v.*

*Dunlap*, 129 S. Ct. 448, 448 (2008) (Roberts, C.J., dissenting from the denial of a cert. petition)

("an officer is not required to eliminate all innocent explanations for a suspicious set of facts to

have probable cause to make an arrest" (citing *Gates*, 462 U.S. at 244 n.13)). Here, any innocent

explanations for Ali's actions were irrelevant to the question of probable cause. The issuing

magistrates were not required to make a determination of Ali's guilt or innocence, or to assess

his intent.

---

[27] In his reply in support of his motion to suppress, Ali posits that,

> if an affidavit stated that criminal informant observed a kilo of marijuana inside a
> particular building, a search warrant would likely be issued. But that search
> warrant would have been illegal *based upon that fact alone* if the building was a
> research laboratory authorized to possess marijuana, and the affiant had
> deliberately failed to disclose that fact.

(Def. Suppression Reply at 3 n.1 (emphasis added).) *Sennett* demonstrates why Ali is incorrect:
the omission of such an "innocent explanation" would *not* be determinative where the affidavit
stated "other facts" that would "permit[ the affiant] to reasonably conclude that" the building
would contain evidence of a crime. 667 F.3d at 536.

Under *Franks*, "the intentional or reckless omission of *material* exculpatory facts from information presented to a magistrate may . . . amount to a Fourth Amendment violation," *Burke* 405 F.3d at 81 (emphasis added), and omitted facts are "material" only if "their inclusion in the affidavit would defeat probable cause." *Spencer*, 530 F.3d at 1007 (internal quotation marks omitted). The exculpatory facts that Ali claims were omitted from the affidavits (*see supra* n.24) speak to his intent and nothing more.[28] Because Ali's intent was not at issue, those facts were not material to the magistrates' findings of probable cause and Ali is not entitled to a *Franks* hearing on the basis of their omission. 438 U.S. at 156.

### C.      Staleness

Ali also argues that the affidavits were based on such stale information that the executing officers "'could not have harbored an objectively reasonable belief in the existence of probable cause.'" *Webb*, 255 F.3d at 905 (quoting *Leon*, 468 U.S. at 926). Specifically, Ali protests that the piracy of the *CEC Future* concluded more than fifteen months before the first warrant application was submitted on May 25, 2010, and more than two years before the majority of the warrant applications were submitted in April and May 2011.

It is true that in cases that pre-date *Leon*, the D.C. Circuit concluded that probable cause expired in far shorter periods. *See, e.g.*, *Schoeneman v. United States*, 317 F.2d 173, 177–78 (D.C. Cir. 1963) (no probable cause to believe that classified documents were in defendant's house when they were last seen 107 days before the application for the warrant was made). Yet, "[i]n determining probable cause for the issuance of a search warrant, time alone, of course, is not controlling." *Id.*; *see United States v. Harris*, 369 F.3d 1157, 1165 (10th Cir. 2004) ("The

---

[28] Other omitted facts revealed more than Ali's intent. The Court will addresses these facts below.

determination of timeliness . . . does not depend on simply the number of days that have elapsed between the facts relied on and the issuance of the warrant." (internal quotation marks and citation omitted)). Rather, "the probable-cause requirement looks to whether evidence will be found *when the search is conducted*." *United States v. Grubbs*, 547 U.S. 90, 95 (2006) (emphasis in the original). Accordingly, the critical question is whether, at the time an affidavit is presented to a magistrate, it establishes probable cause that evidence will be found at the location of the search. *United States v. Abboud*, 438 F.3d 554, 572 (6th Cir. 2006). In answering this question, courts consider, *inter alia*, "the nature of the criminal activity, the length of the activity, and the nature of the property to be seized." *Harris*, 369 F.3d at 1165 (internal quotation marks and citation omitted).

As relevant here, "courts have determined that when the evidence sought is of a type that would be maintained after the criminal activity ceased, then older information can still be considered reliable when used to obtain a search warrant." *United States v. Edelin*, 128 F. Supp. 2d 23, 46 (D.D.C. 2001) (collecting cases). Where a warrant targets documentary materials such as business records, for example, staleness presents less of a concern because these "are the type of records typically found to be maintained over long periods of time." *United States v. Dozier*, 844 F.2d 701, 707 (9th Cir. 1988) (citing *Andresen v. Maryland*, 427 U.S. 463, 478 n.9 (1976)); *see United States v. Procopio*, 88 F.3d 21, 26 (1st Cir. 1996) (noting that although "the crime had taken place 14 months before" the affidavit was sworn, this span of time "did not eliminate the likelihood that the paper trail of financial records could be found in [the defendant's] residence"). Where the records or documents in question are digital, staleness is even less of a problem. "[D]igital files remain on computers for extensive periods of time," such that "the passage of time does not necessarily render the evidence stale." *United States v. Coon*, No. 10-

