| | |
|---|---|
| **UNITED STATES OF AMERICA** | **Criminal No. 11-0106** |
| v. | |
| **ALI MOHAMED ALI,** | |
| *Defendant.* | |

## MEMORANDUM OPINION

Before the Court is Ali Mohamed Ali's Renewed Motion for Pretrial Release.  Ali has been subjected to pretrial detention for over twenty-eight months, and his trial is not scheduled to begin until November.  There is a point in time at which due process can no longer tolerate additional pretrial detention.  For Ali, that time has come.  Accordingly, the Court will grant Ali's renewed motion for pretrial release on the grounds that his continued pretrial detention violates his rights to due process.

### BACKGROUND

On November 7, 2008, pirates attacked and seized the *M/V CEC Future* as it was sailing in the Gulf of Aden, near the Horn of Africa.  They held the ship and its crew hostage in order to secure a ransom from Clipper Group A/S, the ship's owner.  Clipper paid $1.7 million on January 14, 2009, and the pirates disembarked the ship over the following two days.

Defendant Ali Mohamed Ali is accused of assisting the Somali pirates in their enterprise by negotiating the pirates' ransom demands directly with Clipper.  Ali boarded the *CEC Future* two days after it was taken by the pirates.  An English-speaker, he communicated the

pirates' demands to Clipper representatives during the remaining sixty-nine days while the vessel was held and departed the ship after the ransom was received.

In April 2011, more than two years after the release of the *CEC Future*, Ali – then acting Director General of the Ministry of Education in Somaliland, a self-declared republic within Somalia – traveled from Somalia to the United States to attend an educational conference in Raleigh, North Carolina. Unbeknownst to Ali, U.S. officials had concocted the conference as a ruse to secure his presence within the United States. U.S. officials arrested Ali when he landed at Dulles International Airport on April 20, 2011, and charged him in a three-count indictment with conspiracy to commit piracy under the law of nations, in violation of 18 U.S.C. § 371, aiding and abetting piracy under the law of nations, in violation of 18 U.S.C. §§ 1651 and 2, and aiding and abetting attack to plunder vessel, in violation of 18 U.S.C. §§ 1659 and 2. (Indictment, April 15, 2011 [Dkt. No. 6].)

On April 28, 2011, the government successfully moved for Ali's detention pending trial, arguing that Ali presented an "extraordinary risk of flight." (*See* Gov't Mot. in Support of Pretrial Detention, April 28, 2011 [Dkt. No. 10] at 8.) Ali subsequently moved for pretrial release. On June 24, 2011, the Honorable Paul L. Friedman denied Ali's motion for release. *See United States v. Ali*, 793 F. Supp. 2d 386 (D.D.C. 2011) ("*Ali I*"). In denying the motion, Judge Friedman did not determine whether Ali's release would endanger any person or the community. *Id.* at 392 n.4. Instead, his determination was based entirely on risk of flight. *Id.* Judge Friedman found that "the gravity of the charges, the potential length of Mr. Ali's sentence, his ties abroad, his past acts of misrepresentation [involving his immigration status in 1988 and 1995], and the presumption created by the charges against him all lead the Court to find by a preponderance of the evidence that Mr. Ali poses a serious flight risk." *Id.* at 392. Accordingly,

Judge Friedman concluded that "no condition or combination of conditions [could] reasonably assure the appearance of the defendant" at trial, and denied Ali's motion for bond. *Id.*

Over the next several months the government moved to delay the trial on two occasions. Ali objected to the delays and continually asserted his speedy trial rights. On May 11, 2011, only two weeks after Ali's arraignment, the government sought to delay the trial by up to a year to wait for evidence that it had requested through mutual legal assistance treaties with foreign countries. (*See* Application for Exclusion of Time Within Which Trial Must Commence, May 11, 2011 [Dkt. No. 15] at 3-4.) Judge Friedman granted the motion in part, but only tolled the speedy trial clock until May 31, 2011. (*See* Minute Entry, May 12, 2011.) On August 19, 2011, the government made a second request to delay the trial, this time until February 1, 2012, arguing, *inter alia*, that the "unusual and[] complex" nature of the case required additional time to prepare for trial. (*See* Application for Exclusion of Time Within Which Trial Must Commence Under the Speedy Trial Act, Aug. 19, 2011 [Dkt. No. 36] at 1.) Over Ali's opposition, Judge Friedman granted the motion. (Findings of Fact and Order, Sept. 6, 2011 [Dkt. No. 42].)

On December 5, 2011, Ali, having now been detained for over seven months, renewed his motion for pretrial release. (*See* Defs.'s Sealed Renewed Mot. for Pretrial Release, Dec. 5, 2011 [Dkt. No. 71].) In support of his motion, Ali argued that the record, as expanded since his initial bond hearing, no longer supported his pretrial detention, or, in the alternative, that continued pretrial detention violated his due process rights. (*See generally* Defs.'s Memo. of Points and Authorities in Support of Defs.'s Renewed Mot. for Pretrial Release, Dec. 5, 2011 [Dkt. No. 72-2].) Judge Friedman heard arguments on the motion on December 20, 2011, and from the bench he affirmed his prior ruling that Ali's risk of flight necessitated a finding that no

condition or combination of conditions could reasonably assure his appearance at trial. *See United States v. Ali*, 2011 WL 6748503, at *1 (D.D.C. Dec. 21, 2011). The next day, Judge Friedman rejected Ali's due process claim in a written opinion. *Id.* He concluded that "[w]hile it may be true that at some point and under some circumstances, the duration of a defendant's pretrial detention becomes unconstitutional, . . . that point has not been reached in this case." *Id.* (citation omitted). In reaching this conclusion, Judge Friedman emphasized that "[w]hile the defendant has been detained for seven (7) months, a firm trial date now has been set – May 21, 2012 – *assuring that the defendant will not have been detained in advance of trial for more than twelve (12) months*." *Id.* (emphasis added). During the December 20, 2011 hearing on the motion, Judge Friedman also stated that he would "revisit . . . bond . . . [i]f [trial] is going to be in the fall [of 2012]" because Ali was "not going to sit in jail until the fall [of 2012]." (12/20/11 Mot. Hr'g Tr. at 4.)

Ali appealed, and on March 14, 2012, the D.C. Circuit affirmed. *See United States v. Ali*, 459 F. App'x 2 (D.C. Cir. 2012). The Court of Appeals held that Judge Friedman "did not commit reversible error in determining" that pretrial detention was necessary and that Ali "had not established a due process violation based upon the length of [his] pretrial detention." *Id.* at 3. In its denial of Ali's petition for rehearing, the Court of Appeals clarified that its panel decision was "*without prejudice to [Ali] raising in the district court his argument that new developments warrant a new bond hearing*." *United States v. Ali*, No. 12-3001, Doc. No. 1373195 (D.C. Cir. May 10, 2012) (emphasis added).

