**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____

UNITED STATES OF AMERICA,      )

)

      v.                       )

)    **Crim. No. 11-106 (ESH)**

ALI MOHAMED ALI,         )

)

           Defendant.    )

_____)

## DEFENDANT'S MOTION TO DISMISS COUNTS TWO AND THREE ON DOUBLE JEOPARDY GROUNDS

Defendant Ali Mohamed Ali was acquitted of aiding and abetting the detention of the M/V *CEC Future* under 18 U.S.C. § 1651. The government now seeks to try him a second time for the exact same conduct, using the label of hostage taking. As explained below, the jury's verdict on Count One necessarily determined that Ali did not have the specific intent to detain human beings required for inchoate liability under 18 U.S.C. § 1203. Accordingly, Counts Two and Three must be dismissed under the Double Jeopardy Clause.

## FACTUAL BACKGROUND

### A.    The Indictment

Ali was indicted on April 15, 2011 for, *inter alia*, piracy under the law of nations in violation of § 1651. Dkt. 6 at 4-5. On April 29, 2011, a Superseding Indictment was filed adding the charge of aiding and abetting hostage taking in violation of § 1203, as well as modifying the end-date of the piracy count from "on or about January 16, 2009" to "on or about January 27, 2009." Dkt. 11 at 4, 6. On May 9, 2013, a Second Superseding Indictment was filed adding the charge of conspiracy to commit hostage taking in violation of § 1203, and changing the end-date of the piracy count back to "on or about January 16, 2009." Dkt. 172. Finally, a

1

retyped version of the Second Superseding Indictment was filed on November 20, 2013 to

remove the dismissed count of conspiracy to commit piracy.  Dkt. 371.

As submitted to the jury, Count One of the Second Superseding Indictment alleged in its

final form:

> From at least on or about November 7, 2008, until on or about January 16,
> 2009…the defendant…and others…committed the crime of piracy as defined by
> the law of nations, by knowingly and willfully using violence against, *seizing*,
> *detaining*, robbing, and *holding for ransom* the *M/V CEC Future*, and did aid,
> abet, counsel, command, induce and cause others to commit the offense….

*Id.* at 2 (emphasis added).  Count Two alleged:

> From at least on or about November 7, 2008, until on or about January 27,
> 2009…the defendant…and others…did conspire and agree with one
> another, to *seize*, *detain* and threaten to kill, to injure, and to *continue to
> detain* the crew of the *M/V CEC Future*, in order to compel a third person,
> that is, Clipper Group A/S, to do an act, that is, *to pay a ransom*…as an
> explicit condition for the *release* of the *M/V CEC Future* .…

*Id.* at 3-4 (emphasis added).  And Count Three alleged:

> From at least on or about November 7, 2008, until on or about January 16,
> 2009…the defendant…and others…did knowingly, willfully and intentionally
> *seize* and *detain* and threaten to kill, to injure, and to *continue to detain* the crew
> of the *M/V CEC Future*, and did aid, abet, counsel, command, induce and cause
> others to commit the offense…, in order to compel a third person, that is, Clipper
> Group A/S, to do an act, that is, *to pay a ransom*…as an explicit condition for the
> *release* of the *M/V CEC Future*….

*Id.* at 5 (emphasis added).  Accordingly, as pleaded in the Second Superseding

Indictment, all counts were based on the "seizing," "detaining," and "holding for ransom"

of the *CEC Future*, while Count One also included allegations of violence and robbery.

**B.**   **Pre-Trial Rulings**

In a ruling shortly before trial, this Court addressed the scope of piracy under § 1651.

Applying the D.C. Circuit's holding that the U.N. Convention on the Law of the Sea

("UNCLOS") sets out the legal framework for piracy, the Court held that § 1651 "does not limit

piracy to discrete acts of violence and depredation, but extends the offense to acts of 'detention' against a ship, or persons or property aboard that ship, as well." Dkt. 342 at 1 (quoting UNCLOS Art. 101(a)) (citing *United States v. Ali*, 718 F.3d 929, 936-37 (D.C. Cir. 2013)). Since crimes of detention are ordinarily treated as continuing offenses, the Court held that "the offense of piracy continues even after the perpetrators leave the high seas," such that "a defendant can be convicted of aiding and abetting piracy even if he facilitates only non-high-seas acts…." *Id*. at 5.   In reaching this conclusion, the Court embraced the analogy between piracy and kidnapping, despite defense objections that doing so would conflate the crime of piracy with hostage taking. *Id.* at 5 n.1; Dkt. 333 at 10-11 (arguing that making piracy a continuing offense would "defin[e] the crime of piracy as synonymous with a hostage taking conspiracy").

        The Court also addressed the necessary elements for aiding and abetting and conspiratorial liability in a pretrial ruling on May 25, 2012.  In the opinion, the Court explained that conspiracy and aiding and abetting both require the "heightened mental state" of "specific intent." *United States v. Ali*, 870 F. Supp. 2d 10, 19 (D.D.C. 2012) (citing *United States v. Moore*, 651 F.3d 30, 92 (D.C. Cir. 2011) (aiding and abetting); *United States v. Childress*, 58 F.3d 693, 707 (D.C. Cir. 1995) (conspiracy)).  "Specific intent, in sum, is described as encompassing notions of purpose." *Id.* (citing *United States v. Bailey*, 444 U.S. 394, 405 (1980)).  Accordingly, the Court held that "in order to convict Ali of conspiracy [to commit hostage taking], the government must establish that Ali acted with the specific intent, or the *purposeful* intent, to…compel Clipper to pay a ransom by seizing, detaining, and threatening to kill, injure, and continue to detain the *CEC Future*'s crew." *Id.* (emphasis in the original) (citations and quotations omitted).  The Court held that the same "'purposeful attitude'" toward the detention of the *CEC Future*'s crew also governs liability for aiding and abetting. *Id.* at 20

(quoting *United States v. Peoni*, 100 F.2d 401, 402 (2d Cir. 1938) (Hand, J .)) (citing *Nye &*

*Nissen v. United States*, 336 U.S. 613, 619 (1949) ("In order to aid and abet…it is necessary that

a defendant…participate in [the crime] as something that he wishes to bring about….")).