34

CR-110A, 2011 WL 1871165, at *3 (W.D.N.Y. May 16, 2011) (collecting cases).  Thus, "'the

nature of digital evidence . . . weighs against a finding of staleness.'"  *United States v. Payne*,

394 F. App'x 891, 894 (3d Cir. 2010) (unpublished) (quoting *United States v. Payne*, 519 F.

Supp. 2d 466, 477 (D.N.J. 2007)).

In addition, "[c]ourts have been considerably more lenient in assessing the currency of

information supporting probable cause in the context of extended conspiracies than in the context

of single-incident crimes."  *Webb*, 255 F.3d at 905.  Accordingly, staleness is also less likely to

defeat the existence of probable cause where the affidavit alleges ongoing criminal activity.

*Abboud*, 438 F.3d at 573; *see United States v. Greene*, 250 F.3d 471, 481 (6th Cir. 2001); *accord

United States v. McElroy*, 587 F.3d 73, 77–78 (1st Cir. 2009); *United States v. Kennedy*, 427

F.3d 1136, 1142 (8th Cir. 2005); *United States v. Riddick*, 156 F.3d 505, 509 (3d Cir. 1998);

*United States v. Harris*, 20 F.3d 445, 450 (11th Cir. 1994) (collecting cases).  Furthermore, "acts

which are not inherently criminal may become criminal and support a finding of probable cause

if committed to further an ongoing conspiracy."  *Id.* at 451 n.7.

All of the above factors weigh in the government's favor.  The magistrates were entitled

to conclude that the evidence targeted by the warrants (documents, computer files, emails, call

records, text messages, photos, and address book entries pertaining to piracy) was of the "type

that would be maintained after" the pirates released the *CEC Future*.  *Edelin*, 128 F. Supp. 2d at

46.  Furthermore, the affidavits allege that Ali continued to use his email account, cell phone,

and computer to communicate about piracy well after the *CEC Future* incident,[29] which in itself

---

[29] *See* Def. Mot to Suppress, Ex. 1 at 1393 (alleging that Ali continued to use his email address to communicate about the *CEC Future*, and piracy more generally, after he disembarked from the boat); *id.*, Ex. 4 at 1367–68 (same, cell phone); *id.*, Ex. 5 at 1442–43 (same, laptop computer); *id.*, Ex. 6 at 1458–59 (same, external hard drive); *id.*, Ex. 7 at 1418 (same, email).

may be enough to "defeat [Ali's] claim of staleness." *Abboud*, 438 F.3d at 573.  The fact that Ali

conceivably could have deleted his email, wiped his phone, cleared his computer, or destroyed

his business records is of no consequence to the Court's inquiry, for probable cause requires only

a "*fair probability* that contraband or evidence of a crime will be found." *Gates*, 462 U.S. at 238

(emphasis added).  At the very least, the Court concludes that the warrants were not so lacking in

fresh information so as to make the executing officers' reliance on them objectively

unreasonable.  *Webb*, 255 F.3d at 905.

Having rejected Ali's general challenges to the affidavits' omissions of certain allegedly

exculpatory facts and to their purported staleness, the Court will now assess Ali's remaining

arguments for suppression.[30]

D.      **May 25, 2010 and October 11, 2011 search warrants for Ali's email**

1.      **May 25, 2010 warrant**

On May 25, 2010, a magistrate issued a warrant authorizing the police to search Ali's

email account.  (Def. Mot. to Suppress, Ex. 1)  Ali alleges that he is entitled to a *Franks* hearing

because the affidavit underlying the warrant contains misrepresentations and omissions.

Certain of Ali's allegations can be summarily dismissed.  First, Ali protests that the

affidavit described him as "very knowledgeable about pirate operations, procedures and ransom

negotiations" (*id.*, Ex. 1 at 1386), notwithstanding that Gullestrup had told the affiant that, after

Ali boarded the *CEC Future*, Ali "realized he was in over his head and remained in his own

---

[30] As to the April 21, 2011 warrant for Ali's cell phone, Ali only argued that the underlying
affidavit was stale.  (*Id.* at 28.)  Because the Court has rejected that argument, it need not further
address that particular warrant.

cabin away from the pirates." (*Id.*, Ex. 14[31] at 2010.)  But the Court does not agree that these statements are "in considerable tension."  (*Id.* at 22.)  Ali may have known a great deal about piracy generally but still have been overwhelmed by the specific occurrences aboard the *CEC Future*.  This rather nuanced dispute over the proper inference does not rise to the level of a falsity.