On December 30, 2011, the case was reassigned to the undersigned. This Court oversaw the government's production of classified and non-classified evidence, a host of evidentiary and legal motions, and the full briefing on Ali's motion to dismiss all counts of the first superseding

4

indictment.  Given the extensive discovery, including classified information that had to be produced, and an extensive motions practice, the May trial date was not realistic.  (*See* 3/15/12 Status Hr'g Tr. [Dkt. No. 155] at 7.)  Moreover, on May 8, 2012, the government filed a second superseding indictment.[1]  Following the return of this second superseding indictment, renewed and modified motions to dismiss were filed (*see* Omnibus Mot. To Dismiss Counts, May 29, 2012 [Dkt. No. 188]), and a two-month trial was set to commence on July 31, 2012.

On July 13, 2012, the Court granted in part and denied in part Ali's motion to dismiss. *See United States v. Ali*, 885 F. Supp. 2d 17 (D.D.C. 2012) ("*Ali II*"), *vacated in part*, 885 F. Supp. 2d 55 (D.D.C. 2012) ("*Ali III*"), *rev'd in part and aff'd in part*, 718 F.3d 929 (D.C. Cir. 2013).  The Court dismissed Count One of the indictment, which alleged conspiracy to commit piracy under 18 U.S.C. §§ 1651 and 371.  *Id.* at 33-35.  The Court also narrowed the scope of Count Two, holding that, while Ali's prosecution for aiding and abetting piracy in violation of 18 U.S.C. §§ 1651 and 2, "may proceed as it is articulated in . . . the indictment," "[i]t will be the government's burden to convince the jury beyond a reasonable doubt that Ali intentionally facilitated acts of piracy while he was on the high seas." *Id.* at 32.  The Court then denied Ali's due process challenge to his prosecution for hostage taking under 18 U.S.C. §§ 1203 and 2, in Counts Three and Four.  *Id.* at 43-45.  The Court's determination that Counts Three and Four could proceed was contingent in part on the fact that the hostage taking charges in those counts "allege the same high-seas conduct for which Ali is lawfully subject to prosecution for piracy" in Count Two.  *Id.* at 45.

---

[1] The superseding indictment charged Ali with four counts: conspiracy to commit piracy under the law of nations in violation of 18 U.S.C. §§ 1651 and 371 (Count One); aiding and abetting piracy under the law of nations in violation of 18 U.S.C. §§ 1651 and 2 (Count Two); conspiracy to commit hostage taking in violation of 18 U.S.C. § 1203 (Count Three); and aiding and abetting hostage taking in violation of 18 U.S.C. §§ 1203 and 2 (Count Four).  (*See* Superseding Indictment, May 8, 2012 [Dkt. No. 172].)

On July 19, 2012, the government filed a motion for reconsideration of the Court's limitation of the aiding and abetting piracy charge in Count Two. (Mot. for Reconsideration, July 19, 2012 [Dkt. No. 242].)[2] The next day, on July 20, 2012, the government admitted at a status conference for the first time since the commencement of the case "that it had scant evidence to show that Ali aided and abetted the pirates while he was on the high seas." *Ali III*, 885 F. Supp. 2d at 58. Up until that point – and as recently as June 11, 2012 – the government had taken the position that "the indictment alleges" and "the evidence will show that [Ali] was acting as a negotiator for the pirates while the *CEC Future* was on the high seas." (Gov't Opp'n to Def.'s Mot. to Dismiss Counts of the Indictment, June 11, 2012 [Dkt. No. 201] at 8-9.)

During the July 20, 2012 status conference, the government identified "a concern government-wide about the [Court's] interpretation" of Count Two, and informed the Court that it was considering filing an interlocutory appeal of the Court's July 13, 2012 decision. (*See* 7/20/12 Status Hr'g Tr. [Dkt. No. 280] at 83.) In response to the government's representation, the Court notified counsel of its intent to reconsider Ali's bond status given the delay that would necessarily be caused by an interlocutory appeal. (*Id.* at 78-80.)

By letter dated July 24, 2012, the government formally notified the Court that it intended to pursue an interlocutory appeal of the Court's July 13, 2012 decision. (*See* Letter Regarding Intention to File a Notice of Appeal, July 24, 2012 [Dkt. No. 259].) That same day, the Court reconsidered Ali's pretrial detention. The Court orally ruled that new information substantially

---

[2] The government requested that the Court address its motion for reconsideration "by midday on July 26" in order to enable the government, if the Court were to deny its motion, "to decide promptly whether to notice an [interlocutory] appeal." (Mot. for Reconsideration at 13 n.12 (citing 18 U.S.C. § 3731).) It was not until the government filed this motion for reconsideration that it provided any legal argument for the position that an aider and abettor of piracy does not have to commit any acts on the high seas. (*See generally id.* at 3-12.)

undermined the arguments the government had made to Judge Friedman as to risk of flight. (*See* 7/24/12 Status Hr'g Tr. at 28 ("[T]he weight of the evidence is no longer anywhere as compelling as it was before.").) In particular, the Court noted that Ali had less of an incentive to flee to Somalia, because his son no longer resided there (*id.* at 17); he had a long history of working with the U.S. government (*id.* at 9, 21); contrary to the government's initial representations, he had family and friends in the Washington, D.C. area (*id.* at 27); there was "no evidence that [he] ever participated in any kind of violence" (*id.* at 25); and high-level executives of Clipper "thought he did an excellent job and . . . recommended him for subsequent cases," and thus, the government's main witness was "going to come on and say he likes him." (*Id.* at 28.) For these reasons, the Court ruled from the bench that Ali presented neither a flight risk (*id.* at 24, 28), nor a danger to the community. (*Id.* at 28.) The Court subsequently ordered Ali's release into home confinement with Mr. Said of Centerville, Virginia, under the Pretrial Service Agency's high-intensity supervision program. (Order Setting Conditions for High Intensity Supervisory Program, July 24, 2012 [Dkt. No. 261].)

The next day, considering the government's intention to file an interlocutory appeal, the Court vacated its prior ruling with regard to the hostage takings charges, and dismissed Counts Three and Four of the indictment. *Ali III*, 885 F. Supp. 2d at 58. On July 27, 2012, the government filed its notice of appeal from that ruling, as well as the Court's prior July 13, 2012, ruling.

On the same day, the government appealed the Court's order releasing Ali. The only argument before the Court of Appeals raised by the government was risk of flight. (*See generally* Appellant's Memo. of Law and Fact Seeking Reversal of the District Ct.'s Order of Release, *United States v. Ali*, No. 12-3057, Doc. No. 1386747 (D.C. Cir. July 31, 2012).) On

August 3, 2012, the Court of Appeals reversed and remanded to this Court to order Ali's

immediate return to custody for detention pending trial. *United States v. Ali*, 473 F. App'x 6, 7

(D.C. Cir. 2012). The Court of Appeals stated only:

> This court previously affirmed the district court's December 21, 2011 order
> determining that no condition or combinations of conditions will reasonably
> assure appellee's appearance if he is released, *see United States v. Ali,* 459 F.
> App'x 2 (D.C. Cir. 2012), and the underlying reasons for this court's prior
> decision remain substantially unchanged.