### C.    The Trial

Consistent with the Second Superseding Indictment and the Court's pretrial rulings, the

government treated piracy and hostage taking as interchangeable crimes of detention in its

opening:  "[T]he elements of the piracy and the hostage taking are two, basically:  It is the

capture…, and then it is the money…[I]t has no other purpose."  11/4/13 Tr. at 8.[1]  Using both

labels, the government explained that the purpose of the seizure and detention was to obtain a

ransom:

> The pirates…waited for 15 hours because the whole purpose of this, the reason
> that their lives were risked, the reason for it all, no other reason, only one, is to get
> the money.  That is where [Ali] comes in….He is guilty of the piracy and hostage
> taking because without him, without his role, it is all for naught….His mouth was
> his gun.  And you will hear…that that was the most important 'gun' on board
> because that's the gun who got them the money.

*Id.* at 11, 14-15.  For its part, the defense opening did not dispute the fact of the crew's detention

or that Ali helped the pirates achieve their "purpose" of obtaining a ransom.  *Id.* at 23

(acknowledging that "the *CEC Future* was taken hostage," that Ali "went on board," and that

"the pirates [] like[d] having Ali there" because "[i]t got them money.").  Rather, the defense

explained that the conduct alleged by the government was fully consistent with an innocent

intent to achieve the release of the crew.  *Id.* at 22 ("[I]t is a sad fact in the world as it is that the

key to [hostages'] freedom also gets money to the people who took them hostage."); *id.* at 23

("[Ali's] mouth is not his gun; his mouth was the key to [the hostages'] freedom.").

---

[1] The transcripts of openings and closings are attached as exhibits.  Opening statements are in the
11/4/13 Transcript, attached as Exhibit 1; closing arguments are in the 11/19/13 and 11/20/13
Transcripts, attached as Exhibits 2 and 3, respectively.

Closing arguments closely followed the substance of openings, with more detail.  The parties expressed mutual agreement on virtually all of the relevant facts.  *See*, *e.g.*, 11/19/13 Tr. at 37-38 (Gov't Closing:  "Frankly, most of the facts [regarding piracy] are undisputed....Again, most of the facts here [regarding hostage taking] are again essentially undisputed."); *id.* at 42-43 (Def. Closing:  "[T]here is so much in this case that is not in dispute.").  Specifically, there was no dispute that Ali boarded the *CEC Future* two days after its capture; communicated the pirates' demands to Clipper Group; negotiated a final agreement resulting in the payment of a $1.7 million ransom (including and a separate wire payment to a bank account he personally specified); and that, through these actions, the pirates obtained what the government described as the goal of the crime.[2]

The only essential disputed issue—and thus the only fact necessary for the jury to decide—was whether Ali acted with the *mens rea* necessary for liability as a conspirator or aider and abettor.  As the Court explained in its pretrial rulings, the government had to prove that Ali "consciously desired" the detention of the crew in order to secure a conviction on any of the three counts.  From the beginning, the government's closing argument recognized that Ali's attitude toward the crew's detention was the essential question for the jury, and that it determined whether or not Ali was guilty:

---

[2] *See*, *e.g.*, 11/19/20 Tr. at 37 (Gov't Closing:  "He doesn't dispute that he was on the ship.  He doesn't dispute he made those phone calls.  He doesn't dispute any of that."); *id.* at 42-43 (Def. Closing:  "The government doesn't have to prove to you just Mr. Ali negotiated the release of these people.  That's undisputed.  We're not coming here and asking you to sit for two weeks to decide [if] Mr. Ali negotiated."); 11/20/13 Tr. at 7-8 (Def. Closing:  "[W]hen this [$75,000] payment is going to a wire transaction to a bank and then ultimately a wire to Somalia, of course that's how it has to happen. There is no dispute about that."); *id.* at 52 (Def. Closing:  "[I]t is a fact that ransoms get hostages free and they also get pirates money."); Dkt. 388 at 48 (stating, in theory of the defense instruction, that Ali "helped…the pirates negotiate a ransom for the release of the ship and her crew").

As you start looking at and examining the evidence in this case, I want you to first ask yourselves a question….[T]he whole purpose of all this is to make money, to *capture* the ship, *hold* the crew *hostage* and make the *ransom* demand.  So, are [the pirates] just going to let anybody get on the ship, somebody that really is not of *the same state of mind* as they are, who doesn't *want the same thing* as they do?  Of course not.  That's the whole purpose of *capturing* the ship and *holding* these people for *ransom*, this money….And as a result you have overwhelming evidence, beyond a reasonable doubt that Mr. Ali is in fact guilty as charged.