Second, Ali challenges the fact that the affidavit describes as a "ruse" his alleged statement to Clipper that "his was life in danger."  (*Id.*, Ex. 1 at 1391.)  Ali alleges that the characterization was false because Gullestrup had told the affiant that, "[a]round day 60 of the hijacking, the pirates were thinking about getting another negotiator" and "confined Ali to his cabin."  (*Id.*, Ex. 14 at 2013.)  However, Gullestrup's source for this information was Ali himself.  The fact that Gullestrup relayed Ali's statements to the affiant does not undercut the affiant's belief that the whole story was pretextual.[32]

---

[31] Exhibit 14 to Ali's motion to suppress is an April 13, 2010 summary, written by the affiant who sought the May 25, 2010 warrant, of the affiant's interview with Gullestrup.  The words quoted above are the affiant's own.

[32] In his reply, Ali argues that an affiant's beliefs and inferences have no place in an application for a warrant.  (Def. Suppression Reply at 4–6.)  As noted, the Fourth Amendment requires "the usual inferences which reasonable men draw from evidence . . . [to] be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime."  *Johnson*, 333 U.S. at 14.  Yet, this statement merely stands for the proposition that the ultimate question of whether probable cause exists, *i.e.*, whether "the right of privacy must reasonably yield to the right of a search," is "to be decided by a judicial officer, not by a policeman."  *Id.*  Thus, were an affidavit to consist solely of a policeman's beliefs, it would not support the issuance of a warrant.  *See Ventresca*, 380 U.S. at 108–09 (Probable cause cannot "be made out by affidavits which are purely conclusory, stating only the affiant's or an informer's belief that probable cause exists without detailing any of the underlying circumstances upon which that belief is based." (internal quotation marks omitted)).  But, in alleging facts and arguing why probable cause exists, the Fourth Amendment does not prohibit an affiant from stating his beliefs.  *Cf. Jones*, 362 U.S. at 269 ("an affidavit does not establish probable cause which merely states the affiant's belief that there is cause to search, *without stating facts upon which that belief is based*" (emphasis added) (citing *Nathanson v. United*

Ali's remaining challenges to the sufficiency of the affidavit underlying the May 25, 2010 warrant are more troubling.  First, the affiant knew that "[t]here was no email contact with the [p]irates" or with Ali while they were onboard the *CEC Future* (*id.*, Ex. 14 at 2010), but immediately after describing the piracy negotiations and ransom payment (*see id.*, Ex. 1 at 1390–91), the affiant implied that Ali used email *during* negotiations by stating, "[s]ometime during discussions between Mr. Ali and Clipper Shipping, Mr. Ali provided a Clipper Shipping representative his email address."  (*Id.*, Ex. 1 at 1391.)  The Court agrees that a fair reading of the above, in combination with other passages in the affidavit,[33] could create the impression that

_____

*States*, 290 U.S. 41 (1933)); *Virgin Islands v. John*, 654 F.3d 412, 420 (3d Cir. 2011) ("[A]n individual's Fourth Amendment right cannot be vitiated based on fallacious inferences *drawn from facts not supported by the affidavit*." (alteration in the original, emphasis added) (quoting *United States v. Falso*, 544 F.3d 110, 122 (2d Cir. 2008) (Sotomayor, J.))).  Rather, the Fourth Amendment ensures that it is a magistrate who decides whether those beliefs are reasonable in light of the facts alleged, and whether the affidavit as a whole demonstrates the existence of probable cause.  *See id.* (a "bedrock principle of the Fourth Amendment" requires "that a warrant applicant state explicitly her belief . . . as well as reasons justifying such a belief").

[33] For example, the affidavit states:

> During [the piracy of the *CEC Future*], Mr. Ali and Clipper Shipping were in constant contact to discuss ransom amounts, the welfare of the crew and terms of release.  Mr. Ali requested that Clipper Shipping activate communications systems, *specifically email* and fax, in order to expedite the ransom negotiations.  Mr. Ali *utilized the ship's satellite telephone*, a Somali based mobile telephone, and the ship's fax machine *during these negotiations*.