*Id.* This Court subsequently committed Ali to the custody of the Department of Corrections.

(Order, Aug. 3, 2012 [Dkt. 275].) All told, Ali spent ten days under high-intensity supervised

home confinement without incident or reported violation.

On November 19, 2012, the Court of Appeals heard arguments on the government's

appeal from this Court's July 13 and July 27, 2012 decisions. On June 11, 2013, the Court of

Appeals affirmed this Court's dismissal of Count One and reversed its dismissal of Counts Three

and Four and its limitation of Count Two to high seas conduct. *United States v. Ali*, 718 F.3d

929 (D.C. Cir. 2013). On July 2, 2013, Ali petitioned the Court of Appeals for rehearing and

rehearing *en banc*. On July 10, 2013, the Court of Appeals *sua sponte* ordered the government to

respond, *United States v. Ali*, No. 12-3056, Doc. No. 1445984 (D.C. Cir. July 10, 2013), and on

August 21, 2013, the Court denied rehearing and rehearing *en banc*. *United States v. Ali*, No. 12-

3056, Doc. Nos. 1452725, 1452726 (D.C. Cir. Aug. 21, 2013). The mandate issued on August

29, 2013.

Meanwhile, on July 25, 2013, while Ali's petition for rehearing and rehearing *en banc*

was pending before the Court of Appeals, Ali filed his second renewed motion for pretrial

release. (Mot. for Pretrial Release, July 25, 2013 [Dkt. No. 284].) The Court had scheduled the

trial to begin on August 19, 2013; however, briefing on Ali's petition for rehearing and rehearing

*en banc* delayed the issuance of the mandate and required the trial to be rescheduled to November 4, 2013.[3]  At this point, Ali has been detained for over twenty-eight months and will likely remain there for over thirty-one months before the trial is concluded (assuming that a verdict is ultimately reached).

## LEGAL STANDARD

Ali argues that he should be granted pretrial release because his detention of twenty-eight months violates his due process rights.  (Mem. of Points and Authorities in Support of Def.'s Renewd Mot. for Pretrial Release ("Mot."), July 25, 2013 [Dkt. No. 287].)  Pretrial detention of a defendant is permissible under the Due Process Clause only when its purpose is regulatory, rather than punitive.  *See United States v. Salerno*, 481 U.S. 739, 746-47 & n.4 (1987).  "Permissible regulatory purposes include preventing danger to the community, and ensur[ing] [a defendant's] presence at trial."  *United States v. Briggs*, 697 F.3d 98, 101 (2d Cir. 2012) (internal quotation marks and citations omitted).

"[D]ue process places no bright-line limit on the length of pretrial detention."  *Id.*  Instead, courts undertake a case-by-case analysis balancing (1) the length of the pretrial detention, (2) "the government's responsibility for the delay in proceeding to trial," and (3) "the strength of the evidence justifying detention."  *Id.*  As the Third Circuit has described

> [D]ue process judgments should be made on the facts of individual cases, and should reflect the factors relevant in the initial detention decision, such as the seriousness of the charges, the strength of the government's proof that defendant poses a risk of flight or a danger to the community, and the strength of the government's case on the merits.  Moreover, these judgments should reflect such additional factors as the length of the detention that has in fact occurred, the

---

[3] Since a trial could not be formally set until the mandate issued, November was the earliest possible date to begin trial because a two-month delay is necessary for the jury office to have sufficient time to summons enough jurors to empanel a jury that can sit for a four-to-six week trial.

> complexity of the case, and whether the strategy of one side or the other has
> added needlessly to that complexity.

*United States v. Accetturo*, 783 F.2d 382, 388 (3d Cir. 1986). In short, "[t]he longer the detention, and the larger the prosecution's part in prolonging it, the stronger the evidence justifying detention must be if it is to be deemed sufficient to justify the detention's continuance." *Briggs*, 697 F.3d at 101.

The "strength of the evidence justifying detention" inquiry refers to the weight of evidence supporting a conclusion under the Bail Reform Act that "no condition or combination of conditions will reasonably assure the appearance of the [defendant at trial] . . . and the safety of any other person and the community." 18 U.S.C. § 3142(e). To determine whether a defendant poses either a risk of flight or represents a danger to the community, a court weighs "(1) the nature and circumstances of the offense charged . . . ; (2) the weight of the evidence against the [defendant]; (3) the history and characteristics of the [defendant] . . . ; [and] (4) the nature and seriousness of the danger to any person or the community that would be posed by the [defendant's] release." *Id.* § 3142(g)(1)-(4).

The government generally bears the burden of proving the necessity of pretrial detention. *United States v. Nikolow*, 534 F. Supp. 2d 37, 38 (D.D.C. 2008). However, Congress created a rebuttable presumption in favor of pretrial detention when a court finds that there is probable cause to believe that the defendant committed an offense listed under 18 U.S.C. § 2332b(g)(5)(B) that also carries a maximum term of imprisonment of at least ten years. 18 U.S.C. § 3142(e)(3)(C). As Judge Friedman previously held, Ali's charges trigger the § 3142(e)(3)(C) presumption in favor of pretrial detention. *See Ali I*, 793 F. Supp. 2d at 387-88. However, the presumption places on Ali only a burden of producing evidence that he does not

pose a risk of flight or danger to the community. *See United States v. Alatishe,* 768 F.2d 364, 371 (D.C. Cir. 1985); *see also United States v. Mercedes*, 254 F.3d 433, 436 (2d Cir. 2001). "Even in a presumption case, the government retains the ultimate burden of persuasion by clear and convincing evidence that the defendant presents a danger to the community[,] . . . [and] by the lesser standard of a preponderance of the evidence that the defendant presents a risk of flight." *Mercedes*, 254 F.3d at 436.

## ANALYSIS

### I.  PRIOR RULINGS ON PRETRIAL RELEASE

In its opposition to Ali's motion, the government argues that consideration of pretrial release is precluded by prior decisions issued by Judge Friedman and the Court of Appeals. (*See* Gov't Opp'n to Def.'s Renewed Mot. for Pretrial Release ("Opp'n"), Aug. 5, 2013 [Dkt. No. 290] at 2.)  The Court cannot agree.

As an initial matter, Congress clearly intended that courts be able to reopen and reconsider prior bond determinations. *See* 18 U.S.C. § 3142(f)(2)(B) (allowing a court to reopen a bond hearing if "at any time before trial . . . the judicial officer finds that information exists that was not known to the movant at the time of the [original] hearing and that has a material bearing on the issue" of bond).  In its May 2012 decision, the Court of Appeals explicitly embraced the possibility of a renewed motion for pretrial release by clarifying that its decision affirming Judge Friedman's denial of bond was "without prejudice to [Ali] raising in the district court his argument that new developments warrant a renewed bond hearing." *United States v. Ali*, No. 12-3001, Doc. No. 1373195 (D.C. Cir. May 10, 2012).  The Court of Appeals did not abandon this holding when it reversed this Court's order releasing Ali to home confinement in August 2012.