11/19/13 Tr. at 2-4 (emphasis added).  The government's thesis throughout closing was that Ali's "motivation" was "to make money," *id.* at 35, and that from this motivation the jury should infer an illegal intent "to profit *from the…captivity* of human beings."  *Id.* at 32 (emphasis added).[3]

The defense likewise based its entire argument on the claim that Ali did not want the *CEC Future*'s crew to be detained until a ransom was paid, repeatedly emphasizing that this was the *only* issue for the jury to decide.  *See, e.g.*, 11/19/13 Tr. at 43 ("[W]hat they had to prove is that Mr. Ali wanted and wished to bring about by his actions the continued holding of these people, the human beings on that ship….So that is the question.  The only disputed question really before you.").[4]  The defense argued that the numerous audio and video recordings

---

[3] *See also id.* at 21 ("Do you think those are the words of somebody that is there to supposedly help release the crew, who actually cares about the people who are there being held hostage at that point for almost two months?  He doesn't."); *id.* at 23 ("[A]ll [Ali] cares about is the money.  That is what motivates him, that is what drives him.  That is why he is on that ship."); 11/20/13 Tr. at 58 (Rebuttal: "[H]e wanted them to pay more money.  That's what he wanted….And that is why he is guilty beyond any reasonable doubt.").

[4] *See also* 11/19/13 Tr. at 44 ("[I]if someone does not want people taken hostage…then that is inconsistent with what you have to find in order to check guilty beyond a reasonable doubt…."); *id.* at 48 ("[T]he question is whether Mr. Ali wanted to hold people hostage, he wanted their detention to continue."); 11/20/13 Tr. at 36 ("Mr. Ali did not, did not wish to bring about the crime of piracy and hostage taking."); *id.* at 39 ("The government has to prove beyond a reasonable doubt that he wished to bring about this hijacking or he wished for it to continue, he wished for the detention of these people to continue."); *id.* at 40 ("[I]t is not a crime to try to get them free.  The crime is wanting them held in the first place, wishing to bring that about."); *id.* at 41 ("This is the key to the government's case to show you that Mr. Ali wanted this piracy to happen…."); *id.* at 43-44; *id.* at 56 ("If any of those make you question and the question is

presented to the jury documented an ethical state of mind that was entirely inconsistent with

consciously desiring detention of human beings for ransom:

> [DEFENSE]:  Why would somebody who agrees with hostage taking, who agrees
> with piracy, which means they consciously desire these people be held so that
> they can profit off of it, be concerned about lying to a hostage?  Why would they
> have that ethical concern?
>
> ...
>
> We told you you would hear Mr. Ali wrestling with the moral questions here.  We
> told you you would hear him wrestling with the fact, and it is a fact, that ransoms
> get hostages free and they also get pirates money.  And the element that you have
> to decide here is whether he wanted them held in the first place or if he wanted
> them to continue to be held.  I submit to you that someone who is wrestling with
> that question --
>
> [GOVERNMENT]: Objection.
>
> THE COURT: No, overruled.
>
> [DEFENSE]: -- does not have the intent to want them to continue to be detained
> and, therefore, is not guilty of hostage taking and piracy, the crimes he's charged
> with.

11/20/13 Tr. at 52.  The defense made similar arguments for numerous other pieces of evidence.[5]

Significantly, neither the government nor the defense ever made any distinction between

the intent required for piracy and the intent required for hostage taking, referring to them

interchangeably throughout their arguments.[6]  Likewise, although the government recited the

---

reasonable, why would someone do those things if they wanted people to be held hostage, then
you have reasonable doubt.").

[5] *See, e.g.*, 11/19/13 Tr. at 36 (arguing that Ali's contact with "American law enforcement
officials whose job it is to stop and prosecute crimes of hostage taking and piracy…[shows] that
Ali did not wish to bring about the crime of piracy and hostage taking."); *id*. at 39-40 (arguing
that Ali's absence from the planning meeting shows that he did not "conspire[] and wish[] to
bring about this hijacking"); *id*. at 43-44 (arguing that evidence of a financial interest in the
ransom does not reflect an intent "to bring about this hostage crisis," because Clipper's
negotiator had a similar financial motive yet "testified truthfully [that] he doesn't want piracy to
happen…doesn't want hostage taking to happen").

[6] *See, e.g.*, 11/19/13 Tr. at 9 (government argument referring to a single "criminal enterprise" and
describing post-seizure accomplices in territorial waters as "new pirates" who "guard the

elements of the three counts, neither party relied on any distinction between the intent required for aiding and abetting and conspiracy.[7]

### D.       The Jury Instructions

Following UNCLOS, the Court's instructions for Count One defined piracy under § 1651 to include acts of violence, detention, or depredation.  Dkt. 388 at 34.  The Court further instructed that piracy "is a continuing offense that is not completed until the offenders cease to use illegal acts of violence or detention or depredation against the pirated ship."  *Id.* at 35. Noting that "[t]he parties have stipulated to the fact that…the M/V *CEC Future* was attacked and seized in violation of Section 1651," the Court instructed the jury that the government need only prove "that at some point between November 7, 2008 until or about January 16, 2009,…. Ali knowingly and intentionally aided and abetted the principal offenders in and during their continued use of illegal acts of violence or *detention* against the *M/V CEC Future* and its crew." at 36-37 (emphasis added).  This required a jury finding that Ali "knowingly associated himself

---

hostages"); *id*. at 40-41 (government argument referring to Ali's participation "in this piracy, in this hostage-taking"); 11/20/13 Tr. at 59-60 (government argument stating that "they want you to believe, based on his conduct in that case, [he] didn't have the intent to aid and abet piracy and hostage taking in the *CEC Future*."); 11/19/13 Tr. at 43 (defense argument stating that "both of those crimes require as an element detention of human beings, seizure of human beings. So what they had to prove is that Mr. Ali wanted and wished to bring about by his actions the continued holding of these people….").