(Def. Mot. to Suppress, Ex. 1 at 1387 (emphasis added).)  Later, the affidavit stated that, "[a]s noted above, the investigation has revealed that Mr. Ali utilized the *ali_ali692@hotmail.com* account to communicate with Clipper Shipping."  (*Id.*, Ex. 1 at 1392.)  The implication is that Ali was able to access his email via the ship's satellite phone and used his email to conduct negotiations.

Ali used his email account to negotiate with Clipper during the piracy, when the affiant knew that he did not.[34]

Second, the affiant's statement that Ali "expressed concern that ███████ would have his email address," and the affiant's corresponding "belie[f] that this indicates that Mr. Ali still utilizes this email address for communications and is concerned that ████████ may be able to access the account," are also troublesome.  (*Id.*, Ex. 1 at 1392.)  In fact, as the affiant knew, ████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████  That the affiant knew this,

███████████████████████████████, belies his characterization in the affidavit.

---

[34] As Ali argues, "[i]ndeed, even the *FBI agents* who [authored affidavits after the May 25, 2010 warrant was issued] appear to have been misled by [the] language" in the affidavit underlying the May 25, 2010 warrant.  (Def. Suppression Reply at 12 (emphasis in the original); *see* Def. Mot. to Suppress, Ex. 3 at 1490 ("During the negotiations, Ali communicated with Clipper Group A/S via email and fax."); *id.*, Ex. 5 at 1442 (same); *id.*, Ex. 6 at 1458 (same); *id.*, Ex 7 at 1416 ("Based on identification of [ali_ali692@hotmail.com] as being *used by Mr. Ali during the time of the piracy* of the *CEC Future*, a search warrant . . . was issued by the United States District Court for the District of Columbia." (emphasis added) (referencing the May 25, 2010 warrant)).

Yet, although these misstatements and omissions may well have misled the magistrate, Ali is only entitled to a *Franks* hearing if they are material, *i.e.* if, when the misstatements are "set to one side" and the omitted facts are included, the corrected affidavit does not "support a finding of probable cause."  438 U.S. at 171–72; *see Spencer*, 530 F.3d at 1007.  Here, Ali argues that the misstatements and omissions are material because the corrected affidavit does not demonstrate the required "nexus between the place to be searched, the things to be seized, and the underlying criminal activity."  *United States v. Glay*, No. 08-cr-213, 2009 WL 1921405, at *2 (D.D.C. June 30, 2009).[35]  With regard to the May 25, 2010 warrant, the place to be searched is Ali's email account, the things to be seized are emails within a certain timeframe pertaining to specified subjects, and the underlying criminal activity is the piracy of the *CEC Future*.  (*See* Def. Mot. to Suppress, Ex. 1 at 1381, 1386, 1391.)

Ali is surely correct that it would not be enough if the corrected affidavit amounted to nothing more than, for example, "crimes were committed aboard the *CEC Future*, Ali was aboard the *CEC Future* and may have participated in those crimes, and Ali has an email account."  In concluding that warrants to search suspects' email accounts adequately establish a nexus, courts insist on a direct connection between the alleged criminal activity and the specific email account at issue,[36] and that connection typically arises because the affidavit asserts that the

---

[35] *See United States v. Hammons*, 411 F. App'x 837, 842 (6th Cir. 2011) (unpublished) ("Affidavits supporting a search warrant have to establish a nexus between the place to be searched and probable evidence of criminal activity . . . ."); *United States v. Peterson*, 145 F. App'x 820, 821 (4th Cir. 2005) (unpublished) ("For a search warrant to be supported by probable cause, a nexus must be established between the place searched and the alleged criminal activity." (citing *United States v. Lalor*, 996 F.2d 1578, 1582 (4th Cir. 1993)).

[36] In this circuit, the requisite connection can be established by either "an independent evidentiary basis" or "an affiant's statement that her training and experience provides probable cause to believe that there is a nexus between criminal activity and the place to be searched."

account was used in the commission of the crime.[37]  To require anything less would be to

authorize "'a general, exploratory rummaging in a person's belongings'" contrary to the Fourth

Amendment's prohibition against general warrants.  *Andresen*, 427 U.S. at 479 (quoting

*Coolidge v. New Hampshire*, 403 U.S. 443, 467 (1971)).  As Ali notes, however, he is "accused

of committing piracy on the high seas, not software piracy."  (Def. Suppression Reply at 16 n.9.)

The corrected affidavit would state that Ali did not have email access while he was aboard the

*CEC Future*, so his account would not contain any communications made during the piracy.

Furthermore, it would neither state nor imply that Ali had been guarded about revealing his email

address to ████████████████ .