Instead, the Court of Appeals merely found that "the underlying reasons for [its] prior decision remain *substantially unchanged*." *Ali*, 473 F. App'x at 7 (emphasis added).[4]

To this point, the government argues that the only new developments since Judge Friedman's and the Court of Appeals' decisions is the passage of time. (*See* Opp'n at 3.) Even assuming *arguendo* that this were true (which it is not), the additional passage of time alone can be enough to require "a release from pretrial detention or, at a minimum, a fresh proceeding." *Accetturo*, 783 F.2d at 388; *see also United States v. El-Gabrowny*, 35 F.3d 63, 65 (2d Cir. 1994) ("Needless to say, if the trial is substantially delayed, [the defendant] may renew his motion in the district court."). Indeed, in at least one circuit case the court reversed a pretrial detention order it had once before affirmed because it did "not believe that due process c[ould] tolerate any further pretrial detention in this case." *United States v. Ojeda Rios*, 846 F.2d 167, 169 (2d Cir. 1988). Several other courts, although affirming pretrial detention orders, did so while establishing timeframes for when the order would require reconsideration. *See Briggs*, 697 F.3d at 104 ("[D]ue process demands that the district court begin Briggs's trial, or set reasonable bail, very soon."); *United States v. Warneke*, 199 F.3d 906, 909 (7th Cir. 1999) ("[I]f the trial of this case . . . is still not started when the flowers start to bloom next spring, we think the district court will be obliged to consider ordering a less restrictive alternative to straight pretrial detention."

---

[4] In its June 2013 merits opinion, the D.C. Circuit stated:

> Ali next targets the length of his pretrial detention. While he is correct that excessive pretrial detention may in certain circumstances deprive a defendant of his right to a speedy trial, "courts must still engage in a difficult and sensitive balancing process." *Barker v. Wingo,* 407 U.S. 514, 533 (1972). Beyond stating the length of his detention, Ali has offered no specifics on how his rights have been violated or his defense prejudiced.

*Ali*, 718 F.3d at 946-47. This statement was not made in the context of a review of a bond decision and thus cannot be considered as an impediment to reconsideration of the issue. In addition, Ali does not need to establish prejudice to demonstrate a due process violation, as opposed to a violation of the Speedy Trial Act. *See, e.g.*, *Briggs*, 697 F.3d at 101. And, the Court concludes that while Ali may not have offered "specifics on how his [due process] rights have been violated," he offers them here.

(footnote omitted)); *United States v. Zannino*, 798 F.2d 544, 549 (1st Cir. 1986) ("Any outcome of the district court's medical inquiry other than the setting of an immediate trial date may raise anew the difficult constitutional issue discussed herein.").

Finally, Judge Friedman's December 21, 2011 ruling that Ali's continued pretrial detention did not violate due process was explicitly time-limited. *See Ali*, 2011 WL 6748503, at *1. Judge Friedman based his decision in part on the fact that "a firm trial date now has been set [for] May 21, 2012," which assured that Ali would not be detained for more than twelve months prior to trial. *Id.* From the bench, Judge Friedman also warned the government that he would not tolerate further delays in the trial, and that he would "revisit . . . bond . . .[i]f trial is going to be in the fall of 2012" because Ali was "not going to sit in jail until the fall [of 2012]." (12/20/11 Status Hr'g Tr. at 4.) The trial is now set to begin long after the time when Judge Friedman stated he would revisit bond. Accordingly, there is no merit to the government's argument that this Court cannot consider whether Ali's continued pretrial detention in jail violates his due process rights.

## II.    THE LENGTH OF DENTENTION

On the merits of Ali's due process claim, the Court first considers the length of Ali's detention to date, as well as the non-speculative projected length of his detention before the end of trial. Although "the Constitution imposes no bright-line limit on the length of pretrial detention," *Briggs*, 697 F.3d at 103, the Court concludes that this is clearly a case where the length of pretrial detention "weighs heavily in [the defendant's] favor in his argument that his due process rights have been violated." *United States v. El-Hage*, 213 F.3d 74, 80 (2d Cir. 2000).

13

Contrary to the government's suggestion, this is not a case of merely a "few months" of pretrial detention. (*See* Opp'n at 4.) Aside from his ten-day release in late-July and early-August 2012, Ali has been detained and awaiting trial for twenty-eight months and will be in detention for at least another three or four months before his trial concludes. (*See* Mot. at 9; 8/14/13 Mot. Hr'g Tr. [Dkt. No. 294] at 19.) Pretrial detention of twenty-eight months unquestionably raises serious due process concerns. *See Ojeda Rios*, 846 F.2d at 169 (finding due process violation for thirty-two months of pretrial detention); *United States v. Gonzales Claudio*, 806 F.2d 334, 343 (2d Cir. 1986) (same for twenty-six months). Indeed, many courts have suggested that much shorter lengths of pretrial detention signal a due process violation. *See Warneke*, 199 F.3d at 908 (expressing "deep[] concern[]" about seventeen months of pretrial detention); *United States v. Jackson*, 823 F.2d 4, 7 (2d Cir. 1987) ("[A] potentially long trial commencing over seven months after detention has already begun raises grave due process concerns for the government to allay."); *Zannino*, 798 F.2d at 548 ("assum[ing] that in many, perhaps most, cases, sixteen months would be found to exceed the due process limitations on the duration of pretrial confinement").

Moreover, the cases the government cites where courts have upheld comparable or longer periods of pretrial detention, *see, e.g.*, *El-Hage*, 213 F.3d at 80 (thirty to thirty-three months); *El-Gabrowny*, 35 F.3d at 65 (twenty-seven months); *United States v. Millan*, 4 F.3d 1038, 1044 (2d Cir. 1993) (thirty to thirty-one months), are distinguishable from this case. In each of those cases the court found that the defendant's pretrial release would pose a significant danger to the community. *See El-Hage*, 213 F.3d at 80; *El-Gabrowny*, 35 F.3d at 65; *Millan*, 4 F.3d at 1047-48. Both El-Hage and El-Gabrowny were charged with conspiracy to commit terrorist acts, including the killing of U.S. citizens, *see El-Hage*, 213 F.3d at 77, 80, and the levying of war

against the United States and bombing conspiracy.  *See El-Gabrowny*, 35 F.3d at 64.  Similarly, although Millan was charged with conspiracy to traffic narcotics, his role as a central figure in the conspiracy, as well as past evidence that he had "ordered numerous shootings, beatings, and a contract murder, and had issued threats against the families of witnesses who testified adversely to him at trial," *Millan*, 4 F.3d at 1047, supported the court's finding that Millan's pretrial release "would pose a very serious danger to the community."  *Id.* at 1048.