[7] *See, e.g.*, 11/19/13 Tr. at 40-41 (Gov't Closing: "And you know that this man…*aided and abetted*, not with a gun, with his mind and with his mouth, in this piracy, in this hostage-taking. He *agreed* to do that… simply to make money.  It is time for you to…find him guilty as charged, *aiding and abetting* piracy. *Conspiracy* to commit hostage-taking and *aiding and abetting* hostage-taking.") (emphasis added); *id.* at 36-39 (government closing outlining elements of all three counts and arguing that Ali is guilty "because he wanted to get money" and "had the intent to help them"). 11/20/13 Tr. at 36 (Def. Closing: "What are they trying to convince you beyond a reasonable doubt?  That somebody who is…right before and right after talking to American law enforcement officials about his personal role as a negotiator…was really a *conspirator* despite doing that.") (emphasis added); 11/4/13 Tr. at 24 (Def. Opening:  "That's not the actions of a pirate *conspirator*, of a *hostage taker*.") (emphasis added).

with the commission of the crime [of violence or detention], that he participated in the crime as something he wished to bring about, and that he intended by his actions to make it succeed." *Id.* at 46.

For the conspiracy count, the Court instructed the jury that the government must prove: (1) that "between November 7, 2008 until or about January 27, 2009, an agreement existed between two or more people to commit the crime of hostage taking, that is, to *seize* and *detain*, and threaten to kill, to injure, and *to continue to detain* the crew of the M/V *CEC Future*, in order compel…Clipper…to pay a ransom, as an explicit condition for the release of the M/V *CEC Future*, its crew, and its cargo"; and (2) that Ali "underst[ood] the unlawful nature of the plan and voluntarily and intentionally join[ed] in it with the intent to advance or further the unlawful object of the conspiracy." *Id.* at 41-42 (emphasis added).  After the jury inquired into the meaning of "object of the conspiracy," Dkt. 380, Judge Friedman instructed the jury that the government must prove that Ali acted with the intent to advance or further "the crime of hostage taking" with all of its elements, which includes the continued detention of the *CEC Future* crew until a ransom was paid.

For Count Three, the Court's instructions recited the charge in the indictment that Ali "did knowingly, willfully, and intentionally aid, abet, counsel, command, and induce others to *seize* and *detain* and threaten to kill, to injure, and to *continue to detain* the crew of the M/V *CEC Future*, in order to compel Clipper Group to do an act, that is to pay a ransom, as an explicit condition for the release of the M/V *CEC Future*, its crew, and cargo."  Dkt. 388 at 44 (emphasis added).  Applying the general aiding and abetting instruction, the Court informed the jury that the government must prove that Ali "participated in the crime [of hostage taking] as

something he wished to bring about," *id.* at 46, i.e., that he wished to bring about the continued detention of the crew of the *CEC Future*.

The defense requested and received a theory of the defense instruction. The instruction acknowledged that Ali "boarded the *CEC Future* and served as a translator and negotiator between the Somali pirates, the ship's crew, and the ship's owner," and that Ali "helped the ship's owner, Clipper, and the pirates negotiate a ransom for the release of the ship and her crew." *Id.* at 48. The instruction asserted the defense's theory of innocence, namely, that notwithstanding these acts, "Mr. Ali wanted the crew to be free," *id.*, and thus did not agree with or wish to bring about the continued detention of the *CEC Future*'s crew.

### E.     The Verdict

On November 26, 2013, the jury returned a verdict of not guilty on Count One of the Second Superseding Indictment, and this Court entered a judgment of acquittal. Accordingly, the jury necessarily found that Ali did not aid and abet the detention of the *CEC Future*'s crew at any "point between November 7, 2008 until or about January 16, 2009." *Id.* at 36. On December 12, the Court declared a mistrial on the remaining counts after the jury was unable to reach a verdict.

### LEGAL STANDARDS

The Double Jeopardy Clause "protects a man who has been acquitted from having to 'run the gantlet' a second time." *Ashe v. Swenson*, 397 U.S. 436, 446 (1970) (quoting *Green v. United States*, 355 U.S. 184, 190 (1957)). In addition to prohibiting successive trials for the same offense, the Clause also "precludes the Government from relitigating any issue that was necessarily decided by a jury's acquittal in a prior trial." *Yeager v. United States*, 557 U.S. 110, 119 (2009) (citing *Ashe*, 397 U.S. at 444). Applying *Yeager* and *Ashe*, the D.C. Circuit has identified two questions a court must address when a jury hangs after a partial acquittal: "What

facts were necessarily decided by the jury's acquittal[]…?  And, do those facts make up an essential element of the remaining counts?"  *United States v. Coughlin*, 610 F.3d 89, 97 (D.C. Cir. 2010).  If the court "determine[s] that an issue necessarily decided in [the defendant's] favor on the acquitted counts is an essential element of a hung count, [it] must bar retrial on that count notwithstanding the jury's failure to reach a verdict."  *Id*.