Nonetheless, especially given that Ali's intent is the central issue in this case, the

evidence sought need not be contemporaneous with the piracy to support a finding of probable

cause.  What happened after the pirates released the *CEC Future* is also relevant to that inquiry.

Even when the statements which Ali alleges to be false are left out and the facts which Ali argues

were omitted are included, the affidavit shows a sufficient nexus because it posits that Ali may

---

*Glay*, 2009 WL 1921405, at *3 (citing *United States v. Johnson*, 437 F.3d 69, 71–72 (D.C. Cir. 2006); *United States v. Thomas*, 989 F.2d 1252, 1254 (D.C. Cir. 1993)).

[37] *See, e.g.*, *United States v. Bansal*, 663 F.3d 634, 662 (3d Cir. 2011) ("The affidavit more than sufficiently establishes probable cause to believe Bansal's email accounts contained evidence of his *internet-based* illegal controlled substance distribution operation." (emphasis added)); *United States v. Wagers*, 452 F.3d 534, 541 (6th Cir. 2006) ("the nexus between an AOL email account and *Internet-accessed* child pornography, especially where some of that access has been through AOL IP addresses, is . . . obvious" (emphasis added)); *United States v. Yousef*, No. S308cr1213, 2011 WL 2899244, at *11 (S.D.N.Y. June 30, 2011) ("The affidavit supporting the warrant" specified that the defendant's co-conspirator "used the [target] email account to conduct a fraudulent, large-scale weapons deal" with the defendant.); *United States v. Noyes*, No. 1:08-cr-55, 2010 WL 5139859, at *9 (W.D. Pa. Dec. 8, 2010) ("the exhibits that were attached and incorporated into [the affidavit] clearly showed that Noyes was using the specified Yahoo and Google email accounts to communicate with others in furtherance of his alleged criminal activities").

have used his email to arrange the logistics of his $75,000 payment from Clipper and to communicate with Clipper and others about the piracy thereafter.[38] The Court concludes that these statements establish a sufficient nexus between Ali's email account and the alleged criminal activity. It is not material that Ali had no email access during the time he was onboard the *CEC Future* and that he never expressed concern about revealing his email address to government officials. Therefore, the Court need not determine whether these omissions and misstatements were made intentionally or with reckless disregard for the truth, and Ali is not entitled to a *Franks* hearing with regard to the May 25, 2010 warrant. 438 U.S. at 171–72.

[38] The revised affidavit would include the following statements, *inter alia* (with alterations to correct alleged misstatements and omissions in italics): 1) "The 1.7 million U.S. dollars in ransom was dropped in the water via air and taken on board the *CEC Future* to be counted and divided among the pirates. Mr. Ali was later paid $75,000.00 via money transfer for the successful release of the ship." (Def. Mot. to Suppress, Ex. 1 at 1391.) 2) "Sometime during discussions between Mr. Ali and Clipper Shipping," *but after the CEC Future was released*, "Mr. Ali provided a Clipper Shipping representative his email address of ali_ali692@hotmail.com." (*Id.*) 3) "On April 13, 2010, a Clipper Shipping representative sent an email to Mr. Ali at the address ali_ali692@hotmail.com. [redacted] 4) In another email sent from ali_ali692@hotmail.com, "Ali [redacted] . . . I believe this email message shows that Mr. Ali currently utilizes the ali_ali692@hotmail.com email account to relay information about past and present pirate activities." (*Id.*, Ex. 1 at 1392.) 5) "As noted above, the investigation has revealed that Mr. Ali utilized the ali_ali692@hotmail.com account to communicate with Clipper Shipping." (*Id.*) 6) "It is . . . believed that Mr. Ali may have utilized the email accounts to receive, deposit, and access the U.S. currency . . . he received from Clipper Shipping." (*Id.*, Ex. 1 at 1393.) 7) "I believe that although it is unclear when Mr. Ali exchanged electronic mail addresses with representatives of Clipper [S]hipping, it is likely that Mr. Ali continues to use the email account ali_ali692@hotmail.com to provide current information on pirate activity to at least one representative of Clipper Shipping." (*Id.*) 8) "Accordingly, I believe that further information and evidence regarding the piracy scheme and the identities of the pirates and their co-conspirators is stored within the email account ali_ali692@hotmail.com." (*Id.*)

### 2.    October 11, 2011 warrant

Ali alleges that the second warrant for his email, issued on October 11, 2011 (Def. Mot. to Suppress, Ex. 7), contains similar misstatements and omissions.  The Court concludes that Ali's arguments fail for similar reasons.