Ali's release pending trial, in contrast, would pose no such threat.  Ali is neither a terrorist nor a drug kingpin.  As the government admitted to Ali during plea negotiations in July, the government does not even think that Ali is a pirate.  (*See* Mot. Ex. 2 at 1 ("During the meeting, [counsel for the government] said to Mr. Ali, 'No one thinks you're a pirate[.]'").)[5] Moreover, no court has found that he should be held based on dangerousness, and at a status hearing on July 24, 2012, the Court found that Ali posed no danger to the community.  (7/24/12 Status Hr'g Tr. at 28.)  Indeed, the government did not argue that Ali's release would endanger the community during the last bond hearing before this Court (*see generally id.*) or before the Court of Appeals.  (*See generally* Appellant's Memo. of Law and Fact Seeking Reversal of the District Ct.'s Order of Release, *United States v. Ali*, No. 12-3057, Doc. No. 1386747 (D.C. Cir. July 31, 2012).).

---

[5] Contrary to the government's objections (*see* Opp'n at 8 n.2), Fed. R. Evid. 410 does not render inadmissible the statements government counsel made to Ali during plea negotiations, since that rule does not apply to bond proceedings, *see* 18 U.S.C. § 3142(f)(2)(B), and it only prohibits the use of statements made during plea negotiations "*against* the defendant."  Fed. R. Evid. 410(a) (emphasis added).  Nowhere does the rule suggest that exculpatory statements made by the government cannot be used *by* the defendant, and the advisory committee notes to the rule clarify that "[l]imiting the exclusionary rule to use *against the accused* is consistent with the purpose of the rule . . . ."  *See id.* advisory committee's note (emphasis added).

Nonetheless, the government in a mere footnote now argues feebly that Ali's pretrial release would endanger the community because "he is charged with serious crimes" and "he facilitated the armed boarding of a merchant vessel and the ransoming of the vessel and its crew." (Opp'n at 9 n.3.) The government's argument of dangerousness hinges almost entirely on the "nature" of the charges. Although the charged offenses are undoubtedly serious given their potential life sentences, and thereby they create a rebuttable presumption of dangerousness, *see Ali I*, 793 F. Supp. 2d at 387-88, the government cannot support that presumption by merely pointing to the offenses that created it. *See United States v. Eischeid*, 315 F. Supp. 2d 1033, 1036-37 (D. Ariz. 2003) (finding that the record lacked clear and convincing evidence that defendant, charged with murder, presented a danger to the community when the only evidence in support of that danger was the charge and the government's proffer). This is so because the factual "circumstances" of the charged offenses, as well as the weight of the evidence underlying those charges, tell a different story. *See United States v. Singleton*, 182 F.3d 7, 12 (D.C. Cir. 1999) ("The distinction between 'nature' and 'circumstances' clarifies that the former refers to the generic offense while the latter encompasses the manner in which the defendant committed it."). Importantly, the government does not allege that Ali committed any act of violence when acting as a negotiator; nor does the record contain any evidence that he did so. (7/24/12 Status Hr'g Tr. at 25.) [6] Further, Ali has no prior criminal history and is "well regarded both [in this country] and in Somaliland." *Ali I*, 793 F. Supp. 2d at 390. And while it will be the role of the

_____

[6] Ali's case is starkly different from *United States v. Shibin*, 722 F.3d 233 (4th Cir. 2013), the only other case prosecuted to date involving a negotiator for Somali pirates. There, the evidence established that the defendant, Mohammad Saili Shibin, was a key participant in several attacks on foreign vessels. *Id.* at 236. As part of his negotiation tactics, Shibin tortured hostages aboard the *Marida Marguerite*, and after being removed from the role of negotiator for that vessel, he stood guard over the hostages with an AK-47. *Id.* Shibin also "held a high position among the pirates" that killed four Americans aboard the U.S. sailing vessel, the *Quest*. *Id.*

jury to determine whether Ali had the necessary *mens rea* to support a charge of aiding and abetting piracy, there is certainly no dispute that Ali is not, under any common definition of the term, a "pirate."[7]

Therefore, the seriousness of the offenses charged simply do not comport with the facts. Even considering the presumption created by the charges against him, the record lacks clear and convincing evidence that Ali presents a danger to any person or to the community. *See Eischeid*, 315 F. Supp. 2d at 1036-37. For this reason, the cases cited by the government where courts have upheld comparable or longer periods of pretrial detention for extremely dangerous individuals do not support Ali's continued pretrial detention.[8]

In concluding that Ali's pretrial detention of twenty-eight months raises due process concerns, the Court also notes that pretrial detention is the exception to the "'general rule' of substantive due process that the government may not detain a person prior to a judgment of guilt in a criminal trial." *Salerno*, 481 U.S. at 749. Pretrial detention "has a detrimental impact on the individual." *Barker v. Wingo*, 407 U.S. 514, 532 (1972); *see also United States v. Perry*, 788 F.2d 100, 114 (3d Cir. 1986) (describing pretrial detention as a "grave invasion of the most fundamental of all personal liberties"). "It often means loss of a job; it disrupts family life; and it

---

[7] Counsel for the government recently admitted as much to Ali when stating that: "I think you wanted [the hostages] free and off the boat. I don't think you would put a gun to someone's head and hold them. That's not Ali Ali." (Mot. Ex. 2 at 1.)

[8] The Court also notes that in each of the cases the government relies upon, the court recognized that the length of pretrial detention as a factor weighed in the defendant's favor notwithstanding the grave offenses charged. *See El-Hage*, 213 F.3d at 80 ("[T]he length of El-Hage's detention weighs heavily in his favor in his argument that his due process rights have been violated."); *El-Gabrowny*, 35 F.3d at 65 (finding that twenty-seven months is "unquestionably a long duration"); *Milan*, 4 F.3d at 1044 (finding the length of pretrial detention "weigh[ed] in favor of release.").

enforces idleness. Most jails offer little or no recreational or rehabilitative programs. The time spent in jail is simply dead time." *Barker*, 407 U.S. at 532-33 (footnote omitted).

The effects of pretrial detention are even more serious in Ali's case. A pretrial detainee generally is "hindered in his ability to gather evidence, contact witnesses, or otherwise prepare his defense." *Id.* at 533. This hindrance is heightened where the defendant is also the key defense witness. Pretrial detention limits defense counsels' access to their client and thus limits counsels' ability to prepare effectively for trial and to prepare the defendant to testify. Moreover, the physical and psychological toll of pretrial detention, particularly a detention lasting for several years, where the defendant is effectively cut off from everyone but his attorneys, can significantly affect a defendant's ability to participate in his own defense. *Cf. id.* at 520 ("Lengthy exposure to these [pretrial detention] conditions 'has a destructive effect on human character. . . .'").