"To decipher what a jury has necessarily decided,…courts should 'examine the record of a prior proceeding, taking into account the pleadings, evidence, charge, and other relevant matter, and conclude whether a rational jury could have grounded its verdict upon an issue other than that which the defendant seeks to foreclose from consideration.'"  *Yeager*, 557 U.S. 119-20 (quoting *Ashe*, 397 U.S. at 444).  This inquiry "must be set in a practical frame and viewed with an eye to all the circumstances of the proceedings."  *Ashe*, 397 U.S. at 444.  Courts should approach this task with "realism and rationality," eschewing "the hypertechnical and archaic approach of a 19th century pleading book."  *Id.*

In conducting this inquiry, courts may look only to the acquitted counts. A hung count is a "nonevent" that "cannot—by negative implication—yield a piece of information that helps put together the trial puzzle."  *Yeager*, 557 U.S. at 121.   The focus is simply on "what the jury decided," and courts "should not presume 'that the jury may have disbelieved substantial and uncontradicted evidence of the prosecution on a point the defendant did not contest.'"  *Coughlin*, 610 F.3d at 96 (quoting *Ashe*, 397 U.S. at 444).

## ARGUMENT

I.      **The Jury Necessarily Found that Ali Did Not Wish to Bring About the Continued Detention of the *CEC Future*'s Crew**

In its May 2012 pretrial order, the Court noted that "[t]he parties agree that Ali's intent in conducting the negotiations for the pirates aboard the *CEC Future* is expected to be the primary

issue at trial." *Ali*, 870 F. Supp. 2d at 17 (quotations omitted).  The Court was right:  in light of

the undisputed nature of the events surrounding the hijacking of the *CEC Future* and Ali's role

as a translator/negotiator, there is no question that Ali's state of mind with regard to the detention

of the *CEC Future*'s crew was *the* essential issue decided by the jury's verdict.[8]  No other

conclusion is realistic in light of the pleadings, evidence, jury instructions, and circumstances

surrounding the trial.

To begin with, Count One of the Second Superseding Indictment specifically alleged that

Ali and others committed piracy in violation of § 1651 "*by*… using violence against, *seizing*,

*detaining*, robbing, and *holding for ransom* the *M/V CEC Future*."  Dkt. 371 at 2 (emphasis

added).  The Court's instructions then defined piracy to include acts of violence, detention, or

depredation, including any such acts that continued beyond the high seas.  Dkt. 388 at 35.

Finally, the parties stipulated that the seizure of the *CEC Future* violated § 1651, leaving the

issue of aiding and abetting as the only question for Count One.  Accordingly, to acquit Ali of

Count One, the jury was required to find that Ali did not aid and abet *any* acts of violence *or*

detention at *any* "point between November 7, 2008 until or about January 16, 2009."  *Id.* at 36.

This required a finding that *for this entire period*, the government could not prove that Ali (1)

"knowingly associated himself with the commission of the crime" of detention; (2) "participated

in the crime [of detention] as something he wished to bring about"; and (3) "intended by his

actions to make [the crime of detention] succeed."  *Id.* at 46.

Based on the evidence at trial, it could not have been Ali's *conduct* that the jury found

lacking, however.  It was undisputed that Ali boarded the *CEC Future*, conducted the

---

[8] Unlike in May 2012, by the time trial actually started, the only other potential issue of
significance—whether Ali aided and abetted any acts "on the high seas"—was no longer in play.

negotiations, and facilitated an agreement that resulted in pirates receiving a $1.7 million

ransom. *See* note 1, *supra*. If Ali did these acts with the specific intent to detain the crew

members until a ransom was paid, his conduct would indisputably meet the instructions'

tripartite standard for aiding and abetting, and no rational jury could have acquitted him. *Accord*

*Coughlin*, 610 F.3d at 99 ("Given the court's instructions and the government's arguments, a

rational jury could not have grounded its verdict on the conclusion that the mailings were not

sent in furtherance of the fraudulent scheme—*if* such a scheme existed at the time of each

mailing.") (internal quotations and citations omitted) (emphasis added); *id.* at 100 ("*[I]f* the jury

believed Coughlin had in mind a scheme to defraud…even a small amount of money on the date

of the letter referenced in Count Two, it could not have doubted that the letter…was mailed for

the purpose of advancing that scheme."). As in *Coughlin*, the jury's finding that Ali did not aid

and abet the detention of the *CEC Future*'s crew—despite the centrality of his conduct—is

intelligible *only* as a rejection of the government's theory that Ali had the specific intent to hold

the crew of the *CEC Future* in detention.

The parties' arguments strongly support this conclusion. As noted above, the defense

indefatigably presented intent—specifically, the intent to detain human beings for ransom—as

the singular issue for the jury to decide. *See* note 3-4, *supra*, and accompanying text. Indeed,

Ali offered no other defense. Likewise, the government began and ended by arguing that Ali

was guilty because he had "the same state of mind" as the pirates, 11/19/13 Tr. at 2, namely, to

profit from the "captivity" of "human beings," *id.* at 32. By rejecting the government's argument

that Ali became "guilty of aiding and abetting piracy and hostage taking" the moment he

"demand[ed] $7 million for the release of human beings," 11/20/13 Tr. at 61, the jury necessarily

concluded that Ali did not "wish to bring about" the detention that prevented their release—and

that he never did at any point during the 71 days that the 13 human beings on the *CEC Future*

were detained.  *Accord Coughlin*, 610 F.3d at 100 ("[I]n rendering a verdict on the acquitted

counts, the jury necessarily decided that Coughlin lacked fraudulent intent during the entire

period encompassed by the charged mailings—including those mailings cited in the hung counts.

And because fraudulent intent is an essential element of those counts, the Double Jeopardy

Clause bars their retrial.").