First, Ali protests that the affiant for this warrant repeated the statement, made in the May 25, 2010 affidavit, "that Ali's knowledge about piracy indicates that 'he was a key participant in the conspiracy.'"  (*Id.* at 28 (quoting *id.*, Ex. 7 at 1416).)  There is nothing misleading here. Ali's *actions* aboard the *CEC Future*, which the affiant described in some detail (*see id.*, Ex. 7 at 1416), justify the affiant's characterization of Ali as a "key participant."  Whether Ali was a conspirator is a separate issue, and one that is not relevant to the probable cause analysis.  (*See supra* Section II(B).)

Second, Ali argues that this affiant, like the affiant of the May 25, 2010 affidavit, sought "to conjure a nexus by misleading the magistrate into believing that Ali used his personal email account during the *CEC Future* crisis" (*id.* at 29) when the affiant stated that Ali "provided a Clipper Shipping representative with his email address . . . [d]uring the ransom negotiations." (*Id.*, Ex. 7 at 1417.)  Yet, as previously decided, this misstatement does not entitle Ali to a *Franks* hearing.  Had the fact that Ali had no email access while he was aboard the *CEC Future* been included in the affidavit, the affidavit nonetheless still would have supported a finding of probable cause to search Ali's email account because it stated that Ali continued to use the account after he disembarked from the boat to communicate about his experiences on the boat and about his involvement in other piracies.  (*See id.*, Ex. 7 at 1418–19 (describing how Ali communicated about his involvement in the piracy of the *Lynn Rival* via email with reference to evidence obtained via prior warrants, all of which the Court concludes were valid).)

### 3.        Scope of the warrants as executed

In addition to challenging the validity of the May 25, 2010 and October 11, 2011 warrants, Ali challenges their execution, claiming that the officers exceeded the scope of the warrants when they searched his email.  Specifically, Ali claims that the government seized emails that were outside the date ranges and not pertinent to the subject matters specified in those warrants.  (Def. Mot. to Suppress at 27–28, 30–31.)

Here, Ali's claims go to the behavior of the police, and they therefore implicate the precise concerns that motivate the exclusionary rule.  *Davis*, 131 S. Ct. at 2427–28.  Furthermore, challenges to the scope of searches for digital evidence raise unique Fourth Amendment issues, in part because computers and email accounts "'often contain significant intermingling of relevant documents with documents that the government has no probable cause to seize.'"  *United States v. Cioffi*, 668 F. Supp. 2d 385, 391 (E.D.N.Y. 2009) (quoting *United States v. Vilar*, No. S305CR621, 2007 WL 1075041, at *35 (S.D.N.Y. April 4, 2007)).[39]  Thus, the "acute constitutional hazards" of document searches, *United States v. Heldt*, 668 F.2d 1238, 1260 (D.C. Cir. 1981) (per curiam), are amplified in the information age.  *Cioffi*, 668 F. Supp. 2d

---

[39] As the Sixth Circuit has observed:

> [C]omputers hold [a great deal of] personal and sensitive information touching on many private aspects of life.  We recognize individuals have a reasonable expectation of privacy in the content of emails stored, sent, or received through a commercial internet service provider.  *United States v. Warshak*, 631 F.3d 266, 288 (6th Cir. 2010).  And we know there is a far greater potential "for the 'intermingling' of documents and a consequent invasion of privacy when police execute a search for evidence on a computer."  *United States v. Walser*, 275 F.3d 981, 986 (10th Cir. 2001).

*United States v. Lucas*, 640 F.3d 168, 178 (6th Cir. 2011).

at 391 (citing *Andresen*, 427 U.S. at 482 n.11).[40]  Yet, "'it is precisely because computer files can

be intermingled and encrypted that the computer is a useful criminal tool.'"  *Id.* (quoting *Vilar*,

2007 WL 107041, at *35).  Therefore, "'responsible officials, including judicial officials, must

take care to assure that'" searches of computers and email accounts "'are conducted in a manner

that minimizes unwarranted intrusions upon privacy.'"  *Heldt*, 668 F.2d at 1260 (quoting

*Andresen*, 427 U.S. at 482 n.11).

However, absent a showing that an executing officer exhibited "a flagrant disregard for

the limitations in a warrant [that] might transform an otherwise valid search into a general one,

thereby requiring the entire fruits of the search to be suppressed," where "officers seize some

items outside the scope of a valid warrant, this by itself will not affect the admissibility of other

contemporaneously seized items which do fall within the warrant."  *Id.* at 1259 (collecting

cases).  In Ali's motion to suppress, he does not allege that the officers executing the May 25,

---

[40] The *Heldt* court stated:

> In the context of document searches, the need to prevent general, exploratory
> rummaging in a person's belongings is particularly acute.  Unlike searches for
> other tangibles, document searches—like eavesdropping and bugging searches—
> tend to involve broad disclosures of the intimacies of private lives, thoughts and
> transactions.