Ali's recent unwarranted solitary confinement highlights the extremely stressful conditions that can accompany pretrial detention. From August 12 to August 22, 2013, Ali was wrongfully held in solitary confinement for allegedly possessing "major contraband" in the form of USB thumb drives containing GED teaching materials. (*See* Def.'s Suppl. Mem. in Support of Renewed Mot. for Pretrial Release ("Suppl. Mem."), Aug. 21, 2013 [Dkt. No. 295] at 1.) Ali was placed in solitary confinement even though his cellmate (who was also placed in solitary confinement) claimed ownership of the USB drives. (*Id.* at 1-2.) Ali did not receive a hearing on these charges until August 21, 2013, six days later than required by regulation, *see* 28 DCMR §§ 508.3, 521.7, and two days after Ali's counsel made inquiry of the Department of Corrections officials regarding his solitary confinement and the lack of a hearing. (*See* Suppl. Mem. at 2.) At his hearing, Ali was found not guilty of possessing contraband. (*Id.* at 2-3.) Although he was

cleared of the charges on the morning of August 21, 2013, corrections officials inadvertently failed to remove Ali from solitary confinement until the next day. (*See id.* at 3-4.) Ali's ten days in solitary confinement, only to be found not guilty of the alleged violation – though not the fault of the prosecution – exemplifies the exceedingly harsh conditions that pretrial detainees face while awaiting trial.

With these considerations in mind, the government's suggestion that Ali has been in detention for only "a few months" (Opp'n at 4) demonstrates a disregard for Ali's constitutional rights, as well as the depressing reality of conditions at the D.C. Jail. In short, the twenty-eight months of pretrial detention that Ali has endured to date "points strongly to a denial of due process." *Gonzales Claudio*, 806 F.2d at 341. The Court accordingly weighs the length of Ali's pretrial detention heavily in his favor in evaluating his due process claim.

## III.     THE GOVERNMENT'S RESPONSIBILITY FOR DELAY

The Court now turns to the extent to which the government is responsible for the delay in proceeding to trial. The government need not be fully at fault for the delay. Rather, "[i]t suffices . . . to conclude that the government, even if not deserving of blame, bears a responsibility for a portion of the delay significant enough to add considerable weight to the defendants' claim that the duration of detention has exceeded constitutional limits." *Gonzales Claudio*, 806 F.2d at 342-43. For the following reasons, the Court finds that the government bears a responsibility for a substantial portion of the twenty-eight month delay.

The government argues that it "was ready and willing to try this case on August 19, 2013, shortly after the mandate would have been issued by the D.C. Circuit, and therefore, it is not responsible for any current delay in the trial." (Opp'n at 1.) The government blames Ali for the current delay because "any delay in having a trial now is the direct result of defendant's choice,

as it is his right, to seek a petition for rehearing en banc before the D.C. Circuit." (*Id.*) The Court agrees that Ali's filing and the Court of Appeals' subsequent consideration, of his petition for rehearing and rehearing *en banc*, did cause the trial to be delayed for two-and-a-half months. Accordingly, even though Ali had no choice but to file petitions for rehearing and rehearing en banc if he wanted further appellate review of his arguments, Ali is responsible for the current delay in trial from August 19 to November 4, 2013. (*See id.* at 1-2, 4-5.) But this pales in comparison to the delay that is attributable to the government.

By the government's own logic, it must bear responsibility for the nearly thirteen months of delay caused by its interlocutory appeal. Even though the Court initially dismissed one of the piracy counts and narrowed the other, the government still had two hostage-taking counts upon which it could have proceeded to trial on July 31, 2012. *See Ali II*, 885 F. Supp. 2d at 38, 45. Instead, the government chose to exercise its right to seek an interlocutory appeal "because there [was] a concern government-wide about the interpretation" of Count Two. (7/20/12 Status Hr'g Tr. at 83.) Although it may not have "take[n] an interlocutory appeal for the purposes of delay" (Opp'n at 5), the government (just like the defendant) remains responsible for the consequences of its decisions. "[G]overnment-wide" concern about the *policy implications* of the Court's interpretation of aiding and abetting piracy simply does not justify the *individual implications* of continued pretrial detention under a due process analysis. [9] Accordingly, the Court finds that the

_____

[9] The government attempts to abdicate altogether its responsibility for filing an interlocutory appeal by asserting that "it was ready and able to try the case" on July 31, 2012, but only "exercised its right to take an interlocutory appeal," because "the Court dismissed before trial the majority of the counts in the indictment." (Opp'n at 5.) The Court rejects the government's attempt to rewrite history. The government advised the Court that it "certainly ha[d] thought about an interlocutory appeal" at a status conference on July 20, 2012. (*See* 7/20/12 Status Hr'g Tr. at 79.) On July 24, 2012, the government notified the Court of its intent to file an interlocutory appeal regarding the Court's construction of the piracy charges in Counts One and Two. The government therefore requested that the court cancel the

government bears a significant responsibility for the nearly thirteen months of delay between the pre-appeal trial date of July 31, 2012, and the tentative trial date of August 19, 2013. *See United States v. Chen*, 820 F. Supp. 1205, 1209 (N.D. Cal. 1992) (counting anticipated delay caused by government's interlocutory appeal of suppression order that "add[ed] little to the government's case" in defendant's favor); *cf. United States v. Cos*, 2006 WL 4061168, at *18-19 (D.N.M. Nov. 15, 2006) (counting some portion of time on interlocutory appeal against the government, even though "[a]n appeal is not a delay, but the exercise of a right Congress has granted litigants"); *United States v. Ailemen*, 165 F.R.D. 571, 594-95 (N.D. Cal. 1996) (counting "at least" three or four of nine months of delay from interlocutory appeal against the government even though the appeal was "clearly necessary" and "far from frivolous").[10]

Moreover, the government is also responsible for a significant amount of the delay prior to its interlocutory appeal. (*See* Mot. at 12-14.) The government twice sought, over Ali's objections, substantial delays in the trial date to obtain evidence from abroad and to prepare its case. As a result, the speedy trial clock was tolled, again over Ali's objection, from August 19, 2011 to February 1, 2012. (Findings of Fact and Order, Sept. 6, 2011 [Dkt. No. 42].) The Court

---

jury. (7/24/12 Status Hr'g Tr. at 3-4.) It was only in response to these actions by the government that the Court then dismissed Counts Three and Four to allow definitive review of those counts as well. *See Ali III*, 885 F. Supp. 2d at 58. (*See also* 8/16/13 Mot. Hr'g Tr. at 7 ("I didn't dismiss the hostage-taking counts until [the government] said [it was] going up on appeal."); 7/24/12 Status Hr'g Tr. at 4-5.)

[10] It does not matter that some delay is attributable to the appellate process, rather than to the prosecutors. The Supreme Court has held in the speedy trial context that delay caused by "overcrowded courts should be weighted less heavily but nevertheless should be considered since the ultimate responsibility for such circumstances must rest with the government rather than with the defendant." *Barker*, 407 U.S. at 531. The Supreme Court's treatment of court-caused delay in the speedy trial context should apply with equal force here. *See Ailemen*, 165 F.R.D. at 594-95 ("Seeing no obvious reason why the Supreme Court's treatment of court-caused delay in the speedy trial arena should not be at least instructive to courts considering due process challenges to pretrial detention, I will proceed on the assumption that unnecessary delays caused by the courts can weigh in the defendant's favor in this analysis.").

concludes that these delays were largely unnecessary and should be attributed primarily to the government. The government – by planning a ruse to bring Ali into the United States – decided the time of his arrest. (*See* Mot. at 11 & n.3.) The government did not have to wait until after Ali's arrest to seek to obtain evidence from abroad.