## II.    Specific Intent to Detain is an Essential Element of Counts Two and Three

### A.    Hostage Taking Requires an Intent to Detain Hostages

By definition, hostage *taking* requires the seizure and detention of human beings as

hostages.  § 1203.  This is reflected in the text of Counts Two and Three, which allege that "the

defendant…and others…did conspire and agree with one another, to *seize*, *detain* and threaten to

kill, to injure, and to *continue to detain* the crew of the *M/V CEC Future*" (Count Two), and that

"the defendant…and others…did …*seize* and *detain* and threaten to kill, to injure, and to

*continue to detain* the crew of the *M/V CEC Future*" (Count Three).  Dkt. 371 at 5 (emphasis

added).  Thus, Ali could not have conspired to commit hostage taking, nor aided and abetted

hostage taking, without consciously desiring that hostages be *taken* and *held* until a ransom is

obtained.  *See Ali*, 870 F. Supp. 2d at 19 (describing requirement of "purposeful intent" toward

detention for conspiracy and "purposeful attitude" for aiding and abetting).[9]

Since detention is an essential element of hostage taking, and the jury necessarily found

that Ali did not intend to facilitate the crew's detention at *any point* prior to their release, it

_____

[9] To be clear, Ali need not have been involved prior to the hostages being seized, but his intent at the time of his involvement must be consistent with that of someone who wanted the hostages to have been taken, i.e., he must desire that the hostages "continue to [be] detain[ed]." § 1203.

follows that the government cannot try for a second time to convict Ali of hostage taking under the Double Jeopardy Clause.  Indeed, in light of the Court's ruling that an act of high seas detention remains a piracy for the duration of the crime, it follows that violations of § 1203 are *necessarily* violations of § 1651 whenever, as here, the detention begins on the high seas.[10]  The only difference is that § 1203 requires an additional element:  that the detention be accompanied by threats intended to compel a third party to act.  But adding *more* requirements to a detention-dependent count obviously cannot save it from dismissal when a defendant has been acquitted of aiding and abetting acts of detention *at all*.  This is especially true where, as here, the indictment alleges that the piracy itself—just like a hostage taking—was undertaken *"for ransom."*  Dkt. 371 at 2.[11]  Since, per the Court's instructions, a hostage taking that occurs on the high seas qualifies as a piracy throughout its duration, an acquittal on the broader crime of piracy necessarily includes the finding that the government failed to prove a violation of the specific kind of detention prohibited by § 1203 (or any other crime that requires detention as an element). *See supra* at 4-8 (reciting the parties' arguments during trial, which drew no substantive distinction between piracy and hostage taking).

> **B.     In Light of the Undisputed Nature of Ali's Conduct, the Jury's Finding Applies Equally to Conspiracy and Aiding and Abetting**

---

[10] The only substantive distinction between Counts One and Three was that Count One alleged actions on the high seas; but that distinction was rendered immaterial by the Court's ruling that piracy is a continuing offense and the parties' stipulation that a piracy had occurred.  The defense argued that treating piracy as a "continuing offense" beyond the high seas would "blur the[] distinct crimes" of piracy and hostage taking.  Dkt. 325, at 1.  In its response, the government did not dispute that this blurring would occur.  Dkt 331.  To the contrary, the government described the crime of piracy as if it *were* a hostage taking conspiracy.  *Id.*; *see also* Dkt. 333 at 10-11.

[11] *See also* Dkt. 342 (the Court holding that "much like kidnappers, pirates' 'ultimate illegal objective' is the use of 'illegal acts of violence or detention, or . . . depredation . . . for private ends'") (quoting *United States v. McGoff*, 831 F.2d 1071, 1078 (D.C. Cir. 1987) and UNCLOS art. 101(a));11/19/13 Tr. at 4 (government closing stating that "the whole purpose of [the piracy] is to make money, to *capture* the ship, *hold* the crew *hostage* and make the *ransom* demand.");

Importantly, the undisputed nature of Ali's conduct, and the centrality of that conduct to the successful resolution of the hostage taking from the pirates' perspective, means that the jury's verdict could not have been grounded on any element required for aiding and abetting but not conspiracy.  As the above excerpts from the Second Superseding Indictment reflect, all three counts covered the same attack, seizure, and detention for ransom, and were pleaded in virtually identical terms.  Although Count Two technically did not allege any conduct *per se*, the conduct underlying Counts One and Three was essentially undisputed, and Count Two alleged a conspiracy to commit that exact conduct.  Thus, for all three counts, only one essential element remained to be challenged at trial:  Ali's desire (or lack thereof) to bring about the detention of the crew.

This fact precludes retrial on Count Two based on any "hypertechnical" distinction in "pleading book[s]" between the conspiracy and aiding and abetting.  *Ashe*, 397 U.S. at 444. Although it is *logically* possible to agree to commit a crime without participating in it—and thus to be guilty of conspiracy but not aiding and abetting—the undisputed fact of Ali's participation forecloses that distinction as a rational basis for the jury's acquittal.  Instead, the only realistic and rational interpretation of the acquittal is that the jury found that Ali did not wish to bring about or continue the crew's detention—a mental state that is logically incompatible with any agreement to commit hostage taking.[12]  Accordingly, any theoretical distinction between conspiracy and aiding and abetting cannot save Count Two from the jury's factual finding.