668 F.2d at 1260 (internal quotation marks, citations, and footnotes omitted).  The court went on
to quote at length from the Supreme Court's decision in *Andresen*, "which involved a search and
seizure of a criminal defendant's office files":

> "[T]here are grave dangers inherent in executing a warrant authorizing a search
> and seizure of a person's papers that are not necessarily present in executing a
> warrant to search for physical objects whose relevance is more easily
> ascertainable.  In searches for papers, it is certain that some innocuous documents
> will be examined, at least cursorily, in order to determine whether they are, in
> fact, among those papers authorized to be seized."

*Heldt*, 668 F.2d at 1260 (quoting *Andresen*, 427 U.S. at 482 n.11).

2010 and October 11, 2011 warrants exhibited such a flagrant disregard.  Indeed, in protesting

the scope of the email searches he only moved for the suppression of "all seized information *not*

*specifically identified by the warrant*[*s*]."  (Def. Mot. to Suppress at 27–28, 31 (emphasis

added).)  For its part, the government has represented that it will not "use any emails outside the

scope of the warrant[s] in its case-in-chief at trial."  (Gov't Suppression Opp'n at 16–17.)  Given

this representation, and in the absence of any argument or evidence by Ali to support a claim of

flagrant disregard, *Heldt* compels this Court to deny Ali's unsubstantiated request (*see* Def.

Suppression Reply at 24) for a hearing on the issue.

> **E.      April 21, 2011 and May 4, 2011 warrants for materials in Ali's possession
> when he was arrested at Dulles International Airport**

> **1.      April 21, 2011 search warrant for Ali's suitcase and computer bag**

While Ali states, without elaboration, that the affidavit underlying the April 21, 2011

warrant for his suitcase and computer bag "is materially misleading," the only argument he puts

forward is that the affidavit so lacked in indicia of probable cause as to make official reliance on

it unreasonable because "[t]here is no reason to believe that probable cause existed that Ali

would be carrying . . . incriminating documents relating to piracy *on his person*" when he landed

at Dulles purportedly en route to attend a conference in North Carolina.  (Def. Mot to Suppress at

31 (emphasis in the original).)  Without more, this claim cannot justify exclusion of the evidence

obtained.  When the customs agents opened Ali's suitcase, the affiant "observed . . . that it

contained documents," and in the affidavit she stated her belief that Ali's luggage might "contain

records or documents related to Ali's participation in the piracy of the *CEC Future* and may

identify individuals or associates who were also involved in the piracy."  (*Id.*, Ex. 3 at 1490–91.)

In combination with the other facts relayed, including that Ali communicated with Clipper

during the piracy via fax (*id.*, Ex. 3 at 1490), these statements were enough to establish probable

cause, or at the very least to make it objectively reasonable for the executing officers to rely on

the magistrate's determination thereof.  *Leon*, 468 U.S. at 922.

>    **2.      April 21, 2011 search warrant for Ali's laptop computer and May 4,
>    2011 search warrant for Ali's external hard drive**

The affidavits underlying the April 21, 2011 warrant for Ali's laptop and the May 4, 2011

warrant for Ali's external hard drive are nearly identical.  After briefly describing the piracy of

the *CEC Future* and Ali's alleged role, the affidavit underlying the April 21, 2011 warrant

indicates that:

- During the negotiations, Ali communicated with Clipper Group A/S via
  email and fax. *Witnesses observed Ali in possession of a laptop computer
  when he boarded the ship.  Witnesses observed him using the laptop
  computer when he boarded the ship.*  Investigation revealed that Ali used
  [the] email address, ali_ali692@hotmail.com.  Ali has communicated with
  numerous people via email regarding piracy after the *CEC Future* was
  released.  In some of those communications, Ali marketed himself as an
  expert in piracy.  It is reasonable to believe that communications regarding
  piracy would be contained on the *laptop computer*.

- Upon arrest, Ali was found to be in possession of a *laptop computer* . . . .

- It is believed that this device and any associated media may contain
  records or documents related to Ali's participation in the piracy of the
  *CEC Future* and may identify individuals or associates who were also
  involved in the piracy.  If the device was used to connect to the internet, it
  may contain records of email communications and their content.