Moreover, the government is responsible for delay caused by its failing to timely produce classified materials and its late filing of a superseding indictment. The government delayed producing classified materials for almost two months after defense counsel had received the appropriate clearance. Likewise, the government's superseding indictment, filed on May 8, 2012, over a year after the initial indictment and slightly more than two months before trial, caused delay by adding an additional count and mooting Ali's prior omnibus motion to dismiss, which had been fully briefed in March.

Finally, the Court notes that the government disclosed on the eve of trial its lack of evidence that Ali's charged conduct occurred on the high seas. The government asserts that, from day one, it did not hide and "has always embraced" the fact that the Ali was not on board the *CEC Future* when it was abducted, and "[t]o say there was a late disclosure of an evidentiary fact from day one is just not true." (Opp'n at 6-7.) Again, the government fails to understand the legal significance of not having evidence to support the allegations in its indictment. As late as its June 11, 2012 motion opposing Ali's motion to dismiss the indictment, the government clearly stated that "the indictment alleges" and "the evidence will show that [Ali] was acting as a negotiator for the pirates *while the* CEC Future *was on the high seas*." (Gov't Opp'n to Def.'s Mot. to Dismiss Counts of the Indictment at 8-9 (emphasis added).) Much to the Court's surprise, the government did not confess its mistake and admit that it did not have high seas evidence until the July 20, 2012 status conference. (7/20/12 Status Hr'g Tr. at 67, 69). The

government's lack of candor caused delay, additional briefing by the parties, and opinion writing.  (*See id.* at 65.)  Had the Court been aware of the lack of the government's evidence supporting the indictment's factual charges, it could have acted sooner and would have had more than a matter of days to address a complex legal issue that, until July 19, 2012, the government had apparently never seriously considered or briefed.  The delay caused by the government's misleading statements – whether intentional or negligent – must count against the government. *See Millan*, 4 F.3d at 1045 (holding against the government its "failure to advise the court prior to the initial trial concerning the misconduct of certain agents who participated in the *Millan* investigation" because "[t]he failure of communication in the[ government's] office has . . . caused significant delay in bringing this case to trial.").

In an attempt to excuse the delay, the government points to the complexity of the case.  (Opp'n at 5-6.)  It is axiomatic that a factually complex case may "reasonably require a lengthy period for pretrial preparation."  *El-Gabrowny*, 35 F.3d at 65; *see also Gonzales Claudio*, 806 F.2d at 342-43.  However, this is not the typical "complex" case where such a significant delay may be excused.  The indictment charges only four counts, all of which relate to the same event, and the government estimates that its case will take only ten days.  (*See* 8/13/13 Mot. Hr'g Tr. at 11.)  Ali is not charged as a co-defendant in a large criminal conspiracy; nor is there a substantial debate between the parties about the underlying facts.  Rather, the complexities inherent in this case come from its legal novelty, including the government's expansive use of universal jurisdiction to prosecute a defendant who is a foreign national, for crimes committed on foreign soil against victims who are foreign nationals.  Moreover, unlike the usual case of piracy (*see supra* note 6), there is extensive favorable information, including classified information and other evidence of Ali's activities on behalf of victims of piracy and on behalf of

the U.S. government, that supports the defendant's claim that he did not act with the necessary *mens rea*. Needless to say, this case is a far cry from *El-Gabrowny*, cited by the government (Opp'n at 5) and the Court of Appeals (*see Ali*, 459 F. App'x at 3), where the Second Circuit concluded that the complexity of a multi-defendant terrorism conspiracy case, involving substantial amounts of evidence in Arabic, reasonably required a lengthy period for preparation for the projected eight-month long trial. *El-Gabrowny*, 35 F.3d at 64-65; *see also El-Hage*, 213 F.3d at 78, 80 (case of "exceptional complexity" involving six conspiracies to kill United States citizens and destroy United States property abroad, twenty counts of perjury, and three counts of false statements, with a trial expected to last six to nine months).

Moreover, to the extent that the government suggests that the *legal* complexity of this case may excuse the length of the interlocutory appellate process (*see* Opp'n at 3), this complexity is largely of the government's own creation. The Court of Appeals' approval of the government's construction of aiding and abetting piracy notwithstanding, the government had to have known that it was proceeding on a novel legal theory whenever it finally learned from GPS data that Ali may have done little, if anything, to aid and abet piracy while on the high seas. The government must therefore bear the responsibility for whatever delays – both before and after appeal – are attributable to the legal complexity of this case.

Simply put, this is not a case where "the government has done all it could to bring [Ali] to trial expeditiously." *Zannino*, 798 F.2d at 548. The two-and-a-half months of delay attributable to Ali's petition for rehearing and rehearing *en banc* are dwarfed by the substantial periods of delay attributable to the government both before and on appeal. Accordingly, the Court concludes that the government is "responsib[le] for a portion of the delay significant

enough to add considerable weight" to Ali's due process claim.  *See Gonzales Claudio*, 806 F.2d at 342-43.

## IV.    THE STRENGTH OF THE EVIDENCE JUSTIFYING DETENTION

Because Ali's pretrial release would not endanger the community (*see supra* at 15-16), the justification for Ali's detention can only be based on his risk of flight.  Judge Friedman previously found by a preponderance of the evidence that Ali posed a flight risk.  *Ali* I, 793 F. Supp. 2d at 392.  But since Judge Friedman's ruling it has become clear that Ali's ties abroad (in particular to Somalia) are no longer as strong as the government once represented (*see, e.g.*, 7/24/12 Status Hr'g Tr. at 17) and that Ali's ties to the United States have always been stronger than the government has acknowledged.  (*See id.* at 27.)  Accordingly, the government now limits its argument that Ali "has every reason to flee before trial" to the fact that he is "charged with serious crimes, [the] conviction of which would result in a mandatory life sentence." (Opp'n at 9.)  The Court concludes that the gravity of the offenses charged and the potential life sentence that he faces are insufficient to justify his prolonged detention.

To be sure, the serious nature of the offenses charged, along with the potential life sentences those charges carry, create a presumption in favor of pretrial detention[11] and function as evidence that Ali poses a flight risk.  *See United States v. Bess*, 678 F. Supp. 929, 934 (D.D.C. 1988).  However, this is not enough.  *See United States v. Friedman*, 837 F.2d 48, 50 (2d Cir. 1988) (requiring "more than evidence of the commission of a serious crime and the fact of a potentially long sentence to support a finding of risk of flight"); *see also Eischeid*, 315 F. Supp. 2d at 1036-37.

---

[11] Because of the charges alone, Ali is disqualified from placement in a halfway house, so conditions of release cannot include this traditional alternative to incarceration.