---

[12] Although the intent requirements for conspiracy and aiding and abetting are expressed in different terms ("wish to bring about" vs. "agree"), both require a "purposeful attitude" toward the commission of the crime.  *Ali*, 870 F. Supp. 2d at 19.  In any event, any difference between these standards counts *against* the government, since aiding and abetting liability is broader than conspiracy and does not require a further showing of agreement.  *See Pereira v. United States*, 347 U.S. 1, 11 (1954) ("Aiding, abetting, and counseling are not terms which presuppose the

This conclusion is supported by the holding in the analogous case of *United States v. Ohayon*, 483 F.3d 1281 (11th Cir. 2007).  In *Ohayon*, the defendant took a bag of drugs from a hotel room occupied by a confidential informant and placed the bag in the trunk of a car.  He was arrested and charged with conspiracy and attempt to possess with intent to distribute in violation of 21 U.S.C. §§ 841(a)(1) and 846.  Ohayon's "only defense" was that he was unaware of the contents of the bags.  483 F.3d at 1282.  A jury acquitted him of the attempt count but hung on the conspiracy count.  The government sought to retry Ohayon for conspiracy, and the defendant moved for dismissal.  Citing the jury instructions and the fact that Ohayon relied on "one defense," *id*. at 1285, the district court concluded that the government failed to prove that Ohayon was aware that there were drugs in the bags.  Since it would be logically inconsistent to conclude that Ohayon conspired to possess the very drugs he did not know about, the court dismissed the indictment as barred by collateral estoppel.  *Id*. at 1285.

On appeal, the government asserted categorically that an acquittal for a substantive offense does not bar a second trial for the separate crime of conspiracy to commit that offense.  The Eleventh Circuit rejected the government's formalistic approach, however.  Following *Ashe*, 397 U.S. at 444, the court made a "careful and thorough review of the record," 483 F.3d at 1287, to determine what the jury was realistically asked by the parties' arguments to decide:

> The *lone dispute* at trial was whether Ohayon was aware of the contents of the bags….Ohayon *never disputed* that he placed one of the duffle bags in his car and returned to the hotel room to obtain the other two; his *sole defense* was that he believed the bags contained the personal effects of a man he met in Canada. Ohayon asserted in his opening statement and closing argument that he was in

_____

existence of an agreement.  Those terms have a *broader application*, making the defendant a principal when he consciously shares in a criminal act, regardless of the existence of a conspiracy.") (emphasis added); *see also United States v. Tyler*, 758 F.2d 66, 70-71 (2d Cir. 1985) (finding evidence "*insufficient* with respect to the conspiracy count but *sufficient* with respect to the aiding and abetting count," because "a defendant may wittingly aid a criminal act and be liable as an aider and abettor…but not be liable for conspiracy") (emphasis added).

17

Canada and the United States for legitimate purposes….Ohayon did not attempt to
conceal his identity…and the activities of Ohayon…leading up to [his] arrest
were entirely consistent with the actions of innocent men.

In its case against Ohayon, the government likewise focused on the issue of
Ohayon's knowledge.  The government emphasized in its closing argument that
Ohayon "knew exactly what was going on" and was "aware there are people up
there in Canada from whom he is getting that ecstasy."  The government did not
present its case to the jury as turning on *any issue* other than Ohayon's
knowledge….

In the words of *Ashe,* "[t]he single rationally conceivable issue in dispute before
the jury was whether" Ohayon knew the bags contained drugs.  397 U.S. at 445.
The record yields no other conclusion than that a rational jury that acquitted
Ohayon of attempt did so because it found reasonable doubt that Ohayon was
aware of the contents of the bags.  *There was no other factual issue.*

483 F.3d at 1287 (emphasis added).  Finding that the record realistically presented "no other

factual issue" upon which to ground the acquittal, the Eleventh Circuit affirmed the dismissal of

the conspiracy count.  *Id.*

    *Ohayon* strongly parallels the situation in this case.  Like Ohayon, Ali "never disputed"

that he boarded the *CEC Future* and made the phone calls presented by the government; like

Ohayon, Ali's "sole defense" was his lack of criminal intent; like Ohayon, Ali "asserted in his

opening statement and closing argument that he was [on the *CEC Future*] for legitimate

purposes"; as in *Ohayon*, "the government likewise focused on the issue of" Ali's state of mind;

as in *Ohayon*, "the government emphasized in its closing argument" that Ali had the requisite

intent; and, as in *Ohayon*, the jury acquitted Ali of an inchoate crime.  Just as the jury's finding

that Ohayon did not know about the drugs was incompatible with an agreement to possess them,

the jury's finding that Ali did not "wish to bring about" the detention of the *CEC Future* is

incompatible with the claim that he conspired with others to do just that.

    A similar situation—albeit in reverse—was addressed by the Supreme Court in *Sealfon v.*

*United States*, 332 U.S. 575 (1948).  In *Sealfon*, the indictment alleged that Sealfon had

conspired with his co-defendant, Greenberg, to defraud the United States.  The evidence of

Selfon's participation in the alleged conspiracy consisted solely of a letter Sealfon wrote to a

government agency containing some false representations, however.  *Id*. at 567–77.  When the

jury acquitted Selfon of conspiracy, the government sought to retry him for the substantive

offense under an aiding and abetting theory.  The Court acknowledged that "[i]t has long been

recognized that the commission of the substantive offense and a conspiracy to commit it are

separate and distinct offenses," and that "[t]hus, with some exceptions, one may be prosecuted

for both crimes."  *Id*. at 578.  However, the Supreme Court held that on the facts of the case,

retrial was barred:

> [T]he earlier verdict precludes a later conviction of the substantive offense. The
> basic facts in each trial were identical.  As we read the records of the two trials,
> petitioner could be convicted of either offense only on proof that he wrote the
> letter pursuant to an agreement with Greenberg.  Under the evidence introduced,
> petitioner could have aided and abetted Greenberg in no other way.  Indeed,
> respondent does not urge that he could.  Thus the core of the prosecutor's case
> was in each case the same: the letter, and the circumstances surrounding it and to
> be inferred from it, and the false invoices….[Retrial] was a second attempt to
> prove the agreement which at each trial was crucial to the prosecution's case and
> which was necessarily adjudicated in the former trial to be non-existent.