(Def. Mot. to Suppress, Ex. 5 at 1442–43 (emphasis added).)  The affidavit underlying the May

4, 2011 warrant omitted the two italicized sentences, each beginning "Witnesses observed . . .,"

and swapped the italicized references to Ali's "laptop computer" with references to the "external

hard drive" that Ali also had with him when he was arrested.  (*Id.*, Ex. 6 at 1458–59.)  Otherwise,

the affidavits established how the government had come to possess the devices, described their

chain of custody, defined mostly irrelevant "technical terms" (including "digital camera," "GPS," "PDA," and "pager"), and proposed search protocols.  (*Id.*, Ex. 5 at 1443–48; *id.*, Ex. 6 at 1459–64.)

Ali argues that both affidavits suffer from misstatements and omissions that were made intentionally or with reckless disregard for the truth, and that, when corrected, the affidavits fail to establish probable cause.  Critically, whereas the May 25, 2010 warrant for Ali's email only *implied* that Ali had communicated with Clipper during the crisis via email, these warrants *state* that, "[d]uring the negotiations, Ali communicated with Clipper Group A/S *via email* and fax." (*Id.*, Ex. 5 at 1442 (emphasis added); *id.*, Ex. 6 at 1458 (emphasis added).)  To the contrary, at least some government agents knew that Ali did not have email access while he was onboard the *CEC Future*.  (*Id.*, Ex. 14 at 2010 ("There was no email contact with the [p]irates.").)  Indeed, the government has conceded that these statements are "incorrect (and should have read 'via phone and fax')."  (Gov't Suppression Opp'n at 15.)  Still, these warrants sought to search Ali's laptop and external hard drive, not his email, so the nexus calculus is different.  Thus, the government argues that the misstatements are immaterial.

Also troubling is Ali's allegation that the government knew that the laptop computer Ali used aboard the *CEC Future* was damaged sometime after the piracy, and replaced by a different computer, which was the one that Ali carried when he landed at Dulles on April 20, 2011.  When government agents sought the April 21, 2011 and May 4, 2011 warrants, they had in their possession emails from April–May 2010 where Ali explained to a journalist that his laptop had "crashed" (Def. Mot. to Suppress, Ex. 20 at 37), and where the journalist indicated that he had bought Ali a new laptop and arranged for its delivery.  (*Id.*, Ex. 21 at 1103.)  ██████████  ████████████████████████████████████████  Therefore, the

government knew that the laptop Ali had with him when he arrived in the United States could

not have been the laptop witnesses had seen him use when he was onboard the *CEC Future*.

This omission was misleading and goes directly to the nexus question.

Again, however, the Court concludes that these misstatements and omissions were not

material to the establishment of probable cause. Even the corrected affidavits would establish a

sufficient nexus. The affiants placed Ali onboard the *CEC Future* using a laptop, and landing at

Dulles with a laptop and external hard drive. Even if the affidavits omitted any mention of email

and stated that two different laptops were at issue, the possibility that Ali might have transferred

his files from one to the other, or from his original laptop to the external drive, would establish a

"fair probability" that Ali's laptop and external hard drive would contain evidence of a crime.

*Gates*, 462 U.S. at 238. Therefore, the alleged omissions and misstatements do not provide a

basis for a *Franks* hearing.[41]

## CONCLUSION

For the reasons stated, the Court will deny the government's motions in limine pertaining

to evidence of Ali's mental state, grant Ali's motion for the admission of evidence under Rule

---

[41] In the alternative, the government argues that all of the searches authorized by the April 21, 2011 and May 4, 2011 warrants could have been executed without warrants pursuant to the government's authority to conduct searches incident to arrest and border searches without warrants. (*See* Gov't Suppression Opp'n at 11; Gov't Supp. Suppression Mem. at 1–4.) The government appeals to the "inevitable discovery" doctrine on the theory that any inadequacies in its April 21, 2011 and May 4, 2011 warrants are irrelevant where the evidence "could [have been] lawfully . . . obtained through another" lawful process. *Cioffi*, 668 F. Supp. 2d at 397. Because the Court concludes that the warrants were valid, however, it need not address the government's alternative argument.

404(b), and deny Ali's motion to suppress.  A separate Order accompanies this Memorandum

Opinion.[42]

> _____/s/_____
> ELLEN SEGAL HUVELLE
> United States District Judge

Date:   May 25, 2012

---

[42] Because many of the underlying motions, oppositions, and replies are sealed, the Court is issuing this Memorandum Opinion under seal.  The accompanying Order directs the parties to notify the Court by June 8, 2012, of whatever redactions are necessary in order for this Memorandum Opinion to be unsealed.