In this case "what is significant is the absence of any prior acts specifically evidencing likelihood of flight." *See Gonzales Claudio*, 806 F.2d at 343. There is no evidence that Ali "has ever fled from lawful authority, or failed to honor court orders." *See id.* (citation omitted). On the contrary, when the Court previously ordered Ali's release on July 24, 2012, he was released to reside in Virginia with a third-party custodian. Rather than flee, Ali contacted his attorney and went to the place of his home confinement. He wore a GPS monitoring device and complied with all conditions of his release for the ten days he was in the community. (Mot. at 18.) This ten-day period provides further support for the conclusion that he does not pose a risk of flight. *See United States v. Motamedi*, 767 F.2d 1403, 1408 (9th Cir. 1985) (citing, upon reconsideration of its initial grant of bail, the fact that the defendant "has not violated any conditions of his release" as evidence that he did not pose a risk of flight).

Furthermore, changed circumstances since Judge Friedman's denials of bail not only demonstrate that Ali's motivations to flee are weaker than they then-appeared, but also serve to rebut the presumption that he is a flight risk. When Judge Friedman considered Ali's first motion for pretrial release, the government took the position that Ali was a foreign national that lacked any ties to the United States; the government has since changed its tune. On appeal, the government recognized that Ali lived in the United States for twenty-six years, married an American citizen, and has friends and family members in the Washington metropolitan area. (*See* Appellant Br., *United States v. Ali*, No. 12-3056, Doc. No. 1391964, at 45-55 (D.C. Cir. Aug. 29, 2012).) These new concessions echo Ali's long-asserted version of the facts, *see Ali I*, 793 F. Supp. 2d at 389, and undercut Judge Friedman's prior finding that Ali poses a risk of

flight because of his lack of nexus to the United States. *See United States v. Xulam*, 84 F.3d 441, 444 (D.C. Cir. 1996). [12]

Considering the government's inability to sustain its burden of showing by a preponderance of the evidence that Ali poses a risk of flight, this factor favors Ali's due process claim. The Court also finds that there are "conditions of release that will reasonably assure the appearance of" Ali at trial. 18 U.S.C. § 3142(g). The government contends that the proposed conditions of release are insufficient because "electronic monitoring" can be defeated, and law-enforcement personnel would only receive "after-the-fact alerts" of violations. (Opp'n at 9.) [13] However, the conditions of release prescribed need not *guarantee* Ali's appearance at trial; they need only *reasonably assure* his appearance. *See* 18 U.S.C. § 3142(c), (e), (g); *United States v. Hir*, 517 F.3d 1081, 1092 n.9 (9th Cir. 2008); *see also United States v. Tortora*, 922 F.2d 880, 884 (1st Cir. 1990) ("Requiring that release conditions *guarantee* the community's safety would fly in the teeth of Congress's clear intent that only a limited number of defendants be subject to pretrial detention."). Given Ali's minimal flight risk, the Court concludes that the fact that Ali has surrendered his passport and has agreed not to contest extradition, coupled with the Pretrial Service Agency's high-intensity supervision program, including twenty-four hour electronic monitoring, home confinement, and exclusionary zones within a mile of local airports and 500

---

[12] Ali's past misrepresentations to the U.S. Immigration and Naturalization Service in 1988 and 1995 do not provide support to the statutory presumption that he is a flight risk. (*See* 7/24/12 Status Hr'g Tr. at 28-29.) A defendant's willingness to obtain and utilize fabricated documents to *get into* or *stay in* the United States is minimally probative of his willingness to obtain and utilize fabricated documents to *get out* of the United States. *Cf. Xulam*, 84 F.3d at 443-44 (reversing district court's finding of risk of flight when charged offense was falsification of information to remain in the United States).

[13] As explained by a representative of the Pretrial Services Agency at the hearing on September 4, 2013, the electronic GPS monitoring system provides real-time updates to law enforcement agents of any violations, including encroachment into the exclusionary zones which have been established by the Court.

feet of bus and train stations, provides more than a reasonable assurance of his appearance at trial in November.

## V.     BALANCING THE DUE PROCESS FACTORS

Balancing the three due process factors, *see Briggs*, 697 F.3d at 101, the Court concludes that the slight risk of flight that Ali poses simply does not justify twenty-eight (much less more than thirty-one) months of pretrial detention, particularly considering the government's responsibility for the delay.  *See Gonzales Claudio*, 806 F.2d at 343 (risk of flight alone did not justify twenty-seven months of pretrial detention); *Ojeda Rios*, 846 F.2d at 169 (same for thirty-two months of pretrial detention); *see also El-Hage*, 213 F.3d at 80 ("In an ordinary case, the risk of the defendant's flight alone might not justify a detention of this length [*i.e.,* thirty-two to thirty-three months].  A longer pretrial detention is more justifiable for a defendant found to be dangerous than for a defendant who presents only a risk of flight."); *United States v. Orena*, 986 F.2d 628, 631 (2d Cir. 1993) ("[T]he constitutional limits on a detention period based on dangerousness to the community may be looser than the limits on a detention period based solely on risk of flight. In the former case, release risks injury to others, while in the latter case, release risks only the loss of a conviction.").

The Court, of course, is not indifferent to the prospect of flight.  However, as the Second Circuit has observed

> the enforcement of all constitutional restraints upon government in its efforts to administer the criminal law entails risks.  Occasionally such enforcement creates the risk that a person convicted of crime may escape punishment.  In this case the enforcement of due process limits upon the duration of preventive detention creates the risk that a person accused of crime may avoid a trial that might result in conviction and punishment.  That risk is serious, but of at least equal gravity is the preventive detention for fourteen months of defendants who are presumed innocent and whose trial to determine guilt or innocence will not even begin until detention has lasted eighteen months.  In mandating fundamental fairness, the

28

Due Process Clause endeavors to set outer limits at which risks to society must be
accepted to avoid unconscionable deprivations of the liberty of individuals.

*Gonzales Claudio*, 806 F.2d at 343. The Second Circuit's rationale applies with even more force

in this case, where Ali has been in preventative detention for twenty-eight months, and his trial

will not conclude before December.

Simply put, "for every set of circumstances, due process does impose some limit" on the

length of preventative detention without a trial. *Briggs*, 697 F.3d at 103. The Court finds that in

this case the limit has been passed. The government has no valid regulatory purpose for

continuing to detain Ali, and thus, his continued detention violates his rights under the Due

Process Clause. *Cf. Salerno*, 481 U.S. at 746-47.[14]

## CONCLUSION

The Court will therefore grant Ali's Renewed Motion for Pretrial Release [Dkt. No. 284].

A separate order accompanies this Memorandum Opinion setting forth in detail conditions of

pretrial release.

_____/s/_____
ELLEN SEGAL HUVELLE
United States District Judge

Date:   September 5, 2013

---

[14] Since the Court concludes under a conventional analysis that Ali's continued pretrial detention violates
his due process rights, it need not address Ali's theory that the government's regulatory interest in
detaining a defendant for a universal jurisdiction crime is uniquely weak. (*See* Mot. at 5-8.)