332 U.S. at 580.

As with *Ohayon*, *Selfon*'s reasoning is applicable here.  Were the government to retry Ali

on Count Two, it would present the same "basic facts" concerning his involvement in the

negotiations of the *CEC Future* and his alleged financial motive in an attempt to show that Ali

agreed with a conspiracy to seize and detain crewmembers for ransom.  But such a trial would

represent nothing more than "a second attempt to prove [Ali's intent to detain] which…was

crucial to the prosecution's case and which was necessarily adjudicated in the former trial to be

non-existent."  *Id*.  On these facts, that is something "the prosecution may not do."  *Id*.

A third case illustrates in sharp relief why Counts Two and Three are equally barred by the jury's verdict: *United States v. Wittig*, 575 F.3d 1085 (10th Cir. 2009). In *Wittig*, the defendants were retried on conspiracy charges after their convictions on substantive counts were reversed for insufficienct evidence. Citing *Ohayon* and *Sealfon*, the defendants challenged their subsequent conspiracy convictions on double jeopardy grounds. In rejecting their claim, the Tenth Circuit addressed whether and when an acquittal on a substantive count precludes retrial for conspiracy to commit the same offense:

> The principal authorities on which the defendants rely—*Sealfon v. United States*, 332 U.S. 575 (1948), and *United States v. Ohayon*, 483 F.3d 1281 (11th Cir. 2007)—are distinguishable precisely because *the conspiracy alleged in those cases did not cover conduct beyond that alleged in the underlying substantive counts.* While recognizing that a conspiracy count is separate from the underlying substantive offense (so the mere fact of acquittal on one charge does not automatically bar prosecution for the other), these cases noted that, on their peculiar facts, the alleged conspiracy did no more than *track the substantive underlying fraud*, such that any effort to prove one offense would, as a practical matter, implicate an issue needed to prove the other....
>
> The point of these cases is that, when the only way the government can prove one of the elements of a conspiracy offense is to prove *the same facts* decided against it in a prior trial on a substantive offense, collateral estoppel bars the attempt. That circumstance doesn't pertain here. The conspiracy count in this case, unlike the conspiracy counts alleged in *Sealfon* and *Ohayon*, covers a great deal of conduct *not captured* by the substantive wire fraud counts. To convict the defendants of the conspiracy to commit wire fraud alleged in this indictment, the government would *never have to make mention* to the jury of any of the matters (airplanes or the Securities and Exchange Commission) that resulted in the defendants' acquittal on the substantive wire fraud counts after their earlier trial.

*United States v. Wittig*, 575 F.3d 1085, 1100 (10th Cir. 2009).

Applying *Wittig*'s analysis, this case falls squarely on the side of *Ohayon* and *Sealfon*. Far from "covering conduct beyond the underlying substantive counts," *id.*, the conspiracy alleged in Count Two is simply a repetition of the *same* statute to the *same* conduct under a different theory of liability—in other words, it "does no more than track the substantive underlying [offense]," *id*. And far from "never hav[ing] to make mention to the jury of any of

the matters" alleged in Counts One and Two, *id.*, the government here would have "to prove the same facts" decided in the first trial, *id.*  Given the single set of undisputed events in this case, and Ali's sole defense that he lacked the requisite intent to seize and detain the crew, there is no practical difference between Counts Two and Three, and "any effort to prove one offense would, as a practical matter, implicate an issue needed to prove the other."  *Id.*

## **CONCLUSION**

For the foregoing reasons, Ali respectfully requests that Counts Two and Three of the Second Superseding Indictment be dismissed with prejudice.


January 6, 2014                                          Respectfully submitted,


                                                        /s/_____
                                                        Matthew J. Peed (D.C. Bar no. 503328)
                                                        Timothy R. Clinton (D.C. Bar no. 497901)
                                                        CLINTON BROOK & PEED
                                                        1455 Pennsylvania Ave. N.W., Suite 400
                                                        Washington, DC 20004
                                                        (202) 618-1628 (tel)
                                                        (202) 204-6320 (fax)

                                                        Brian C. Brook (admitted pro hac vice)
                                                        CLINTON BROOK & PEED
                                                        347 Fifth Ave., Suite 1402
                                                        New York, NY 10016
                                                        (646) 205-8213 (tel)
                                                        (646) 257-2887 (fax)

## CERTIFICATE OF SERVICE

I, Matthew J. Peed, hereby certify that on this date I caused a true and correct copy of the above document, Defendant's Motion to Dismiss Counts Two and Three on Double Jeopardy Grounds, to be served upon the attorneys for the United States as follows:

**BY E-MAIL & ECF (by consent):**
**Brenda J. Johnson**
Email: brenda.johnson@usdoj.gov
**Fernando Campoamor-Sanchez**
Email: fernando.campoamor-sanchez@usdoj.gov
**Julieanne Himelstein**
Email: julieanne.himelstein@usdoj.gov
U.S. ATTORNEY'S OFFICE
Judiciary Center Building
555 Fourth Street, NW
Room 11-450
Washington, DC 20530
(202) 252-7961
Fax: (202) 307-6059

Dated: January 6, 2014

/s/ Matthew J. Peed
Matthew J. Peed